**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

**SECURITIES AND EXCHANGE COMMISSION,**

**Plaintiff,**

-against-

**GIBRALTAR GLOBAL SECURITIES, INC.,**
and **WARREN A. DAVIS,**

**Defendants.**

13 CV 2575 (GBD) (JCF)

---

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION**
**TO DEFENDANTS' MOTION TO DISMISS**

James Kidney (JK 4830)
Robert Giallombardo
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
100 F Street NE
Washington D.C. 20549
(202) 551-4441
(202) 772-9282 (Fax)
kidneyj@sec.gov

# TABLE OF CONTENTS

Table of Authorities ...................................................................................................... iii

Preliminary Statement .................................................................................................... 1

Summary of Allegations of the Complaint ...................................................................... 3

    A.  Gibraltar Solicited U.S. Customers without Registering with the SEC ......................... 3

    B.  Gibraltar Participated in Distribution of Unregistered Securities................................... 4

Argument ..................................................................................................................... 5

I.  The Complaint Adequately Alleges that Gibraltar Violated Section 15(a) of the
    Exchange Act .......................................................................................................... 5

    A.  Gibraltar Acted as a "Broker" within the Meaning of Section 3(a)(4) of the Exchange ..
        Act ................................................................................................................... 6

    B.  SEC Rule 15a-6(a)'s Exemption For Unsolicited Transactions is Inapplicable Because
        Gibraltar Solicited U.S. Customers ................................................................... 7

        1. The Commission's Adoption of Rule 15a-6(a) ........................................ 7

        2. The Commission's 1998 Pronouncement Concerning Foreign Broker-Dealer's
           Website Solicitation and Its Effect on Rule 15(a)(6)(a)'s Unsolicited
           Exemption ............................................................................................. 9

        3. As Alleged in the Complaint, Gibraltar's Customers Placed Sell Orders Through Its
           Website, and Were Thereby Solicited ................................................... 10

    C.  The Complaint Raises a Strong Inference that Gibraltar's Website Solicited U.S.
        Customers ...................................................................................................... 10

II.  The Complaint Adequately Alleges That Davis is Gibraltar's Control Person ...................... 12

III.  The Complaint Adequately Alleges That Gibraltar and Davis Violated Section 5 of the
     Securities Act ........................................................................................................ 13

    A.  The Complaint alleges Prima Facie Violations of the Securities Act………..…......... 13

        1. Gibraltar Directly Offered and Sold Magnum d'Or Shares………………………..14

2. Defendants' Contention that to Participate in the "Scheme" Davis and Gibraltar
Had to Be Aware of It Misconstrues the Law............................................16

3. Gibraltar Used Jurisdictional Means in the United States .....................................18

4. No Registration Statement Was in Effect ..............................................................18

B. The Broker's Exemption under Section 4(a)(4) is Plainly Inapplicable Because
Gibraltar Acted as an Underwriter.........................................................…….…....18

III. Consolidation is not Appropriate and Will Delay Resolution .................................20

CONCLUSION.....................................................................................................................21

# TABLE OF AUTHORITIES

**Cases**

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)..................................................................................1, 11

*Black v. Coughlin*,
    76 F.3d 72 (2d Cir. 1996) ...................................................................................7

*Brent W. Berry*,
    65 SEC Docket 3017 (Dec. 3, 1997)................................................................17

*Timothy J. Brannon*,
    67 SEC Docket 0249 (May 4, 1998)................................................................17

*Matter of Bunker Securities*,
    1987 WL 756767 (Sept. 30, 1987)...................................................................19

*In re Chambers Development Securities Litigation*
    848 F. Supp. 602 (W.D. Pa. 1994)..................................................................13

*Cohen v. S.A.C. Trading Corp.*
    711 F.3d 353 (2d Cir. 2013)........................................................................1, 11

*Eur. & Overseas Commodity Traders, S.A. v. Banque Paribas London*,
    147 F.3d 118 (2d Cir. 1998)............................................................................13

*Gilligan Will & Co. v. SEC*,
    267 F.2d 461 (2d Cir. 1959)............................................................................14

*Higelman v. National Insurance Co.*,
    547 F.2d 298 (5th Cir. 1977) ..........................................................................13

Johnson v. Celotex Corp.,
    899 F.2d 181 (2d Cir. 1996)............................................................................21

*Matter of L.A. Frances, Ltd.*,
    44 S.E.C. 588 (June 22, 1971) ........................................................................20

*New Jersey Carpenters Health v. Royal Bank of Scotland Group. PLC*,
    709 F.3d 109 (2d Cir. 2013)........................................................................1, 11

*North America Research and Development Corp.*,
    424 F.2d 63 (2d Cir. 1970)..............................................................................17

*Oneida Nation of New York v. Paterson*,
    2010 WL 4053080 (N.D.N.Y Oct. 14, 2010) ............................................................21

*Reach Music Publishing, Inc. v. Warner/Chappell Music, Inc.*,
    2009 WL 3496115 (S.D.N.Y. Oct. 23, 2009) ...........................................................7

*James Ray Ross*,
    67 SEC, Docket 1260 (June 26, 1998) .....................................................................17

*Steven M. Scarano*,
    67 SEC, Docket 2794 (Sept. 9, 1998) ......................................................................17

*SEC v. Boock*,
    2011 WL 3792819 (DLC) (S.D.N.Y. Aug. 25, 2011) ............................................5, 15

*SEC v. Buntrock*,
    2004 WL 1179423 (N.D. Ill. May 25, 2004) ...........................................................12

*SEC v. Calvo*,
    378 F.3d 1211 (11th Cir. 2004) ...............................................................................13

*SEC v. Cavanaugh*,
    155 F.3d 129 (2d Cir.1998)......................................................................................17

*SEC v. Cavanagh*,
    445 F.3d 105 (2d Cir. 2006) ....................................................................................13

*SEC v. Chinese Consolidated Benevolent Association, Inc.*,
    120 F.2d 738 (2d Cir.1941).......................................................................................14

*SEC v. Culpepper*,
    270 F.2d 241 (2d Cir. 1959)......................................................................................19

*SEC v. Devon*,
    977 F. Supp. 510 (D.Me. Aug. 27, 1997) .................................................................6

*SEC v. Elliot*,
    2011 WL 3586454 (S.D.N.Y., Aug. 11, 2011)........................................................16

*SEC v. First Jersey Securities, Inc.*,
    101 F.3d 1450 (2d Cir.1996).....................................................................................12

*SEC v. Friendly Power Co. LLC*,
    49 F. Supp. 2d 1363 (S.D. Fla. 1999) ......................................................................16

iv

*SEC v. Greenstone Holdings, Inc.*,
     No. 10 Civ. 1302 (MGC), 2013 WL 3481551 (S.D.N.Y., July 10, 2013).........5, 15, 17

*SEC v. Hansen*,
     1984 WL 2413 (S.D.N.Y. Apr. 6, 1984).......................................................................6

*SEC v. Carillo Huettel*,
     1:13-cv-01735 (GBD) (Mar. 15, 2013).................................................................2, 20

*SEC v. Kenton Capital, Ltd.*,
     69 F. Supp. 2d 1 (D.D.C. 1998) ...............................................................................6

*SEC v Margolin*,
     1992 WL 279735 (S.D.N.Y. Sept. 30, 1992)..........................................................6

*SEC v. Martino*,
     255 F. Supp. 2d 268 (S.D.N.Y. 2003).................................................................5, 6

*SEC v. National Executive Planners, Ltd.*,
     503 F. Supp. 1066 (M.D.N.C. 1980) ...................................................................5, 6

*SEC v. Ralston Purina Co.*,
     346 U.S. 119 (1953)...............................................................................................14

*SEC v. Rosen*,
     No. 01-0369-CIV, 2002 WL 34421029 (S.D. Fla. Feb. 22, 2002) ............................17

*SEC v. Universal Express, Inc.*,
     475 F. Supp. 2d 412 (S.D.N.Y. 2007), *aff'd, SEC v. Altomare*, 300 Fed. Appx.
     70.....................................................................................................................15, 17

*SEC v. Verdiramo*,
     890 F. Supp. 2d 257 (S.D.N.Y. 2011)....................................................................15

*SEC v. Sky Scientific*,
     SEC Rel. No. 137, 1999 WL 114405 (1999)............................................................17

*Spectrum Info. Techs.*,
     64 SEC Docket 2103...............................................................................................17

*Swenson v. Engelstad*,
     626 F.2d 421 (5th Cir. 1980) .................................................................................16

*Matter of Wonsover*,
     54 S.E.C. 1 (Mar. 1, 1999)......................................................................................20

*Wonsover v. SEC*,
 205 F.3d 408 (D.C. Cir. 2000) ...................................................................20

*Zacharias v. SEC*,
 569 F.3d 458 (D.C. Cir.2009) ...................................................................16

## Statutes and Rules

Fed. R. Civ. P.

Rule 12(b)(6)................................................................................................1

Rule 42 ......................................................................................................20

15 U.S.C. § 77d(a)(1)..........................................................................................18

15 U.S.C. § 78c(a)(4)............................................................................................6

## Other Authorities

Distribution by Broker-Dealers of Unregistered Securities, Exchange Act Release
 No. 6721 (Feb. 2, 1962) ...........................................................................19

General Instruction A.1 (a) to Form S-8 .........................................................17

Registration Requirements for Foreign Broker-Dealers, Release No. 34-27017, 54
 Fed. Reg., 30013 (July 18, 1989)...........................................................7, 8

Statement of the Commission Regarding the Use of Internet Websites to Offer
 Securities Transactions or Advertise Investments Services Offshore, SEC
 Release No. 1125 (March 23, 1998); 1998 WL 128173...........................8, 9

Wright & Miller, *Federal Practice & Procedure, Civil 3d*, §1356, §1357 ........................1

Plaintiff Securities and Exchange Commission ("Commission") respectfully submits this memorandum of law in opposition to Defendants' Gibraltar Global Securities, Inc. ("Gibraltar"), and Warren A. Davis ("Davis") (collectively, the "Defendants")  motion to dismiss the Complaint ("Complaint") pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

## PRELIMINARY STATEMENT

Defendants' motion to dismiss ignores universally accepted basic standards for such motions and instead argues their self-serving interpretation of the factual allegations without benefit of any evidence and, quite often, in an internally inconsistent fashion.  A motion under Rule 12(b)(6) of the Federal Rules of Civil Procedure "is to test the formal sufficiency of the statement of the claim for relief; the motion is not a procedure for resolving a contest between the parties about the facts or the substantive merits of the Plaintiff's case."  Wright & Miller, *Federal Practice & Procedure, Civil 3d*, §1356.  As such, the court must construe the allegations of a complaint in the light most favorable to the Plaintiff, must take the allegations as true, and must draw all reasonable inferences in the Plaintiff's favor.  Id., §1357, accompanied by 38 pages of notes to supporting authorities upholding these standard propositions.  The existence of competing inferences does not prevent allegations from being reasonable unless a competing inference rises to the level of an obvious alternative explanation. *New Jersey Carpenters Health v. Royal Bank of Scotland Grp., PLC* 709 F.3d 109, 121 (2d Cir.2013).  Plaintiffs are only required to plead facts supporting a plausible inference and are not required to plead facts showing that there is no other conceivable alternative explanation. *Cohen v. S.A.C. Trading Corp.*711 F.3d 353 (2d Cir. 2013).  "A claim has facial plausibility when the Plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 662 (2009).

Defendants' motion violates every one of these principles.  They contest whether "offshore" means offshore from the United States, while also arguing that "mainland" may include Canada but not the U.S. because the Bahamas is a member of the British Commonwealth – a *non sequitur*, surely, but not an obvious alternative inference. (Opp. Mem. 8-9).  No actual proof in support of such an argument is offered and, in any event, a motion to dismiss is not a vehicle for offering proof.  It is sufficient that the SEC's suggestion that "mainland" would include the United States is a reasonable inference to be drawn. (If the defendants meant only Canada, why not say so on the website?).

Not only is the Defendants' raw speculation contrary to a reasonable understanding of the language of the Gibraltar website, but it ignores other facts alleged in the complaint, including that Gibraltar routinely accepted deposits of microcap stock from U.S. promoters and brokers, arranged for the transfer agent to re-title the stock certificates in Gibraltar's name, and deposited the shares into various accounts Gibraltar maintained at broker-dealers in the United States. (Cplt. ¶2). As the complaint effectively alleges, a substantial part of Gibraltar's brokerage operation and website were directed to U.S. (and Canadian) customers.  The remainder of the defense motion is similarly only argumentative and ignores the standards for assessing the sufficiency of a complaint attacked by a motion to dismiss.

Nor is this case fit for consolidation with the related case filed with this Court, *SEC v. Carillo Huettel*, et al., 1:13-cv-01735 (GBD) (Mar. 15, 2013).  The allegations herein are limited to Defendants Davis and Gibraltar and are both non-scienter offenses. The broker-dealer registration violation is not relevant to the *Carillo Huettel* complaint because that case involves working with Canadian promoters, not those in the United States.  Further, the alleged sales of unregistered securities involve a completely different security promoted by completely different

persons.  Finally, the SEC anticipates that after it takes the deposition of defendant Davis, the

Section 15 and possibly the Section 5 violations will be resolved by summary judgment,

resulting in a quick resolution of all or part of this case.  Consolidation would result in

unnecessary delay of resolution and involve this litigation in numerous factual issues in

discovery, including scienter, which are irrelevant to this case, as well as confuse a jury with two

factually independent schemes to unlawfully sell unregistered securities.

### SUMMARY OF ALLEGATIONS OF THE COMPLAINT

The Complaint adequately alleges facts demonstrating violations of Section 15(a)(1) of

the Securities Exchange Act of 1934 ("Exchange Act") and Sections 5(a) and 5(c) of the

Securities Act of 1933 ("Securities Act").   Detailed factual allegations identify how Gibraltar

ran an offshore unregistered broker-dealer catering to entities and persons seeking to sell shares

of low-priced thinly traded securities into the United States securities markets.  Gibraltar

accepted deposits of low-priced microcap stocks from its U.S. customers, arranged to have the

shares re-titled in its name, and then sold the shares on behalf of the U.S. customers (Cplt. ¶2),

who placed sell orders through Gibraltar's website (Cplt. ¶ 15). The proceeds, less commissions,

were then directly deposited into the issuer's bank accounts, belying any notion that they were

issued as compensation, as required by the registration exemption under which they were

purportedly issued.

### A.     Gibraltar Solicited U.S. Customers Without Registering with the SEC

The Complaint further alleges that Gibraltar's website solicited U.S. customers.

Gibraltar's website, located at *www.ggsi.bahamas.com* (Cplt. ¶ 15), offered prospective U.S.

customers anonymity, protection from "government seizure and frivolous divorce settlements"

(Cplt. ¶ 16), and International Business Corporations ("IBCs") with nominee officers and

3

directors to conceal the identity of customers (Cplt. ¶ 19).  To further support the allegation that Gibraltar unlawfully solicited in the United States, the Complaint describes factually how Gibraltar enticed prospective customers – in the U.S. and elsewhere – by offering them the added benefit of not having to pay taxes on their profits.  Davis – Gibraltar's sole owner and president – made good on this promise by knowingly submitting false tax withholding forms to United States broker-dealers.  These withholding forms indicated falsely that Gibraltar – a foreign entity generally not subject to U.S. tax withholding – was the owner of the proceeds generated in the accounts at U.S. broker-dealers (Cplt. ¶ 20).  Davis knew that these withholding forms were false because he knew that Gibraltar sold shares (and thus generated proceeds) on behalf of customers, including U.S. customers.

The Complaint also alleges other detailed facts demonstrating that Gibraltar was targeting U.S. customers.   Gibraltar's website was written only in English, referenced only U.S. currency, made no provision for currency exchange, and referenced only United States securities depositories.  As further support of the inference that Gibraltar's website solicited in the United States, the Complaint supplies internet statistics estimating that 20% of Gibraltar's website traffic derived from the United States. (Cplt. ¶¶ 15-18).

The Defendants' contention that the Complaint fails to identify specific solicited U.S. customers rests on the implausible notion that Gibraltar did not successfully solicit *a single* U.S. customer despite selling over $100 million worth of securities for U.S. customers. (Cplt. ¶ 27). The inference that at least some of Gibraltar's U.S. customers were solicited is more plausible than the inference that no U.S. customers were solicited.

### B.     Gibraltar Participated in Distribution of Unregistered Securities

Defendants' contention that the Complaint adequately to allege violations of Section 5(a) of the Exchange Act ignores or misconstrues factual allegations and misapplies the substantive and procedural law.   The Complaint alleges that the promoters of Magnum D'Or stock and their nominees used Gibraltar – a willing participant – as a vehicle to offer and sell securities in the United States even though they were not subject to a registration statement filed with the SEC and were not eligible for any exemption from registration.  (Cplt. ¶¶ 25-29).  Over 11 million shares of Magnum stock were deposited into accounts at Gibraltar, which then deposited the shares in its own name with U.S. brokers, sold the stock, and returned $7.175 million back to Magnum.   Scienter is not an element of a violation of Section 5, *SEC v. Greenstone Holdings, Inc.*, No. 10 civ 1302, 2013 WL 3481551, *2,  (MGC) (S.D.N.Y., July 10, 2013).  But the fact Gibraltar returned the proceeds directly to Magnum (less a commission) is evidence that the securities were not in fact freely tradable but were owned by the issuer and that Gibraltar's participation as the channel through which Magnum realized the proceeds was substantial.  Id., citing, *inter alia, SEC v. Boock*, 2011 WL 3792819, *16, 09-cv-8261 (DLC) (S.D.N.Y. 2011).

## <u>ARGUMENT</u>

### I.     THE COMPLAINT ADEQUATELY ALLEGES THAT GIBRALTAR VIOLATED SECTION 15(A) OF THE EXCHANGE ACT.

Section 15(a)(1) of the Exchange Act requires that any broker or dealer using the mails or any means of interstate commerce to effect or induce purchases or sales of securities must register with the Commission in accordance with Section 15(b).  The Commission is not required to prove scienter for a violation of Section 15(a)(1).  *SEC v. Martino*, 255 F. Supp. 2d 268, 283 (S.D.N.Y. 2003); *SEC v. Nat'l Exec. Planners, Ltd*., 503 F. Supp. 1066, 1073 (M.D.N.C. 1980).

The Complaint adequately alleges that Gibraltar acted as a broker within the meaning of Section 3(a)(4) by: (i) actively soliciting U.S. investors through its website; (ii) executing transactions on behalf of U.S. customers; and (iii) receiving commissions from such transactions.

### A. Gibraltar Acted as a "Broker" within the Meaning of Section 3(a)(4) of the Exchange Act

Section 3(a)(4) of the Exchange Act defines a "broker" as "any person engaged in the business of effecting transactions in securities for the account of others." 15 U.S.C. § 78c(a)(4). The  regularity of participation is the primary indicator of being "engaged in the business." *Martino*, 255 F. Supp. 2d at 283, citing *SEC v. Hansen*, 1984 WL 2413 at *10 (S.D.N.Y. Apr. 6, 1984) and other authorities; *SEC v. Kenton Capital, Ltd.,* 69 F. Supp.2d 1, 12-13 (D.D.C. 1998); *citing SEC v. Margolin*, 1992 WL 279735, (S.D.N.Y. Sept. 30, 1992).  Regularity of participation is demonstrated by, among other things, receiving transaction based compensation, possession of client funds and securities, *Martino*, 255 F. Supp. 2d 283, active solicitation and the dollar amount of securities sold, *Nat'l Exec.Planners, Ltd.*, 503 F.Supp. at 1073 ($4.3 million of securities sold), and the extent to which advertisement and investor solicitation were utilized. *See SEC v. Devon*, 977 F.Supp. 510, 518 (D.Me.1997) (substantial solicitation); *Nat'l Exec. Planners,* 503 F.Supp. at 1073 (investors solicited actively).

In addition to regularity of participation, the statutory definition of broker also requires that the person effect securities transactions on behalf of others.  Among the indicia that a person is effecting transactions on behalf of others are:  (1) active solicitation of investors; (2) receiving transaction-based compensation;(3) facilitating or participating in the execution of transactions; and (4) handling the securities or funds of others in connection with securities transactions. *See, e.g., Hansen*, 1984 WL 2413 at *10

Applying these standards, it is abundantly clear that the complaint adequately alleges that Gibraltar acted as a broker under Section 3(a)(4), and thus violated Section 15(a) by failing to register with the Commission under Section 15(b).  Gibraltar's own website described itself as a broker-dealer offering offshore brokerage services with commissions comparable to those on the mainland. (Cplt. ¶ 15).  As stated, the Complaint also sets forth factual detail describing how Gibraltar actively handled the securities and funds of U.S. customers (Cplt. ¶¶ 21-23, 26), traded for or on behalf of U.S. customers (Cplt. ¶¶ 22, 26-27), earned transaction based compensation of between 2% and 3%. (Cplt. ¶ 23), and solicited United States customers through its website. (Cplt. ¶¶ 1-2, 15-19).  In this regard it is significant to note that Section 15(a) prohibits not just actual inducements, and includes *any* attempt to induce the purchase or sale of a security.

### B.    SEC Rule 15a-6(a)'s Exemption For Unsolicited Transactions is Inapplicable Because Gibraltar Solicited U.S. Customers

Defendants' reliance on Rule 15a-6(a)'s exemption for foreign broker dealers is misplaced because Gibraltar solicited U.S. customers through its website. (Def. Mem. 12).

### 1.    The Commission's Adoption of Rule 15a-6(a)

Defendants' claim to the Rule 15a-6(a) exemption is procedurally premature,[1] and the exemption is substantively inapplicable.  In 1989, in recognition of the accelerating internationalization of securities markets, the Commission adopted Rule 15a-6.  *See* Registration Requirements for Foreign Broker-Dealers, Release No. 34-27017, 54 Fed. Reg., 30013 (July 18, 1989) ("Adopting Release"), available at http://www.sec.gov/rules/final/34-27017.pdf.  In doing

---

[1]  "[G]enerally '[because] Defendants have the burden of raising [an affirmative defense] in their answer and establishing [it] at trial or on a motion for summary judgment, a Plaintiff, in order to state a claim ... need not plead facts showing the absence of such a defense'." *Reach Music Publ'g, Inc. v. Warner/Chappell Music, Inc.*, 2009 WL 3496115, *2 (S.D.N.Y. 2009) quoting *Black v. Coughlin*, 76 F. 3d 72, 75 ( 2d Cir. 1996).

so, the Commission pointedly emphasized the importance of registration, explaining:  "Because

of the broker-dealer's role as an intermediary between customers and the securities markets,

broker-dealers have been required to register with the Commission since 1935."  Adopting

Release at 8.  "Registered broker-dealers are subject to a panoply of U.S. regulations and

supervisory structures intended to protect investors *and the securities markets*."  Adopting

Release at 10 (emphasis added).

The Rule 15a-6(a) exemption requires that any U.S. customers be "unsolicited."  The

Commission defined "solicitation" as "including any affirmative effort by a broker or dealer

intended to induce transactional business for the broker-dealer or its affiliates."  Adopting

Release at 20.   The Commission stated:

> [s]olicitation includes efforts to induce a single transaction or to
> develop an ongoing securities business relationship.   Conduct
> deemed to be solicitation includes telephone calls from a broker-
> dealer to a customer encouraging use of the broker-dealer to effect
> transactions, as *well as advertising one's function as a broker* . . .
> A broker-dealer also would solicit customers by, among other
> things, recommending the purchase or sale of particular securities,
> with the anticipation that the customer will execute the
> recommended trade through the broker-dealer.

Adopting Release at 20-21 (emphasis added).

Thus, in adopting the Rule 15(a)(6) exemption, the Commission prohibited transactions

resulting from any solicitation effort to U.S. persons, including advertising one's function as a

broker.  It is equally clear that the Complaint adequately alleges specific facts that raise the fair

inference that Gibraltar's website constituted "solicitation."

8

2.      **The Commission's 1998 Pronouncement Concerning Foreign Broker-Dealers' Website Solicitation and Its Effect on Rule 15(a)(6)(a)'s Unsolicited Exemption**

In 1998, the Commission addressed the Rule 15a-6 exemption as it related to internet website solicitations by foreign broker-dealers. *See Statement of the Commission Regarding the Use of Internet Websites to Offer Securities Transactions or Advertise Investment Services Offshore.*  SEC Release No. 1125 (March 23, 1998); 1998 WL 128173 *11-12 and http://www.sec.gov/rules/interp/33-7516.htm.   In its 1998 pronouncement, the Commission stated that although a broker-dealer's website would normally constitute a solicitation requiring registration, it "[would] not consider a foreign broker-dealer's advertising on an Internet Web site to constitute an attempt to induce a securities transaction with U.S. persons *if* the foreign broker-dealer [took] measures reasonably designed to ensure that it does not effect securities transactions with U.S. persons as a result of its Internet activities."  (emphasis added).  A broker-dealer could "post a prominent disclaimer on its Web site either affirmatively delineating the countries in which the broker-dealer's services are available, or stating that the services are not available to U.S. persons" and could "refuse to provide brokerage services to any potential customer that the broker-dealer has reason to believe is, or that indicates that it is, a U.S. person, based on residence, mailing address, payment method, or other grounds." *Id*.

Moreover, the Commission further explained that foreign broker-dealers that have Internet Web sites and that intend to rely on Rule 15a-6's "unsolicited" exemption should ensure that the "unsolicited" customer's transactions are not in fact solicited, either directly or indirectly, through customers accessing their web sites. *Id*.  Since a foreign broker's website constitutes a solicitation.  *Id*. at fn 56.  To prevent that result, a foreign broker can obtain from U.S. customers affirmative representations that they have not previously accessed the broker's

Web site.  Alternatively, a broker-dealer can maintain records that are sufficiently detailed and verifiable to determine that U.S. customers have not obtained access to its Web site. *Id.*

As alleged in the Complaint, Gibraltar's website did not contain any disclaimer advising potential U.S. customers that it would not service them. (Cplt. ¶ 18).  To the contrary, Gibraltar's website targeted customers on the "mainland" – *i.e.*, the United States and Canada.

> ### 3.    As Alleged in the Complaint, Gibraltar's Customers Placed Sell Orders Through Its Website, and Were Thereby Solicited

Defendants' contention that the Complaint fails to allege specific facts supporting the inference that the U.S. customers were solicited ignores the Commission's guidance regarding the availability of Rule 15(a)(6)(a)'s unsolicited exemption.  Gibraltar's U.S. customers were exposed to its advertisement of services each time they accessed or attempted to access its website.  This is precisely what the Commission sought to prohibit when it issued guidance in 1998.  By describing how Gibraltar's U.S. customers deposited shares with Gibraltar and thereafter placed sell orders via the website, the Complaint adequately alleges that Gibraltar solicited U.S. customers.  Therefore the Complaint adequately raises the inference that Gibraltar could not avail itself of Rule 15(a)(6)'s unsolicited exemption.  Once again, even though the Complaint alleges that Gibraltar's customers placed orders through its website (and were therefore solicited), the burden of establishing the Rule 15(a)(6) exemption rests on the Defendants.

> ### C.    The Complaint Raises a Strong Inference that Gibraltar's Website Solicited U.S. Customers

The Complaint alleges facts supporting the inference that at least some of Gibraltar's U.S. customers were solicited, which is far more realistic than the remote possibility (proposed

by Defendants) that none of Gibraltar's U.S. customers were solicited, and greatly exceeds the plausibility standard enunciated by the Supreme Court in *Ashcroft v. Iqbal,* 556 U.S. 662 (2009)

The inference – that Gibraltar's U.S. customers were solicited via its website -- is at least as strong as any other alternative inference.  Defendants suggest that since the Bahamas is a former British colony, perhaps Gibraltar's website solicited investors only in England – not the United States.  But *Iqbal* requires courts to interpret the pleadings using judicial experience and common sense.   It is unrealistic to infer that Davis meant to solicit investors only in "mainland England," or, as they suggest elsewhere, Canada, particularly since the website referenced only U.S. depositories and dollars (and not pounds, Euros or Canadian dollars) and the Defendants concede they did substantial Canadian business. (Cplt. ¶ 18, Def. Mem. 8).

The Commission is not obliged to allege facts that rule out all other possible alternative inferences.  It cannot reasonably be suggested that all of Gibraltar's U.S. customers were unsolicited.  This competing inference does not reasonably constitute an obvious alternative explanation.  *N. J. Carpenters Health v. Royal Bank of Scotland Grp., PLC* 709 F.3d 109, 121 (2d Cir.2013).  Plaintiffs are only required to plead facts supporting a plausible inference and are not required to plead facts showing that there is no other conceivable alternative explanation. *Cohen v. S.A.C. Trading Corp.* 711 F.3d 353 (2d Cir. 2013).

It is far more likely that, since Gibraltar's website charged fees only in U.S. dollars, made no provision for currency exchange, and referenced securities transfers at United States securities depositories (and not foreign depositories) (Cplt. ¶ 17), U.S. customers accessed the site.  The inference is supported by the allegation that Gibraltar effected at least $100 million of securities transactions on behalf of U.S. citizens, and Website statistics generated by ebstatsdomain.com

11

and Hupso.com estimated that Gibraltar's website attracted approximately 2,200 visitors daily, over 21% of which were located in the United States.[2]

## II.      THE COMPLAINT ADEQUATELY ALLEGES THAT DAVIS IS GIBRALTAR'S CONTROL PERSON

To sustain a claim that Davis is liable as a "control person" under Section 20(a) of the Exchange Act, the Commission must allege facts raising the reasonable inference that:  (1) Gibraltar committed a primary violation of Section 15(a); (2) Davis controlled Gibraltar; and (3) Davis was a culpable participant in the acts perpetrated by Gibraltar.  *See SEC v. Buntrock*, 2004 WL 1179423, *9 (N.D. Ill. May 25, 2004); *see also SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1472 (2d Cir.1996).  Control over a primary violator may be demonstrated by evidence showing that "the defendant possessed 'the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise.'" Id. at 1472-73 (quoting Exchange Act Rule 12b-2's definition of control).

The Complaint alleges facts raising a strong inference that Davis is liable as a control person for Gibraltar's primary violations of Section 15(a) and has no good faith defense.  Davis was Gibraltar's founder, sole owner and president.  Davis established the accounts at the U.S. broker-dealers.  He deposited shares and entered sell orders of Magnum d'Or into the U.S. account.  (Cplt. ¶¶ 25-27).  He directed trades and authorized other Gibraltar employees to trade in the United States.  (Cplt. ¶ 9).  Davis submitted IRS withholding forms to U.S. broker-dealers falsely certifying that Gibraltar was the beneficial owner of the proceeds of shares sold in the

---

[2]  Defendants' assertions questioning the accuracy of statistics provided by ebstatsdomain.com and Hupso.com  asks the court to weigh evidence prematurely and furthermore, to improperly construe facts against the Plaintiff.

U.S.  (Cplt. ¶ 20).  Given these facts, the inference that Davis was Gibraltar's control person and a culpable participant is not just plausible, it is probable.  The inference is at least as strong as the alternative inferences that someone else controlled Gibraltar (the Defendants offer no alternative candidate), or that the wrongdoing happened without Davis's participation. Furthermore, because of the highly factual nature of the inquiry into control person liability, disposition on the pleadings is seldom appropriate. *Higelman v. Nat'l Ins. Co.* 547 F.2d 298, 302 (5th Cir.1977); *In re Chambers Dev. Secs. Litig.* 848 F.Supp. 602, 618 (W.D. Pa.).

## III.   THE COMPLAINT ADEQUATELY ALLEGES THAT GIBRALTAR AND DAVIS VIOLATED SECTION 5 OF THE SECURITIES ACT

### A.  The Complaint alleges *Prima Facie* Violations of the Securities Act

To establish a *prima facie* violation of Section 5 of the Securities Act, the Commission must establish the following three elements by a preponderance of the evidence:[3]

1. That the defendant directly or indirectly offered or sold securities;

2. That the defendant did so through the use of any means of interstate transportation or communication or the mails; and

3. That there was no applicable registration statement in effect or on file for the offer or sale of those securities.

*SEC v. Cavanagh*, 445 F.3d 105, 111 n. 13 (2d Cir. 2006), *quoting Eur. & Overseas Commodity Traders, S.A. v. Banque Paribas London*, 147 F.3d 118, 124 n. 4 (2d Cir. 1998).  *See also SEC v. Calvo*, 378 F.3d 1211, 1214 (11th Cir. 2004).  When the Commission demonstrates these elements, the burden shifts to the defendants to establish that they are entitled to an exemption

---

[3] Sections 5(a) and 5(c) of the Securities Act make it unlawful for any person to use the means or instruments of transportation or communication in interstate commerce or of the mails to sell any security, or to offer to sell or to offer to buy any security, or to carry such security for purposes of sale or delivery after sale, when no registration statement has been filed or is in effect as to the security.

from registration.  *SEC v. Ralston Purina Co.*, 346 U.S. 119, 126 (1953) ("[k]eeping in mind the broadly remedial purposes of the federal securities legislation, imposition of the burden of proof on an issuer who would plead the exemption seems to us fair and reasonable").

The Complaint alleges a *prima facie* case.  Paragraphs 25-29 of the Complaint set forth unambiguous factual allegations for each element.  The Complaint alleges that, from about November 2008 through September 2009, Gibraltar and Davis deposited 11 million shares of Magnum D-Or stock into accounts at four U.S. broker-dealers and sold the stock in 600 transactions for proceeds of over $11 million.  Gibraltar instructed the four U.S. brokers to wire the sale proceeds from various locations in the U.S. to Gibraltar's bank account in the Bahamas.  Thereafter Gibraltar wired approximately $7.175 million of proceeds directly back to Magnum d'Or, which was located in the United States. (Cplt. ¶¶ 10, 29).  No registration statement was filed with the Commission or in effect with respect to any of the sales effected by Davis and Gibraltar on behalf of Gibraltar's U.S. customers.

### 1. Gibraltar Directly Offered and Sold Magnum d'Or Shares

Despite the fact that Defendants directly placed orders in over 600 transactions to sell the 11 million Magnum d'Or shares (through the U.S. brokers) into the public markets, they contend that they "added nothing" to the scheme and were therefore not "substantial participants." Def. Mem. at 23.  Such assertions are totally inappropriate arguments in the context of a motion to dismiss because they are issues to be decided by the finder of fact and may not be assumed.  In addition, the Defendants fail to recognize their duties under the law.  Gibraltar was a direct participant in the unregistered sale of $11 million of Magnum stock and is therefore liable for offering and selling securities in violation of Section 5.  Section 5 extends to those who have engaged in steps necessary to the distribution of unregistered offerings. *SEC v. Chinese Consol.*

*Benevolent Ass'n, Inc.,* 120 F.2d 738, 741 (2d Cir.1941); *Greenstone Holdings*, No. 10 Civ. 1302

(MGC), 2013 WL 3481551(S.D.N.Y., July 10, 2013) at *2; *Boock*, 2011 WL 3792819 (DLC)

(S.D.N.Y. Aug. 25, 2011) at *16; *SEC v. Universal Express, Inc.*, 475 F. Supp. 2d 412, 422

(S.D.N.Y. 2007, *aff'd, SEC v. Altomare*, 300 Fed. Appx. 70 (2d Cir. 2008).  Gibraltar is liable as

a direct participant because it was obviously engaged in necessary steps in accomplishing the

unregistered offering and sale.  From November 2008 through September 2009, Gibraltar and

Davis received deposits of 11 million shares of Magnum d'Or from customers in the United

States, re-titled the shares in its name, and deposited them by mail into its accounts at four

identified U. S. brokers.  Thereafter Gibraltar and Davis sold the shares through the U.S. brokers

in 600 transactions for over $11 million. (Cplt. ¶¶ 26- 27).   Defendants received the proceeds of

the sales through wire transfers to Gibraltar's bank account and distributed the money to

Magnum d'Or. *Id.*

It has long been the case that a broker-dealer like Gibraltar selling securities in

unregistered transactions on behalf of customers violates Section 5 in the absence of an

applicable exemption from the Securities Act's registration requirements.  It is the defendant's

burden to show that the securities in fact qualified for an exemption.  *Gilligan Will & Co. v. SEC*,

267 F.2d 461 (2d Cir. 1959); *SEC v. Verdiramo*, 890 F. Supp. 2d 257, 268 (S.D.N.Y. 2011).

Defendants have not even attempted to do so in their motion to dismiss.

Defendants do not provide authority supporting the notion that a participant in an

unregistered offering can escape liability simply because its participation (substantial as it might

have been) was on the selling side.  (Def. Mem. at 23)  In this regard, Defendants obviously

misapply the "substantially motivating factor" analysis.  That concept is applied to determine

whether participants are liable under Section 5 despite the fact that they were not involved

15

directly in the final steps of the distribution.  Here, as alleged, Gibraltar and Davis were directly involved in the sell side of the offering – directly offering and selling securities through their accounts at the U.S. brokers.  Defendants' reliance on *SEC v. Elliot*, 2011 WL 3586454 (S.D.N.Y. Aug. 11, 2011), is misplaced.  As the *Elliot* court stated in applying the "substantial motivating factor" analysis:  "Defendants do not have to be involved in the final step of the distribution to have participated in it."  2011 WL 3586454  at *7 (citing *Zacharias v. SEC,* 569 F.3d 458, 464 (D.C.Cir.2009).  The Complaint adequately alleges that the Defendants were involved in the final steps of the distribution – they offered and sold the shares in the market.[4]

Even under the "but for" test cited by Defendants (Def. Mem. at 23), Gibraltar and Davis could not escape liability.  Under that test, a defendant is liable if the transaction would have not occurred absent his participation.  Without Davis and Gibraltar, the transactions obviously would not have occurred because they took in the shares, re-titled them in Gibraltar's name, placed the trades in the United States, funneled the money out of the country and then back onshore.

### 2.   Defendants' Contention that to Participate in the "Scheme" Davis and Gibraltar Had to Be Aware of It Misconstrues the Law

Defendants' contention that they could not be substantially involved in an unregistered offering scheme simply because they were purportedly unaware of it misconstrues the law under Section 5.  Neither scienter nor negligence is required under Section 5.  *Swenson v. Engelstad*, 626 F.2d 421, 424 (5th Cir. 1980) ("The Securities Act of 1933 imposes strict liability on

---

[4]  Nor can Defendants escape liability on the grounds that they traded through intermediary brokers in the United States.  It is well accepted that "[e]ven where the person or entity does not have individual contact with the purchasers of the securities, that person or entity has indirectly offered or sold that security to the public if he or it has employed or directed others to sell or offer them, or has conceived of and planned the scheme by which the unregistered securities were offered or sold."  *SEC v. Friendly Power Co. LLC*, 49 F. Supp. 2d 1363, 1371 (S.D. Fla. 1999).

offerors and sellers of unregistered securities… regardless of… any degree of fault, negligent or intentional, on the seller's part"); *Greenstone Holdings, Inc.*, 2013 WL 3481551, *2,; *SEC v. Rosen*, No. 01-0369-CIV, 2002 WL 34421029, at *3 (S.D. Fla. Feb. 22, 2002) ("Neither negligence nor scienter is an element of a *prima facie* case under Section 5 of the Securities Act....   *A fortiori*, a good-faith belief that the sales or offers in question were wholly legal is not a defense to a Section 5 violation") (internal citations omitted)).

Gibraltar executed sell orders from its customers (Cplt. ¶¶ 25-29) and funneled much of the sales proceeds back to Magnum d'Or, the issuer.  Gibraltar had ample reason to know or suspect that the S-8 offering to the Flatt Nominees was phony because S-8 securities are issued a compensation to consultants, but the proceeds of the Magnum securities sales were sent back to Magnum, not to consultants, and were not subject to a new registration statement or an exemption.[5]

---

[5]  It is significant to note the distinction between the original issuance of Magnum d'Or shares to the Flatt Nominees – which was purportedly made pursuant to S-8 Registration Statements – and subsequent offers and sales by the Flatt Nominees through the Gibraltar accounts, which were not.  Shares issued in an S-8 offering require a subsequent registration statement or an exemption when re-sold.  *SEC v. Cavanaugh*, 155 F.3d 129, 133 (2d Cir.1998); *SEC v. Universal Express, Inc.*, 475 F.Supp.2d 412 (S.D.N.Y.2007).  Indeed, Form S-8 permits an issuer to issue stock as compensation to consultants, "provided that bona fide services shall be rendered by [the] consultants . . . and such services must not be in connection with the offer or sale of securities in a capital-raising transaction."  *See General Instruction A.1(a) to Form S-8.*  Consultants receiving S-8 stock may not be used as conduits to investors.  *Steven M. Scarano*, 67 SEC Docket 2794 (Sept. 9, 1998) (Commission Order); *James Ray Ross*, 67 SEC Docket 1260 (June 26, 1998) (Settled Order); *Timothy J. Brannon*, 67 SEC Docket 0249 (May 4, 1998); *Brent W. Berry*, 65 SEC Docket 3017 (Dec. 3, 1997) (Settled Order); *Spectrum Info. Techs.*, 64 SEC Docket 2103 (Settled order) (June 25, 1997).  In short, Form S-8 may not be misused to "circumvent the registration requirement by devious and sundry means" and thereby deprive public investors of the protection registration provides.  *SEC v. Sky Scientific*, SEC Rel. No. 137, 1999 WL 114405, *31 (1999), quoting *North Am. Research and Dev. Corp.*, 424 F.2d 63, 71 (2d Cir. 1970).

### 3.   Gibraltar Used Jurisdictional Means in the United States

The second element of a Section 5 violation is that the Defendants used the means and instrumentalities of interstate transportation, communication or the mails.  Gibraltar made use of the means and instrumentalities of interstate commerce by depositing shares in the U.S. and wiring the sale proceeds to the Bahamas and then back onshore to the Flatt Nominees and Magnum d'Or.

### 4.   No Registration Statement Was In Effect

The third element of a Section 5 violation is that there was no registration statement on file or in effect with regard to the offers and sales.  As alleged in the Complaint, no registration statement was filed in connection with the offers and sales by the Flatt Nominees through Gibraltar.  Magnum d'Or's Forms S-8 could not register a capital-raising transaction.  The Defendants misused Form S-8 to disguise what was actually an unregistered public distribution that raised capital for the issuer.  Gibraltar knew that the re-sales were for raising capital because it funneled resale proceeds back to Magnum d'Or.[6]  (Cplt. ¶¶ 25-29).   No valid registration statement was in effect to register the public distributions through the Gibraltar accounts.

### B.   The Broker's Exemption Under Section 4(a)(4) is Plainly Inapplicable Because Gibraltar Acted as an Underwriter.

A person is liable under Section 5 if he acts as an underwriter with respect to a distribution of securities.  15 U.S.C. § 77d(a)(1).  Section 2(a)(11) defines  "underwriter" as "any

---

[6]  Defendants' argument, that the offering scheme was too elaborate to detect, and fooled even a large law firm and the transfer agent, is irrelevant and makes allegations which must be subjected to proof and determination by a finder of fact if it was relevant.  The facts, circumstances, duties and obligations of other parties with respect to the offering are not before the Court.  Even if those parties were duped (which the court is hardly permitted to infer in addressing a motion to dismiss), the Defendants cannot escape liability under Section 5 simply because other parties failed to detect the illegal offering scheme.

person who has purchased from an issuer with a view to distribution, or offers to sell for an issuer in connection with the distribution of any security… or who has a direct or indirect participation in any such undertaking." *In the Matter of Bunker Securities*, 1987 WL 756767, *citing SEC v. Culpepper*, 270 F.2d 241, 247 (2d Cir. 1959) (a direct or indirect participation by a broker-dealer in the distribution brings it within the definition of underwriter). By directly participating in the offering of $10 million in S-8 shares of Magnum d'Or, Gibraltar became an underwriter[7] within the meaning of Section 2(a)(11). Indeed, the Complaint alleges that the Flatt Nominees deposited 11 million shares of Magnum d'Or stock into their accounts at Gibraltar (Cplt. ¶¶ 11, 25). Gibraltar knew or should have known that the Flatt Nominees acquired the shares directly from the issuer. This allegation is supported by the fact that Gibraltar funneled a large portion of the proceeds ($7.125 million) back to the issuer. Brokers are obviously aware that forwarding sales proceeds – particularly of S-8 shares -- back to the issuer is considered a significant red flag that the sales were being used in a prohibited capital raising transaction. The fact that Gibraltar funneled a portion of the sales proceeds to Magnum d'Or raises a strong inference that Gibraltar was selling shares on behalf of Magnum d'Or, directly or indirectly. It is highly unusual for a broker to send the proceeds of a sale of securities from a customer account back to the issuer. This is particularly true with respect to S-8 shares, which are not to be used in a capital raising transaction. Gibraltar and Davis were obligated to make reasonable inquiry as to the origin of the shares that they were asked to sell. *Distribution by Broker-Dealers of*

---

[7] Defendants' reliance on Rule 144 is misplaced. Rule 144 provides certain sellers with a safe harbor from being deemed an underwriter. The Flatt Nominees' offering and sale of over 10 million shares is ineligible for Rule 144's safe harbor because, among other things, the sales greatly exceeded Rule 144's volume limitations.

19

*Unregistered Securities*, Exchange Act Release No. 6721 (Feb. 2, 1962)).[8]  To contend that

Defendants had no reason to question the deposit and sale of 10 million shares of a thinly traded

microcap stock is laughable -- particularly where they were instructed to send the proceeds back

to the issuer.  Defendants' contention that they had no reason to assume the shares were acquired

directly from the issuer (Def. Mem. at 20) is all the more disingenuous because the shares issued

to the Flatt Nominees were acquired in an S-8 offering which applies to shares offered from the

issuer to consultants.  If Gibraltar had done any inquiry, it could have determined that the shares

were issued by Magnum d'Or directly to the Flatt Nominees purportedly for consulting services.

The fact that it funneled the proceeds back to the issuer would have raised obvious red flags.

### III.   CONSOLIDATION IS NOT APPROPRIATE AND WILL DELAY RESOLUTION

The Court should not consolidate this action with *SEC v. Carillo Huettel*, 1:13-cv-01735

(GBD) (Mar. 15, 2013), for the simple reason that there are no common questions of fact or law

as required under Rule 42, Fed. R. Civ. P.  The securities involved are different, the parties

(other than Gibraltar and Davis) are different, and the *Carillo Huettel* case does not allege sales

to U.S. investors by an unregistered foreign broker dealer.  Nor would consolidation avoid

unnecessary cost and delay, a factor considered under Rule 42.  After Davis is deposed, this case

may be ripe for summary judgment in the SEC's favor as to one or both claims.  The *Magnum*

---

[8]   A broker-dealer asked to sell a substantial amount of securities is obligated to take reasonable steps to determine that the proposed sales would not constitute participation in transactions required to be registered.  The Commission has also previously held that "in light of the cardinal role occupied by broker-dealers in the securities distribution process, we cannot overemphasize the importance of their obligation to take all reasonable steps to avoid participation in distributions violative of the registration . . . provisions of the Securities Act." *In the Matter of Jacob Wonsover*, 54 S.E.C. 1, 33 (Mar. 1, 1999) (quoting *In the Matter of L.A. Frances, Ltd.*, 44 S.E.C. 588, 593 (June 22, 1971)), *petition for review denied*, *Wonsover v. SEC*, 205 F.3d 408 (D.C. Cir. 2000).

*D'Or* complaint (Patterson Dec. Ex. A), which is the basis for both claims here, shares no common facts with *Carrello Huettel*.  A jury would have to hear two different trials about two different sets of facts, and litigation of this case would be delayed while discovery proceeded in *Carrello Huettel*.  Further, the Commission must establish scienter for the fraud claims in *Carrello Huettel*.  There is no such requirement in this case.  That factor alone suggests that consolidation would be inefficient and cause needless delay.  The consolidation permitted in the sole authority cited by the Defendants, *Johnson v. Celotex Corp.*, 899 F.2d 181 (2d Cir. 1996), involved tort claims alleging asbestosis caused by conditions at a single work site where Plaintiffs worked in consecutive years.  Plainly, there was likely to be a match of both facts and law.  Such is not the case here.  "The moving party has the burden of establishing that efficiency to be gained by consolidation outweighs potential delay or prejudice."  *Oneida Nation of New York v. Paterson*, 2010 WL 4053080 (Oct. 14, 2010, N.D.N.Y), *6.  Defendants have failed to meet their burden.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court deny Defendants' Motion in all respects.

Dated: August 2, 2013

<div style="margin-left:40%">

Respectfully submitted,

/s/James A. Kidney
By:    JAMES KIDNEY (JK5830)
       ROBERT A. GIALLOMBARDO (RG7912)

Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
100 F Street, N.E.
Washington, D.C. 20549-1040
Telephone: (202) 551-4441 (Kidney)
Facsimile: (202) 772-9282 (Kidney)
KidneyJ@sec.gov

</div>

21

## **CERTIFICATE OF SERVICE**

I hereby certify that on August 2, 2013, a courtesy copy of the foregoing document was mailed to chambers and that the following counsel for the Defendants was served via the Court's ECF filing system.

Nicholas M. De Feis, Esq.
Philip Patterson, Esq.
DE FEIS O'CONNELL & ROSE, P.C.
New York New York 10110
(212) 768-1000
Attorney for the Defendants

/s/JAMES A. KIDNEY