D8D7SECC

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------------x

3   SECURITIES AND EXCHANGE COMMISSION,

4                   Plaintiff,

5          v.                              13 Civ. 2575 (GBD)

6   GIBRALTAR GLOBAL SECURITIES, INC.
    and WARREN A. DAVIS,
7
                    Defendants.
8
    ------------------------------------x
9
                                          August 13, 2013
10                                        12:00 p.m.

11  Before:

12                   HON. GEORGE B. DANIELS

13                                        District Judge

14                        APPEARANCES

15  JAMES KIDNEY
         Attorney for Plaintiff
16
    DEFEIS O'CONNELL & ROSE, P.C.
17       Attorneys for Defendants
    BY:  NICHOLAS DEFEIS
18       PHILIP PATTERSON

19

20

21

22

23

24

25

D8D7SECC

```
1              (Case called)

2              (In open court)

3              MR. KIDNEY:  Good morning.  James Kidney for the

4   plaintiff Securities and Exchange Commission.

5              THE COURT:  Good morning.

6              MR. DEFEIS:  Good morning, your Honor.  Nicholas

7   DeFeis and Philip Patterson for the defendants Warren Davis and

8   Gibraltar Securities.

9              THE COURT:  Good morning.  Let me hear defense on

10  their motion.  Is that you, Mr. DeFeis?

11             MR. DEFEIS:  That would be me.  Thank you.  I guess

12  there are essentially two claims made by the SEC, both of which

13  we argue are deficiently pled:  One is that these defendants

14  solicited U.S. customers without being licensed, essentially to

15  operate it as a broker dealer in the United States.

16             And we contend principally -- and I should say as a

17  preliminary matter, that website is currently down.  It hasn't

18  been in operation.  Gibraltar is in the process of winding down

19  itself.  I should further indicate that we are aware of no

20  cases that have been brought or sustained relying solely on the

21  presence of a website as a solicitation in any way, and we

22  think that the website did nothing to solicit within the terms

23  of the statute itself, and even within the terms of the

24  interpreted guidance given about it.  There were no phone calls

25  made to people in the United States, no mailings, no spam, no
```

D8D7SECC

advertising whatsoever, no presence whatsoever within the

United States.  And as the SEC itself points out in its

interpreted release -- which we cite at page 12 of our opening

brief -- "The Commission does not believe as a policy matter

that registration is necessary if U.S. investors have sought

out foreign broker dealers outside the United States and

initiated transactions in foreign securities markets entirely

of their own accord."  That is precisely what this case is

about.

The case has been under investigation for years.

There is a parallel action pending before your Honor, as you

know, involving some additional defendants, but also involving

other investors of a substantial amount.  There was an

investigation and a settlement in Florida involving still

additional investors.  The SEC obtained records as part of its

investigation through the Bahamian Security Commission -- with

the cooperation, by the way, of my client and his company -- of

19 investors that are listed in the subpoena, and they have yet

to point to someone who was actually solicited.

All of the transactions involved in this case -- and

even common sense tells us could take place -- were initiated

by the customers.  These customers went to Gibraltar for their

own reasons, and common sense tells us that you don't just surf

the Web thinking about what potential brokerage opportunities

there are for you.  None of these customers involved or

D8D7SECC

1    investors involved in the various SEC complaints -- and, by the

2    way, in the companion action just about all those investors are

3    Canadian, and I think the SEC itself agrees that 80 percent of

4    the traffic based on its website statistics were from Canada.

5            THE COURT:  Well, I don't think I had an opportunity

6    to see the websites.  Is there attached a copy of any of the

7    information attached to any of the affidavits?

8            MR. KIDNEY:  No, it's described in our brief fully in

9    the complaint.

10           MR. DEFEIS:  Well, it's selectively described.  It's

11   eight pages long -- when it existed.  It no longer exists.  And

12   the SEC, pardon me, relies on in my view the essentially junk

13   science to establish that customers were solicited by this

14   website.  They haven't pointed to any of their customers

15   involved in these complaints or these investigations actually

16   were solicited or drawn to the website as a result of what is

17   there, and they certainly have this within their power.  Common

18   sense tells us that that's not the way anyone would decide to

19   open a brokerage account.  Then they use this web analyzer tool

20   which every day -- and they cite this in the complaint.  You

21   know, we get the complaint, we look at the web analyzer, and we

22   see that every day of the week, whenever you try it, including

23   the day that we filed the reply brief, says that there are

24   2,200 some odd people came in to view the site.  It's

25   meaningless, but they decided to cite it.  But it proves

D8D7SECC

1    absolutely nothing.

2          Then they rely on language in the complaint to

3    essentially -- I don't know how they think that the court is

4    going to ignore the fact that, yeah, the website is in

5    English -- of course the national language of the Bahamas is

6    English.  Everybody speaks English there -- the currency is in

7    U.S. dollars.  And of course the Bahamian currency is tied to

8    the U.S. dollar on a one-to-one basis.  I mean there is really

9    no reason to make the jump between this website and the

10   solicitation of any U.S. customers whatsoever.

11         THE COURT:  Would it be incorrect or inaccurate to

12   characterize the website as an advertisement or including an

13   advertisement?

14         MR. DEFEIS:  I don't know.  Obviously, the website is

15   promotional in some way.  Our law firm, every law firm in the

16   city that I know of has a website.  I think we are required to

17   have some sort of legend that may say this is advertising.  But

18   is it the solicitation of customers anywhere?

19         The SEC itself has indicated in its interpretive

20   guides that the mere presence of a website is not enough to

21   make out a solicitation of U.S. customers.  And they have

22   adequate opportunity during this investigation to point to U.S.

23   customers who were actually solicited as a result of the

24   website, and they just don't exist.

25         So, they ask the court to draw the inference that some

D8D7SECC

1    U.S. customers must have come to the website as a result of its

2    just barely being there, but I think common sense tells us it's

3    not the case.

4            THE COURT:  Well, the difficulty that I have initially

5    is answering I guess two questions.  Who are you soliciting

6    through the website?  And how does it exclude rather than

7    include U.S. investors?

8            MR. DEFEIS:  I don't think it's required to exclude

9    U.S. investors.  The key is whether U.S. investors initiated

10   the content.  That's what it says in the interpretive release

11   which we cite.  They give some examples --

12           THE COURT:  Well, U.S. investors don't initiate the

13   contact if they do so in response to an advertisement or

14   solicitation.

15           MR. DEFEIS:  That's right.

16           THE COURT:  So, the first question that I have is, all

17   right, I have a website -- and I assume that it's not critical

18   to your argument that I make some determination that the

19   website does not constitute a solicitation.

20           MR. DEFEIS:  No, it's not critical.  You could still

21   determine that it is a solicitation or an advertisement of some

22   kind, but you still have to determine was it targeted to U.S.

23   customers in any way.

24           THE COURT:  That's what I'm asking.

25           MR. DEFEIS:  Yes.

D8D7SECC

```
 1              THE COURT:  Well, who is it targeted to?
 2              MR. DEFEIS:  The investing community, and
 3    already-existing customers who might have heard about Gibraltar
 4    in some way.
 5              THE COURT:  Well, it can't be existing customers who
 6    heard about Gibraltar.  If they are already existing
 7    customers --
 8              MR. DEFEIS:  All right.  In the same way somebody
 9    checking out a law firm or an accounting firm would say, oh,
10    let me just see what's on their website.
11              THE COURT:  So, give me an example of who is being
12    solicited.
13              MR. DEFEIS:  I'm not -- I think it's national.  So I
14    guess I hesitate -- I don't think we have to determine -- it's
15    not critical to our argument that the court find that it
16    doesn't solicit at all.
17              THE COURT:  Well, it has to be critical unless you can
18    answer that question.  Because if it's a solicitation, then you
19    are soliciting customers, and so the natural question is which
20    customers are you soliciting.
21              Now, if you say you are only soliciting Chinese
22    customers, then I can understand it.  If they want to argue
23    that you are only soliciting U.S. customers, that's kind of
24    difficult to argue since I don't hear anything that directly
25    says this is supposed to be only to U.S. customers.  But if you
```

D8D7SECC

1    say it's a general solicitation, then it obviously begs the

2    question.  If you say that general solicitation includes

3    Canadians, then in what way at this stage of the proceeding am

4    I supposed to say the general solicitation doesn't include

5    Americans, U.S. citizens?

6          MR. DEFEIS:  I think because you have to look at the

7    interpretive -- you have to look at the interpretive guidance,

8    which basically says the mere presence of a website does not

9    constitute solicitation of U.S. customers.  And you do not have

10   to have these legends or warnings excluding U.S. customers to

11   stay away.

12         I mean if the case goes forward, you know, we go to

13   the next step and look at what kind of compliance procedures

14   there are in effect, and what a potential customer would have

15   to provide in order to be able to open an account at Gibraltar.

16   But again, this defunct website was not targeted to U.S.

17   customers, it was informational.

18         THE COURT:  Well, again, that's why it can't be

19   just -- if it's just informational and that's the determinative

20   factor, then it's not a solicitation.  If it's a solicitation,

21   if one of the purposes or the primary purpose is to attain new

22   customers, if they get the benefit of that argument at this

23   stage of the proceedings --

24         MR. DEFEIS:  Right.

25         THE COURT:  -- then the question is:  Is there any way

1    that you can look at this website and determine that it is

2    targeting a particular customer?  Or is there any way that you

3    can look at this website and say that it's targeting customers

4    other than United States investors?

5          MR. DEFEIS:  It does not distinguish among potential

6    customers, but it's not required to.  The key is who initiated

7    the contact with the website.  If it's just a potential

8    customer -- and I don't know how the person would go to the

9    website.  Let's just think about this.  OK?

10         We have a potential customer who received no spam, no

11   mailings, no cold calls, no advertisements in the U.S. at all,

12   no physical presence in the U.S. at all.  How would this

13   potential customer come to the site?  If he is going there with

14   the intent to engage in a transaction and obtains some

15   reassurance that this company is capable of handling the

16   transaction, and has certain features about the way it handles

17   accounts, then that is not something that is a solicitation

18   that is covered by the U.S. securities laws.

19         THE COURT:  Well, you are characterizing it

20   differently.  If you are going to characterize it that way,

21   that characterizes the -- you are making the determinative

22   factor how the contact is initiated with the website, but

23   that's not the critical question.  The question is how does the

24   American investor, the U.S. investor, become a customer.  So,

25   the solicitation isn't did I talk them into coming to my

D8D7SECC

website; the solicitation is did my website talk them into

investing with my company.

MR. DEFEIS:  I actually think the former question is

important, which is basically who initiated the contact with

the website.  Was this a U.S. customer that was looking for

whatever reason to engage in a transaction, open an account

with a foreign broker dealer?

Again, we cite this in somewhat greater length on page

12 of our opening brief, "In the event that U.S. investors

would have taken the initiative to trade outside the United

States with foreign broker dealers, they are not conducting

activities within this country.  Consequently, the U.S.

investors would have little reason to expect these foreign

broker dealers to be subject to U.S. broker dealer

requirements.  Requiring a foreign broker dealer to register as

a broker dealer with the Commission because of unsolicited

trades with U.S. persons could cause that foreign broker dealer

to refuse to deal with U.S. persons under any circumstances."

THE COURT:  I know, but that's what I say, you're

right, the critical point seems to me -- unless you can

convince me I should refocus -- it's whether the trades are

solicited or unsolicited:  It's not whether the contact is.

If I go on the website in this day and age and I say

that I am looking for a licensed contractor, and I need

somebody to fix the sink --

D8D7SECC

1            MR. DEFEIS:  Right.

2            THE COURT:  -- and I get on the website and put in

3    "broken sink" and it comes up with all of these people who can

4    fix sinks --

5            MR. DEFEIS:  Right.

6            THE COURT:  -- and if I see a website, and this person

7    says we fix sinks the cheapest of anybody else, you ought to

8    come to us, and you ought to hire us to fix your sink --

9            MR. DEFEIS:  Um-hum.

10           THE COURT:  -- now, if they're not licensed, and their

11   website is geared to convincing me to choose them over someone

12   else, then once I make a decision based on what I see on their

13   website, that that website convinces me to hire them, in what

14   way is that not a solicitation?

15           MR. DEFEIS:  That would be a solicitation.

16           THE COURT:  OK.  How is that different than if I

17   searched for broker dealers, I come up with a list, I see

18   Gibraltar on that list, Gibraltar says, yeah, we can invest in

19   whatever you want to invest in, you know, we'll take it in U.S.

20   dollars, and clearly in English and says, you know, no question

21   that we're the greatest broker dealer in the world, come and

22   invest with us.  And if I look at the website and based on that

23   I call you up and send you my money, why is that not a

24   solicitation?

25           MR. DEFEIS:  Because it would cover a universe of

D8D7SECC

1    broker dealers operating all around the world that have decided

2    for whatever reason not to register in the United States.  I

3    mean the problem is it proves too much.

4             THE COURT:  Well, no, the question is how did I get

5    the customer.  That's the only question.  The question is did I

6    get this customer -- solicitation to me means did I get this

7    customer because I decided to let the customer know that I was

8    available to do this type of business, and then I convinced the

9    customer to invest with me.

10            MR. DEFEIS:  Right.

11            THE COURT:  Now, if that is the general scenario that

12   the SEC is alleging at this point, why wouldn't that in the

13   abstract fall within, yes, that's what you cannot do.  You

14   cannot put on your website something that convinces them to

15   contact you because they think that you're eligible to do the

16   investment.  And the purpose of the website is to convince them

17   to invest their money with you, and so, therefore, when they

18   contact you you follow up and you convince them to go ahead

19   and --

20            You are saying it's not a solicitation if they go to

21   your website first.

22            MR. DEFEIS:  It's not a solicitation if their

23   intent -- right, if they go to the website first.

24            THE COURT:  But suppose I just search it?  That's what

25   web searches are.

D8D7SECC

1        MR. DEFEIS:  But again it proves -- the SEC intended

2    to provide some sort of safe harbor, international exchanges,

3    trading, the world is becoming smaller place and so forth, for

4    international broker dealers -- not to block out U.S. customers

5    from actually going to the website.

6        THE COURT:  Isn't the purpose of the website -- or at

7    least their arguable purpose of the website -- is to basically

8    say to the customers come and invest with me?

9        MR. DEFEIS:  I think --

10        THE COURT:  Isn't that the definition of a

11    solicitation?

12        MR. DEFEIS:  In a very broad sense, in the same way

13    that any legal website is saying, you know, come hire me as

14    your lawyer.  But I think, with all respect, it's sort of a

15    simple way, too simple a way to look at it.  I think the more

16    complex way to look at it, and the probably the more

17    appropriate way to look at it, is why these customers were

18    there in the first place.

19        THE COURT:  They were there because you told them

20    that -- well, they were there because they were searching not

21    for you, they were searching for someplace to invest.

22        MR. DEFEIS:  Right.

23        THE COURT:  And they happened to run into you, and you

24    told them that, yes, invest with me because I can do this for

25    you.  Why isn't that the scenario?

D8D7SECC

1          MR. DEFEIS:  Well, again, because then we assume that

2     every website would be subject to the same -- every foreign

3     broker dealer that has not blocked U.S. accounts or U.S.

4     citizens from accessing their website would run the same risks.

5          THE COURT:  Well, no, not necessarily, because you

6     have certain websites that make it clear that they're not

7     soliciting U.S. investors.  That's not your case.

8          MR. DEFEIS:  Right.

9          THE COURT:  Two, you have certain websites that would

10    indicate that they're looking for certain types of non-U.S.

11    investors, or -- what was my other example -- that the

12    information is somehow inconsistent with an argument that you

13    are targeting U.S. investors.

14          Obviously, if you said invest with us, we do all our

15    investments in French francs, and you were in French, obviously

16    the argument could easily been made that you could not have

17    been targeting U.S. citizens.  And obviously in the most

18    extreme example, if it was a website in French, saying you

19    invest in francs, saying you invest in euros in Europe, and

20    saying, by the way, we don't invest in U.S. dollars, you'd have

21    a real easy case that that's not a solicitation.

22          But how do I get from one extreme on that side to the

23    other extreme that when I'm saying come invest with me, I will

24    invest in U.S. dollars, I'm giving this in English, I'm not

25    excluding U.S. investors, and their argument is, look, you

D8D7SECC

1   know, it doesn't take a rocket scientist to understand that

2   when you do that it's going to make certain U.S. investors

3   decide based on your communication that they should invest with

4   you.  And they might not have done that unless you had put out

5   a communication, just as if you had sent out a mass mailing.

6   You wouldn't argue if you sent out a mass mailing and that

7   mailing went to both Canada and the U.S. that that mailing

8   wasn't targeted to U.S. citizens.

9           So, the question is where do I draw the line?  Do I

10  draw the line at -- and I haven't seen any case law either way

11  that either one of you have cited that say I should draw the

12  line there -- you want me to interpret the SEC guidelines --

13  but where do I draw the line with regard to websites that are

14  clearly communicating they are not limiting the universe of

15  people that they're communicating with.

16          So, clearly there is nothing about this website that

17  would give anyone the impression that whatever you are trying

18  to communicate, that you're not including U.S. citizens within

19  whatever you are trying to communicate.  So, if you are trying

20  to solicit, isn't there an argument to be made, well, look,

21  based on the communication itself, what's the argument to be

22  made that you are soliciting Canadians rather than U.S.

23  citizens from the website itself?

24          MR. DEFEIS:  You could make the argument that you are

25  soliciting people of any English-speaking country, I suppose,

D8D7SECC

1    but --

2              THE COURT:  But that includes U.S. citizens.

3              MR. DEFEIS:  -- but that proves too much.  That proves

4    too much.  And I think you do need something.  Yes, I mean you

5    could have the extreme example where it's a website in French,

6    and they only deal in I guess it's euros or whatever.  I

7    remember French francs myself.  But in any event, yeah, you

8    could make the argument that you could have a stronger case

9    where there were, you know, no intent to solicit in the United

10   States whatsoever just by looking at the face of the website.

11             But our point is you don't have to have that extreme.

12   You don't have to deliberately block U.S. people.  You don't

13   need to have Surgeon General warnings.  All you need to look at

14   is who initiated these transactions and whether that was

15   actually an intent that involved solicitation -- as opposed to

16   U.S. investors just coming to the site for their own reasons.

17   who want to invest, who want to have a foreign brokerage

18   account, which is what the SEC says that they can do.

19             THE COURT:  But that's a little different than I

20   understood the papers as saying, because I thought you were at

21   least conceding the argument that regardless of how they got to

22   the website, if they had an investor who said I went to the

23   website and the website said they could do all of these

24   services, and I invested because of the website, I thought your

25   argument -- at least part of your concession -- was if they at

D8D7SECC

1    least had someone who said they invested because they went to

2    the website, some U.S. investor, that that would be sufficient.

3    That was not your argument?

4            MR. DEFEIS:  That would at least accomplish at least

5    something of the link that the SEC's complaint lacks.

6            THE COURT:  Well, would that be a sufficient link or

7    an insufficient link?

8            MR. DEFEIS:  Well, I guess if it's one isolated

9    investor, I guess conceivably -- you know, we might be before

10   you arguing, maybe it's on a motion for summary judgment stage,

11   that this is really insignificant.

12           THE COURT:  So, suppose there were five investors.

13   Suppose they said, for example, these five people said they are

14   U.S. investors, they went to the website, and because of the

15   information and what they characterize as a solicitation on the

16   website that's the reason that they decided to invest.

17           MR. DEFEIS:  Right.  Then we would have a factual

18   issue.  We would have to depose these investors.  You know, we

19   would have something -- we might have a complaint that survives

20   the motion to dismiss.

21           THE COURT:  Well, that's the question.

22           MR. DEFEIS:  But they don't have that here.  They

23   don't have the link.  I mean they have tons of investors, they

24   have a significant amount of money, a lot of trading that takes

25   place, but they don't have anyone -- despite an investigation

D8D7SECC

that's at least three years old -- that can say that I was

solicited by this particular brokerage firm.

And, even in this complaint they yoked on transactions

with MDOR -- I forgot what the acronym stock symbol stands

for -- involving it was a case down in Florida, they had three

or four people who were charged, many of whom settled, they

were U.S. investors, but they don't even contend that these

people were solicited to the website.  It's basically two

unrelated --

THE COURT:  But solicited by the website.

MR. DEFEIS:  Either one.  They don't contend that.

It's unrelated.  And they try to paint over this by what I

characterized as the junk science, which is basically a

website.  They know they need that link, by the way, which is

why they plead it.  That's why it's there.  But their website

analyzer comes up with the same result day after day.

And, you know, again, they have selectively quoted

information from the website to argue, including information

that -- again, I think it's, you know, ridiculous to say that

they shouldn't be able to provide quotes in U.S. dollars, since

their currency is tied to the dollar, and English is the native

language down there.  Again, we are talking about a website

that is no longer operational; it hasn't been since before the

SEC filed the complaint.

THE COURT:  Well, the tougher part is that there is

D8D7SECC

nothing about the website that I am aware -- and again I
haven't seen the website but I have heard it described -- there
is nothing about the website that would indicate that the
website is not a communication -- at least I will use that
word -- not a communication to U.S. investors.

        MR. DEFEIS:  Well, I guess I would say not a
communication to the world, including U.S. investors.

        THE COURT:  Well, but if it includes -- I mean, let's
put it this way, it would be difficult to argue, and may even
be not a genuine reasonable argument to say that this website,
that whatever reaction was expected of investors by what was on
this website, that it was intended to affect Canadians the same
way it affects U.S. citizens and vice versa.

        MR. DEFEIS:  I agree a hundred percent, I did not
distinguish among viewers of the website.

        THE COURT:  Right.  So, whatever you are trying to
communicate, you clearly can't argue that the website only
intended to solicit Canadians.

        MR. DEFEIS:  Correct.

        THE COURT:  You can't make that converse offer.

        MR. DEFEIS:  You can't argue the website was intended
to solicit any particular group or to deny access to any
particular group.

        THE COURT:  OK.  And again I want to concentrate,
because I will see how they characterize it, but I think that

D8D7SECC

1    it's critical -- it may be critical to my decision as to

2    whether or not the issue is whether they were solicited to the

3    website or solicited by the website.  What do you say the issue

4    is?

5              MR. DEFEIS:  I think that they have to be solicited --

6    I think it's actually both, but I would say solicited to the

7    website is a critical issue.

8              THE COURT:  Well, but if I'm solicited to the website,

9    and I go decide -- if nothing on the website is a solicitation

10   for me to invest, what difference does it make whether I was

11   solicited to the website?

12             If I did a general search, and the website was one of

13   ten websites that I came up with, and I went to Gibraltar's

14   website, and Gibraltar says, please, U.S. investors, invest

15   with us, it wouldn't matter why I got to the website.

16             MR. DEFEIS:  Because I think that the latter involves

17   too much of a subjective determination frankly for broker

18   dealers to have to contend with.  I think it's beyond what the

19   SEC intended, and I think when we have to try to figure out why

20   this person decided to invest, we're getting into territory

21   that would be very difficult to deal with.

22             THE COURT:  Well, but I'm not sure I can agree with

23   that, because if once you get to the website the website had

24   what is a clear advertisement and solicitation to convince U.S.

25   investors to invest money, I think it would be irrelevant how

D8D7SECC

1   you got to the website if it was the website that was used to

2   convince you to invest, if the nature of the substance of what

3   was on the website --

4           MR. DEFEIS:  Well, then it's hard to argue that you

5   didn't satisfy the former, I suppose, that that wasn't your

6   intent in having the website, which was to solicit U.S.

7   investors.  In fact, if they get to the website and say, hey,

8   U.S. investors, we're closed for the Fourth of July, whatever,

9   then it's hard to argue that wasn't the intent.

10          But I think that the intent of the I guess I will call

11  it the safe harbor provision is to say you still can have a

12  website, and so long as you didn't intend to initiate or

13  solicit, have customers come to open up accounts as a result of

14  a solicitation of the website, that you are OK to operate in

15  this international environment.

16          I think that what we are missing here is we're missing

17  all the other indicia that may exist of solicitation of U.S.

18  customers, including, as a factual matter, people who were

19  solicited in these three cases, which we don't have.  And, you

20  know, again, no advertising, no spam or junk mail, no U.S.

21  presence, no cold calling.

22          THE COURT:  All right.  I mean -- OK, I think I

23  understand.

24          MR. DEFEIS:  What are they supposed to know about --

25  they're not licensed obviously by definition to operate here.

D8D7SECC

What are they supposed to know about what they should put on
the website?

          THE COURT:  I think I understand your argument.  They
have to avoid two things:  They have to avoid soliciting U.S.
customers to the website, and they have to avoid once they get
to the website convincing them to invest.

          So, I understand your argument then if they have done
nothing to get U.S. investors to come to the website, and
they've done nothing specifically on the website that targets
the U.S. investor so that it tries to convince them once they
get there to invest, then you're saying the government needs
something else to define a solicitation.

          MR. DEFEIS:  Right.

          THE COURT:  Because, as I said, I guess they don't do
that anymore.  I don't know if you had this experience, but
I've had friends probably decades ago that would be like Amway
representatives, and they would say come to my house, and they
wouldn't tell me why.  And they'd say, well, we got this thing,
we're going to have a get-together, and then I show up, and
then they have this whole Amway presentation about how I should
buy Amway products.  And I say to myself, well, golly, you
convinced me to come to your house under false pretenses, and
now when I get here, I'm sitting here with everybody trying to
convince me with everybody else to buy a product.  I don't want
to disparage Amway, but I'm just saying that that's the way in

D8D7SECC

1    those days I reacted to it when some people approached me.

2            But in this case your position is that they don't

3    allege that any of the U.S. customers were directed to the

4    website by the company, and they don't allege that anything on

5    the website specifically attempts to convince U.S. customers to

6    invest with Gibraltar.

7            MR. DEFEIS:  That is correct.

8            THE COURT:  If U.S. customers did invest with

9    Gibraltar, then safe harbor applies, unless they can identify

10   or at least give an example of one of those U.S. investors not

11   doing so on their own, but having done so because they were

12   either solicited to the website or solicited by the website.

13           MR. DEFEIS:  That's correct.

14           THE COURT:  All right.

15           MR. DEFEIS:  You know, moving on to -- we also argue

16   that they haven't -- you know, again with respect to the

17   operating as an unlicensed broker dealer, they allege control

18   person liability of Warren Davis.

19           THE COURT:  Well, how is Warren Davis not a control

20   person?  He is the sole investor, sole officer, sole owner of

21   the company.  Who else?

22           MR. DEFEIS:  He controlled Gibraltar, conceded, but

23   again we have not found a case imposing control person

24   liability where there is no fraud alleged.  And the language

25   which we cite there is basically he has to be a culpable

D8D7SECC

1    participant.  And we cite the authority for that.

2           So, it's not ownership; it's culpable participation.

3    And we're not aware of any case that holds -- all these control

4    person cases are Section 10 and Section 17 claims involving

5    fraud.

6           THE COURT:  But why do you say the culpable

7    participation has to rise to the level of fraud?  If I am the

8    control person in the broader sense, in the generic sense, and

9    I am responsible for the illegal acts that the company commits,

10   why are those illegal acts only limited to fraud?  If I know

11   that the company is not supposed to solicit customers in the

12   U.S., and I deliberately make the company solicit customers in

13   the U.S. in violation of U.S. law, why do I escape control

14   person liability simply because in most cases -- if not all

15   examples that you have cited -- the cases are usually fraud

16   cases?

17          MR. DEFEIS:  They all appear to be fraud cases, and

18   the language used is that you have to be a culpable

19   participant.

20          THE COURT:  Well, what is culpable?  Culpable means

21   that you are responsible for the illegal acts of the company.

22          MR. DEFEIS:  Right.

23          THE COURT:  You're not saying the definition of the

24   word culpable is fraud.

25          MR. DEFEIS:  No, I'm saying -- no, they may not be

D8D7SECC

1   synonymous, but there is a certain level of intent involved and

2   a certain level of participation.  This company had --

3            THE COURT:  Well, if I intended to break U.S. laws,

4   why is that not culpable?

5            MR. DEFEIS:  Well, yeah, if you were a one person

6   shop, maybe you would be, maybe you would be chargeable as a

7   principal.  But we are talking about a brokerage firm that when

8   it was in operation employed ten people.  So, again we have

9   what the SEC contends is a case where it's essentially strict

10  liability.  So that's why the courts are, in my opinion --

11           THE COURT:  Well, suppose I violated the tax laws?

12  Are you saying that I can't be a control person?  I mean you

13  say it's limited to fraud.

14           MR. DEFEIS:  I'm saying the cases that we have

15  found -- if the SEC has another case, they should call it to

16  our attention -- but the cases we have found impose control

17  person liability in cases where the allegations are fraud.

18  They're saying this is a strict liability offense.

19           THE COURT:  Right.  But you don't know of any case

20  that says that it is limited to fraud.

21           MR. DEFEIS:  No.  But this would be maybe the first

22  time a court, you know -- this will be the first time that

23  control person liability were imposed for Section 15(a)(1)

24  claims, so far as we know.

25           THE COURT:  But it also would be the first time that

D8D7SECC

 1   any court would say that unless you commit fraud you can't be a

 2   control person.

 3              MR. DEFEIS:  Correct.  But they've always used -- they

 4   have used this language culpable participant.

 5              THE COURT:  Right, culpable --

 6              MR. DEFEIS:  But that's something beyond ownership.

 7              THE COURT:  Yeah, but if you want to give me a

 8   definition of culpable that excludes this, I'm willing to hear

 9   it, but the definition of culpable is not fraud; the definition

10   of culpable is something much broader that includes other

11   illegal acts that you are responsible for other than fraud.

12              MR. DEFEIS:  Certainly the colloquial understanding

13   that we have of what a control person would be -- sorry -- of

14   what culpable would be would be beyond fraud, that they're

15   basically responsible somewhere.

16              But, again, given the breadth of the claims here, and

17   the fact that they don't have to show intent to deceive, we

18   could see why a court would be reluctant to reflexively impose

19   control person liability in instances where there was no intent

20   to defraud involved.  OK?

21              THE COURT:  Well, I'm not sure I would understand

22   that, because, as I say, if there was an intent to violate the

23   tax laws or intent to violate other laws of the U.S., I don't

24   know what would be the good public policy reason to say, well,

25   you get a pass on that because it wasn't fraud.

D8D7SECC

1          MR. DEFEIS:  Well, I mean you still would punish the

2    company.  The company would still be subject to -- so, maybe

3    there is no --

4          THE COURT:  What's the rationale for punishing the

5    control person on fraud and not punishing the control person on

6    other violations of U.S. law?

7          MR. DEFEIS:  Well, because in the fraud instances they

8    are, you know -- the culpable participant does include I think

9    a concept that there is some awareness of the situation and

10   ability to change.

11         THE COURT:  Well, that's the concept here too.

12         MR. DEFEIS:  OK.  Well, you know, maybe we will be

13   making law in the case.  I don't know.  But the bottom line is

14   that we have not found authority for imposing control person

15   liability in claims of this kind.  So, that's basically it.

16   You know, we could argue whether it's good public policy or bad

17   public policy, but we just don't think it exists.

18         The other contention that we make -- and I appreciate

19   all the time the court has given me to make the argument -- is

20   that the MDOR securities themselves were not registered, and

21   that Gibraltar's involvement in that, in basically arranging

22   for sale of these MDOR securities, should be punishable under

23   Section 5(a) or Section 5(c).

24         And I guess we argue a couple of things, and I will be

25   brief about this.  One is that Gibraltar itself was not a

D8D7SECC

1   substantial participant in this transaction at all.  And it's

2   related to the second point that --

3              THE COURT:  Well, it depends on what your definition

4   of substantial participant is.  They were the ones who bought

5   the shares, and they were the ones who transferred the shares.

6              MR. DEFEIS:  They held the shares.

7              THE COURT:  Who is a more substantial participant than

8   the buyer or seller?

9              MR. DEFEIS:  Well, it could have been anyone else in

10  the world.  It could have been another international broker

11  dealer.

12             THE COURT:  Right.  And if another international

13  broker dealer had done that for the purpose of avoiding U.S.

14  laws, then why are they a less significant player?

15             MR. DEFEIS:  That's a critical clause, for the

16  purposes of evading U.S. laws, but the safe harbor here is that

17  it was just providing ordinary broker dealer services.

18             THE COURT:  But that's a question of intent.  That's

19  not a question of the extent of their involvement or whether

20  they are a critical player.  They are clearly a critical

21  player.  If you have nobody buying and selling the shares for

22  the company that you are trying to hide, then it's not going to

23  happen.  So, you need to find somebody who is willing to go

24  along with your plan to make sure that people don't know that

25  you are just buying and selling it to yourself by being the

D8D7SECC

 1    front person who pretends like they're really the independent

 2    buyer and seller.  Why is that not the most critical part?

 3         MR. DEFEIS:  I don't know that they pretended they are

 4    really the buyer.

 5         THE COURT:  Isn't that what they allege?  They

 6    structured a transaction to make it look like this was not a

 7    transaction in which the company was transferring the shares --

 8    I guess I don't want to say -- to itself.  But maybe that's

 9    what I should say.

10         MR. DEFEIS:  What they say is we don't meet the broker

11    dealer exception because effectively we were an underwriter.

12    That is, that the MDOR proceeds were going back to MDOR.

13         THE COURT:  Right.  Because you contend that you were

14    the beneficial owner of these shares, and you knew you weren't,

15    and you knew that MDOR was, and you faked it.  Why isn't that a

16    claim?

17         MR. DEFEIS:  First of all, I think there has been no

18    allegation that they deceived the actual transfer agents

19    involved.  I think that the allegation -- particularly as

20    exemplified by the case that was pled out in Florida -- was

21    that everybody was deceived.

22         THE COURT:  Everybody but MDOR and you.

23         MR. DEFEIS:  And the flat nominees, as they're called,

24    who engaged in the fraud.  But as they alleged down in Florida,

25    they indicated that they had false promissory notes that

D8D7SECC

 1    indicated that these proceeds were going to MDOR to repay a

 2    note.  And they deceived a law firm involved, which we alleged,

 3    taking shares without a restrictive legend and payment.

 4                Again, what we contend is that --

 5                THE COURT:  -- you were deceived too.  But why is that

 6    a pleading problem?  Because, you know, as they say --

 7                MR. DEFEIS:  These were ordinary broker dealer

 8    services, what we're saying is -- because they don't allege

 9    that --

10                THE COURT:  But they don't claim that you were

11    deceived.

12                MR. DEFEIS:  They don't claim that we were deceived.

13                THE COURT:  They claimed that you were in the know.

14                MR. DEFEIS:  Well, they put two and two together and

15    claimed that we know.  They don't really say that there was a

16    conversation and we were in on the deal.

17                THE COURT:  Well.

18                MR. DEFEIS:  What they say is -- and they don't

19    contend that we received anything other than ordinary broker

20    dealer commissions.

21                THE COURT:  But they are saying of all of the people

22    involved in this transaction, you knew or should have known,

23    there is no way you can argue that you didn't know that these

24    were your shares.

25                MR. DEFEIS:  Except if you look at the complaint down

D8D7SECC

1    in Florida, right.

2            THE COURT:  I mean they didn't belong to you, and you

3    represented that they belonged to you.

4            MR. DEFEIS:  But it goes over with the proceeds, for

5    the benefit of a particular customer.

6            THE COURT:  Right.  And they say you hid that.

7            MR. DEFEIS:  I don't know if they said that we did.

8            THE COURT:  Well, I mean for the benefit of the same

9    customer that was selling the shares, if I have it right.

10            MR. DEFEIS:  Right.

11            THE COURT:  Well, it can't be for the benefit of the

12    same -- if you are transferring it right back to the same

13    customer and just taking a commission, that's not a legitimate

14    transaction.  You would agree with that, right?  That if I

15    played the role, if I say I want to buy -- if I say I want to

16    buy a hundred shares of IBM, and I get the hundred shares, and

17    they want to know, well, whose shares are these, and I say

18    they're mine and they're for me, but what I really do is then I

19    take the shares and I sell it back to the person who sold it to

20    me, and then I take a 10 percent commission, what else am I but

21    a broker dealer?  I'm not the buyer or the seller.  I'm not the

22    beneficial owner.  I have no interest in this transaction in

23    owning shares.

24            MR. DEFEIS:  Right.

25            THE COURT:  I only have an interest in facilitating

1    the transaction and getting a fee for that.  Isn't that the

2    classic definition of broker dealer?

3              MR. DEFEIS:  Facilitating a transaction and getting a

4    fee for it is the classic --

5              THE COURT:  And isn't that exactly what they allege on

6    this particular instance?

7              MR. DEFEIS:  No.  They alleged that we were

8    effectively an underwriter because we knowingly were seeing to

9    it that the proceeds went back to MDOR.

10             THE COURT:  Right.

11             MR. DEFEIS:  But that's different.  They try to take

12   us out of that exception.  What we're saying is --

13             THE COURT:  Why is that not a sufficient allegation?

14   I'm not questioning whether it's true.  Why isn't that a

15   sufficient allegation for this liability?

16             MR. DEFEIS:  Because it's contradicted by another

17   pleading that the SEC filed.

18             THE COURT:  Well, that may make the facts incorrect,

19   but it doesn't make the independent allegation insufficient,

20   does it?  I mean if you were going to say that they can't prove

21   it because there is evidence that they admitted that it's not

22   the case, or in a different circumstance --

23             MR. DEFEIS:  Well, frankly I think they should rely on

24   consistent theories.  That's basically it.  I think maybe it's

25   a question of harmonizing what they filed before your Honor

D8D7SECC

 1     with what they filed before another federal --

 2                THE COURT:  How do I resolve that on a motion to

 3     dismiss though?  Suppose the facts are the way they allege it

 4     in front of me rather than the way they alleged it in Florida?

 5                MR. DEFEIS:  Conceivably it's difficult to resolve on

 6     a motion to dismiss, other than to say, hey, why don't you

 7     replead this allegation so we understand exactly what you are

 8     contending here.  I mean, how were they not operating as an

 9     ordinary broker dealer?  I mean why is it if they deceive a

10     large law firm involved in D.C., and as you claim yourself on

11     paragraph 21 that even the share certificates, although they're

12     titled in Gibraltar's name, they generally include the legend

13     for the benefit of the particular customer.

14                THE COURT:  But I don't think there was anything in

15     the Florida case that directly made inconsistent allegations

16     with regard to your client.

17                MR. DEFEIS:  No, we were not involved in the Florida

18     case.

19                THE COURT:  Right.  So, you weren't involved in it.

20     So, how is it -- you are saying it's inconsistent with the

21     allegations they are making here, because in Florida they said

22     all of those people in Florida were deceived --

23                MR. DEFEIS:  Correct.

24                THE COURT:  -- and so, therefore, that should mean

25     that you were deceived too.

D8D7SECC

1          MR. DEFEIS:  Correct.  I would say we were included

2     within, you know --

3          THE COURT:  But they didn't include you.

4          MR. DEFEIS:  They used general language there.

5          THE COURT:  No, they said those other people were

6     deceived, and they explain how they were deceived.  And you

7     want to say that it makes it insufficient pleading for them to

8     say everybody else was deceived except you, and you knew

9     exactly what was going on.

10          MR. DEFEIS:  Yes, and we're saying it would be

11     impossible for us to know if promissory notes were false and

12     that restrictive legends were inappropriately removed from the

13     certificates.

14          THE COURT:  OK.  And how do I resolve that short of a

15     factual dispute?

16          MR. DEFEIS:  I think you ask the SEC to replead it,

17     you know, to consider whether they should be harmonized with a

18     pleading they filed in another federal court.

19          THE COURT:  Well, what is it you say that they haven't

20     alleged against your client?

21          MR. DEFEIS:  I guess what I say is that they haven't

22     alleged anything to take us out of the broker dealer exception.

23          THE COURT:  But they have.  They gave you the

24     elements.  They said that you knew, and you were involved in a

25     transaction, and you were involved in a transaction that

D8D7SECC

1    defines you as an underwriter because you played simply a role

2    of issuing those shares -- I may not be characterizing it

3    accurately -- but issuing those shares rather than simply

4    acting as a broker dealer who should be protected by that

5    exemption.

6         MR. DEFEIS:  I guess what I'm saying is we are relying

7    on the allegations made in another federal proceeding.

8         THE COURT:  Right.  And what are the allegations made

9    in another federal proceeding that would make it inconsistent

10   with the allegations that they made against you?

11        MR. DEFEIS:  That Gibraltar knew that there was some

12   problem with engaging in transactions with these particular --

13        THE COURT:  What's inconsistent with what Gibraltar

14   knew that was in the Florida case?

15        MR. DEFEIS:  Well, in the Florida case they say that

16   the flat nominees who were involved in the MDOR transaction

17   deceived the transfer agent into issuing MDOR share

18   certificates without the required restrictive legend, so that

19   they wouldn't have known that these particular shares -- which

20   are allegedly and apparently were not properly registered --

21   were in fact problematic and shouldn't have been registered.

22        THE COURT:  Are you saying that because they wouldn't

23   have known, you couldn't have known?  It's impossible that you

24   couldn't have known?

25        MR. DEFEIS:  It's possible.  No, I'm not saying it's

D8D7SECC

1  inconsistent.  We're not saying that one necessarily excludes

2  the other.  What I am saying is that, you know, you have --

3  again I apologize for repeating myself -- but you have another

4  federal proceeding where the same agency is alleging there was

5  an elaborate con and deception involved.  And I am also

6  alleging that they don't contend that Gibraltar itself received

7  anything more than ordinary commissions on these transactions.

8          THE COURT:  All right.

9          MR. DEFEIS:  Thank you, your Honor.

10          THE COURT:  Sure.  Let me hear from the SEC.

11          MR. KIDNEY:  I think based on your questions I'm sure

12  you are going to have questions for me too, but I think you hit

13  on a lot of the reasons why this is not an appropriate case to

14  entertain this motion to grant this motion to dismiss.

15          Mr. DeFeis made a number -- as they have done

16  throughout this motion practice -- made a number of assertions

17  which are not in evidence, and I think it's important that we

18  revisit what the standards are on a motion to dismiss.

19          As we cited in our brief by reference to the Federal

20  Practice Digest -- which has dozens if not hundreds of

21  citations -- the standard wisdom on a motion to dismiss, the

22  SEC is entitled that fair inferences be drawn from its

23  complaint, and it is not an occasion on a motion to dismiss to

24  receive allegations which would require additional evidence.

25          THE COURT:  So, let's just go -- I mean we don't have

D8D7SECC

1    to go through the basic standard.  I'm fully familiar with

2    that.  Let's just go straight to the factual allegations.  And

3    let me first ask you -- I have put aside some things.

4           You don't allege that Gibraltar did anything to

5    convince investors to go to the website.  That's not your

6    contention.

7           MR. KIDNEY:  That is not.  But it's only because while

8    we received some voluntary production in the Magnum DOR --

9    which is the MDOR case from Gibraltar, which of course is in

10   the Bahamas, as to which we can't exercise any regulatory

11   authority for investigators to be down there -- we got only

12   voluntary production in that case, very limited.  Mr. DeFeis

13   says there were no phone calls, no mailings, no spam, no

14   presence in the United States.  That is a subject that is a

15   matter that's subject to proof.

16          THE COURT:  Well, it's not a matter subject to proof

17   unless it's a factual dispute that's relevant to your

18   allegations.  You don't allege that that's the basis of your

19   claim.

20          MR. KIDNEY:  No.

21          THE COURT:  So --

22          MR. KIDNEY:  The basis of our claim is -- to step back

23   for a minute, obviously a website is a solicitation, it's an

24   advertisement.  Amazon.com, which some of us may have heard of,

25   didn't send out postcard, didn't get well known by sending out

D8D7SECC

1    postcards saying go to Amazon.com.  It didn't get rich by

2    calling people up and say go to our website Amazon.com.  People

3    were originally looking for books, and they wanted to get them

4    cheaper, they went on the website and Amazon.com said come and

5    buy your books here because we can do it cheaper and we will

6    mail it to you real fast.

7            THE COURT:  So, have I accurately characterized your

8    set of allegations by saying that you are not alleging that the

9    violation is convincing them to go to the website?  You are

10   alleging that the violation is that the website itself is a

11   solicitation by Gibraltar.

12           MR. KIDNEY:  Correct.

13           THE COURT:  So, once I get to the website, you're

14   saying on the website the website itself solicits U.S.

15   investors to invest.

16           MR. KIDNEY:  Well, it says, for example --

17           THE COURT:  Is that a yes?

18           MR. KIDNEY:  Yes, sir.

19           THE COURT:  OK, go ahead.

20           MR. KIDNEY:  And it does so by claiming to offer

21   offshore brokerage services.  Offshore.  From where?  I mean if

22   you were just soliciting people in the Bahamas, it wouldn't be

23   offshore.  I mean obviously the main offshore is the Bahamas,

24   and it says that it has commissions comparable to those on the

25   "mainland".

D8D7SECC

1          Now, today Mr. DeFeis says, well, you can't

2     distinguish between U.S. and Canada.  In their initial moving

3     memorandum they said well, it probably only meant Canada

4     because both the Bahamas and Canada are part of the British

5     Commonwealth.  Which is not a fair inference.  The inference --

6     which at this point is all the court is asked to draw -- is

7     when they say mainland, and say our commissions are lower or

8     are comparable to those in the mainland, the mainland we are

9     talking about is North America, which includes the United

10    States and Canada.

11         THE COURT:  So, you are not contending that mainland

12    is supposed to be a definition, solely a reference to the

13    United States.

14         MR. KIDNEY:  No.  In fact we put in the website

15    statistics, which are subject to further development of

16    evidence.  And if they're admitted, they have to have a

17    sufficient foundation and so forth.  But it's a fair inference

18    that at least these website counter things found that whenever

19    they did it -- and of course the number is probably the same

20    because the website has been down; it hasn't been operating for

21    months and months, so whatever number it is, there is no reason

22    to change it because the website hasn't been operating.  But if

23    it's necessary, subject to going to those people, and

24    establishing their methodology and so forth, but it's an

25    inference drawn from what is available on the website as to

D8D7SECC

1    where the audience for Gibraltar was coming from, and it was

2    U.S. and Canadian.

3         THE COURT:  But I'm not sure what that proves.  I'm

4    not sure what that proves.  If you say -- that's why I'm trying

5    to figure out whether or not I can clearly draw a line between

6    whether or not you are arguing about solicitation to the

7    website or you are arguing about what has convinced them to

8    invest.

9         If the only real issue is whether or not they are

10   being solicited by the website -- and when I say solicited,

11   that means that the website itself has content that is trying

12   to convince them, to convince U.S. investors to invest -- how

13   is -- I don't understand how those statistics advance that

14   argument one way or the other, unless you have some statistics

15   telling me somebody invested.

16        MR. KIDNEY:  Well, somebody did invest.  As we said in

17   the complaint also, there were millions of dollars, that

18   Gibraltar used U.S. brokers, and in the MDOR case alone they

19   made 600 sales transactions.

20        THE COURT:  But you don't claim that that is a

21   violation of any U.S. laws, to simply have U.S. investors.  The

22   question is how they got those U.S. investors.

23        MR. KIDNEY:  Are they solicited.

24        THE COURT:  OK.  So, in what way have you alleged that

25   they -- I assume that you are not -- and maybe you are -- you

D8D7SECC

are not saying that this complaint alleges that there were

certain investors who were solicited and in fact invested as a

result of that solicitation.

MR. KIDNEY:  Actually we're asking the court to take

those allegations about the website, the offering to hide the

profits so you don't have to disclose it in a divorce

settlement or other thing -- and in fact we say in the

complaint they lied to broker dealers about who actually they

were investing for, they said it was only for themselves,

Gibraltar in the Bahamas, so there wouldn't be any tax

consequences.

THE COURT:  Yeah, but that's true of everybody, right?

That's --

MR. KIDNEY:  Right.  But it is more evidence that they

in fact were putting their muscle where their word was, what

they put on their website to say we will do this for.  And we

are saying, yes, American consumers, investors did come and

become customers due to this website.

THE COURT:  All right.  Let me ask you this then.  Is

it your position -- I assume it's not, but it may be -- is it

your position that even if you can't prove that any of the

people that you say were solicited, even if you can't prove

that any of them invested, that you still can make out this

claim?

MR. KIDNEY:  We think we can make out the claim by

D8D7SECC

1   showing that they had a lot of U.S. customers and that they had

2   this website that attracted them.

3           THE COURT:  But that's not my question.

4           MR. KIDNEY:  We think it's a fair inference for the

5   court to draw.

6           THE COURT:  No, I understand that part of it.  I'm

7   just trying to figure out the extent or the limits of your

8   allegation.  You're not saying that you can prove this claim

9   simply by proving they solicited U.S. customers who never

10  invested?

11          MR. KIDNEY:  Well, it's the SEC's position that when

12  U.S. customers go on that website, and go into the website,

13  that they are in effect successfully solicited by the website

14  whether they become customers or not.

15          THE COURT:  That's what I'm asking.

16          So you're saying if you showed that ten people came to

17  the website but they never invested, in what way do these

18  factual allegations -- with regard to people who didn't

19  invest -- in what ways are these factual allegations sufficient

20  to make out solicitation?

21          MR. KIDNEY:  Because the term is solicitation.  They

22  intentionally -- well, they don't even have to have intent.

23  But they don't take any effort -- in this case they clearly did

24  make efforts to attract "mainland investors".  And they were

25  successful at that, and they had this website.

D8D7SECC

1          At this stage of the proceeding it is not a fair

2     inference to suggest that Gibraltar maintained this website for

3     four years and it didn't result in any business, which is what

4     in effect the defense is asking this court to infer at this

5     stage.

6          THE COURT:  So, at this point I would have to conclude

7     that the fact that they have the website, the fact that the

8     website advertises that they're offshore, and they are not on

9     the mainland, and that you can avoid taxes by investing with

10    them.

11         MR. KIDNEY:  Well, they offer comparable-to-mainland

12    commissions.

13         THE COURT:  OK, comparable-to-mainland commissions.

14    It's reasonable to assume that all of those are references to

15    the United States?

16         MR. KIDNEY:  As well as to Canada.

17         THE COURT:  All right.  So, your argument is not that

18    any of this language is exclusively targeted or defined as the

19    United States.  Your argument is it is at least the United

20    States and Canada, and that that's good enough, as long as it

21    includes the United States.

22         MR. KIDNEY:  Correct.  And that answers Mr. DeFeis'

23    argument in response to your question, that -- basically his

24    position would be if it's in English, and it's an English

25    website in, I don't know, Jakarta, the SEC's position would be

1    that if it's just in English and it doesn't specifically say we

2    are not soliciting U.S. investors, well, then, the SEC can go

3    after them.

4              Well, that's not true, because in this instance this

5    website has indicia clearly indicating that it's seeking

6    customers on the mainland.  And the reason why that website

7    number, the 2570 or whatever it is -- which shows more Canadian

8    hits than U.S. hits -- is significant -- and we will have to

9    prove it up, whatever the number is -- is because actual U.S.

10   citizens or U.S. ISPs, in any event, were going to that

11   website.  Some of them may have become customers, maybe none of

12   them did, but they were solicited.  They went to that website.

13             THE COURT:  And in what way once they got to the

14   website, what way were they targeted and in what way did they

15   attempt to convince them to invest as U.S. investors?

16             MR. KIDNEY:  Well, because they said we can keep it

17   secret.

18             THE COURT:  Well, that's true in China, they keep it

19   secret.

20             MR. KIDNEY:  Well, I don't know.  We know for a fact

21   they did it in the United States by filling out falsely IRS

22   forms for the broker dealers so that they wouldn't withhold

23   taxes from those accounts.

24             THE COURT:  But if that's true, that would be true

25   even as to clients they didn't solicit.

D8D7SECC

1          MR. KIDNEY:  It doesn't matter.

2          THE COURT:  That's what I'm saying, it doesn't matter.

3   What difference does it make?  It doesn't advance the

4   solicitation argument.

5          MR. KIDNEY:  Sure it does, because you asked me

6   basically what would cause a U.S. investor -- who is going to

7   pay mainland commissions to this offshore broker dealer -- to

8   invest.

9          THE COURT:  No, but that's not the question I should

10   have asked.  The question is not what would have caused them.

11   The question is whether were they caused to do that because the

12   company, Gibraltar, was attempting to convince them to do that

13   even though they knew that they didn't have the legal right to

14   do so?

15          MR. KIDNEY:  Well, sure, website.  The website was an

16   ad, a solicitation, and it identified reasons why U.S.

17   customers, Canadian customers should invest in -- should buy

18   and sell their securities through Gibraltar.

19          THE COURT:  But what's critical to your argument is

20   the inference that even though it doesn't mention U.S. at all,

21   that the references are meant to be veiled references to U.S.

22   investors, and it's intended to convince U.S. investors to

23   invest offshore with them?

24          MR. KIDNEY:  Correct.

25          THE COURT:  All right.

D8D7SECC

1          MR. KIDNEY:  And it succeeded.  Because we know they

2     had many, many U.S. investors.  I don't quite understand how

3     they could get all those investors and run a website.  And

4     discovery presumably will show that Gibraltar itself maintained

5     sufficient records to show that its website was successful for

6     four years.  Otherwise why would they maintain it?

7          THE COURT:  We don't know.

8          MR. KIDNEY:  And we don't know.  We should find out in

9     discovery.  At this stage of the game on a motion to dismiss,

10    the SEC need only establish sufficient facts along with

11    inferences -- and we pled both facts and asked the court to

12    draw inferences -- so more than sufficient to show that what is

13    an elephant is in fact an elephant.

14         THE COURT:  Yeah, but your argument isn't that if the

15    statistics show that 75 percent of the customers were Canadian

16    and 25 percent of the customers were U.S., that that somehow

17    inherently proves that that 25 percent of U.S. customers were

18    solicited by the website.

19         MR. KIDNEY:  Well, they went to the website, and

20    because of what the content of the website says, yes, they were

21    solicited.

22         THE COURT:  Yeah, but you don't allege that you know

23    somebody who went to the website and therefore invested after

24    they went to the website because of the website.  You don't

25    make that allegation.

D8D7SECC

```
1         MR. KIDNEY:  No, we don't say that, because basically
2    all of these witnesses, the investors that Mr. DeFeis talked
3    about, are supposed investors that were part of this Magnum DOR
4    scheme.  So, they weren't going to say that -- I mean they went
5    there because Magnum DOR was willing to help them return the
6    money to Magnum DOR.
7         THE COURT:  Well, wouldn't you agree that logic would
8    at least dictate that if your claim is that all of these
9    people -- and whatever the raw numbers are -- all of these
10   people came to invest as a result of being solicited by their
11   website, it wouldn't be unreasonable to say that one would
12   expect that you would have such evidence?  You would have
13   identified at least one investor who you claim was such an
14   investor.
15        MR. KIDNEY:  Why would any investor like that want to
16   bring themselves to the attention of the Securities and
17   Exchange Commission when they probably are also avoiding taxes
18   for the IRS?
19        THE COURT:  Then how are you going to prove that any
20   of these people -- how are you going to prove that any investor
21   they have was solicited by the website?
22        MR. KIDNEY:  Well, first of all, we have the website.
23   We don't have to prove that people actually invested.
24        THE COURT:  So, you don't intend that that would be
25   required with regard to your proof.
```

D8D7SECC

1          MR. KIDNEY:  No.  If they visited the website, they

2     were solicited.

3          THE COURT:  So, you say it's sufficient to allege and

4     prove that people came to website, they saw that it was

5     offshore and there was mainland to avoid taxes, and there is

6     some U.S. investors that we can't say are the same investors,

7     but they have U.S. investors, that that in and of itself is

8     sufficient allegations and proof to prove your case?

9          MR. KIDNEY:  Well, we have asked -- at some point I

10    assume we might get to the litigation planning -- but we have

11    asked the defense to provide us with all evidence of any

12    contacts with the United States, which would include the very

13    things that Mr. DeFeis says they didn't do.  But I would be

14    very surprised if there were no phone calls to the United

15    States.  I would be very surprised if there was no e-mail

16    communication to the United States.  After all, it dealt with

17    all these brokers from the United States.

18         THE COURT:  The only relevance of that would be such

19    communications with people who are not customers.

20         MR. KIDNEY:  Well, to the brokers maybe.  No, that

21    would include --

22         THE COURT:  What difference does it make?  If it's

23    already to customers, it doesn't prove how they got those

24    customers.  The critical issue here is not a debate about

25    whether they have U.S. customers.  We know they have U.S.

D8D7SECC

1  customers, and your position is they are entitled to have U.S.

2  customers, and they would be entitled to have as many U.S.

3  customers as want to come to them.

4         MR. KIDNEY:  And that they don't solicit.

5         THE COURT:  Right.  That's not the issue.  The issue

6  is where is there the evidence that the customers they get are

7  being solicited, or some other customers that they're not

8  getting are being solicited?

9         MR. KIDNEY:  The website.

10        THE COURT:  Well, I mean let's put it this way.  I

11 understand your position, and you may convince me for purposes

12 of a motion to dismiss -- and I haven't decided yet -- that

13 that's minimally sufficient.  But quite frankly it is clearly

14 minimally sufficient.  It is not significant proof of

15 solicitation to simply say, well, you have to infer that

16 mainland means that they are talking to U.S. citizens, and you

17 have to infer that offshore means that they want U.S. people to

18 invest, and you've got to infer that because they say you can

19 avoid taxes that they are talking about avoiding U.S. taxes.

20        I mean this isn't the strongest set of allegations

21 that one could make with regard to a solicitation claim.  This

22 is one of the weaker set of allegations that one can make with

23 regards to a solicitation claim because you have no direct

24 evidence of identifying U.S., or articulating that this is for

25 U.S. investors in that direct sense, and you have no allegation

D8D7SECC

1    that you have a person, a company that says, yes, I am a

2    customer, and I am a customer because I was solicited by the

3    company.

4            So, I mean, you know, your inferences are -- as I say,

5    I won't characterize them as weak, but I will characterize them

6    at best minimal as opposed to a maximum set of allegations that

7    one could make.

8            I know what you would characterize as a stronger case,

9    but I don't know what you would characterize as a much weaker

10   case than just simply saying, ah, they solicited because they

11   said mainland, you know what that is a buzzword for.  That's

12   the way your argument is based.

13           MR. KIDNEY:  Well, actually to the contrary, your

14   Honor.  I feel strongly that this is a strong case.  We have a

15   website that was in existence for four years.  We have some

16   statistical information that says U.S. customers did go to that

17   website.  We have a website which presumably was maintained

18   because Mr. Davis and Gibraltar were actually getting results

19   from it.  We have many, many, many --

20           THE COURT:  What do you mean getting results from?

21           MR. KIDNEY:  Getting people to sign up, to invest with

22   them.

23           THE COURT:  Well, where is that?  You don't allege

24   that.

25           MR. KIDNEY:  Well, we haven't taken any discovery from

D8D7SECC

 1    them because they are down in the Bahamas.

 2            THE COURT:  I am not talking about discovery.  You

 3    just said you have a stronger case, and you say you have a

 4    stronger case because of this fact.  But I'm saying to you not

 5    on your complaint, because that's not what you allege in your

 6    complaint.

 7            MR. KIDNEY:  Actually, the complaint alleges that

 8    they -- we have alleged language that the only logical

 9    inference is that it was directed to Canadian and U.S.

10    customers.

11            THE COURT:  Tell me where in your complaint.  Show me

12    where in your complaint you allege that customers of Gibraltar

13    are customers because they were solicited.

14            MR. KIDNEY:  We allege they were solicited.

15            THE COURT:  No.  You see again you are avoiding my

16    question.  That's not my question.  You made a different

17    statement just a minute ago, and I am just saying that that's

18    not what you have in your complaint.

19            You don't have in your complaint that any current

20    customers of Gibraltar or any customer that Gibraltar got was

21    solicited by Gibraltar.  That's not what you allege.

22            MR. KIDNEY:  That's not even an element of the

23    offense.

24            THE COURT:  I didn't ask you that.  You would agree

25    with me that's not what you allege.

D8D7SECC

1              MR. KIDNEY:  We have not put that in.

2              THE COURT:  So, based on that argument -- that's not

3    part of the argument on why this complaint is sufficient,

4    because you have alleged that they have customers who were

5    solicited.  That's not what you allege.  Your case would be

6    stronger if you had alleged that.  As I say, that's a stronger

7    case rather than a weaker case.  I'm not saying that it is an

8    insufficient case, but obviously a stronger case would be if

9    the website said something specifically about U.S. citizens

10   investing with the company rather than just buzzwords.  And

11   obviously it would be stronger if you can allege that there are

12   certain individuals who were customers and they are customers

13   because they were solicited by them.  I am not saying that it's

14   necessary, but that would be a stronger case rather than a

15   weaker case than what you have alleged.

16             MR. KIDNEY:  Well, given that the SEC is a regulator

17   and does not represent individual investors, given that the

18   investors that it has communicated with were by and large to

19   one degree or another involved in a Section 5 violation, the

20   sale of unregistered securities, and given that Gibraltar is a

21   Bahamian company which is not subject to investigative

22   subpoenas down there, it is not surprising that we can't allege

23   with great specificity that there were specific customers who

24   actually became customers because of the website.  But that is

25   not an element of the offense.  I agree that if we had such

D8D7SECC

1    people, we would be in better shape, we would have a stronger

2    case, but I think that right now there is no doubt that we have

3    a sufficiently strong case to withstand a motion to dismiss,

4    which is largely based on matters not alleged and as to which

5    there is no evidence, which Mr. DeFeis makes.  At one point he

6    even argued mainland could mean Great Britain, again bringing

7    up the Commonwealth argument, even though Great Britain is not

8    a mainland.  It's called the British Isles for a reason.  And

9    these inferences that they ask the court to draw are just

10   crazy.

11             THE COURT:  So, what am I supposed to assume is going

12   to be the underlying proof of the way that you have alleged

13   these claims?

14             As I say, the way you have alleged it, I don't have

15   any reason to believe that we'll have a whole lot more at the

16   end of this case than we have at the beginning of the case.

17   The only question is, it seems to me, whether it is reasonable

18   to -- if you are not going to show that there is -- if you

19   don't think that you are going to find direct evidence that

20   certain customers were solicited by the website or in any other

21   way, then the facts as you've given to me aren't going to

22   change.  The question is whether or not the content of the

23   website can reasonably be interpreted as being legally a

24   solicitation.

25             MR. KIDNEY:  Correct.

D8D7SECC

1          THE COURT:  That doesn't depend on any new evidence or

2     any discovery.  Either I have to agree with you that that in

3     and of itself is sufficient to be a solicitation, or it's not

4     sufficient to be a solicitation.

5          So, I would have to determine where it is alleging and

6     proven offshore, mainland, taxes, that that combination of

7     things.  If a reasonable trier of fact, by understanding that

8     that's the nature of the language being used by the website,

9     whether that would constitute in and of itself, legally without

10    any further proof -- because you are not alleging any further

11    proof -- whether that in and of itself would legally constitute

12    a solicitation.  Isn't that really a legal issue and not a

13    factual issue?

14          MR. KIDNEY:  Well, that's partly a legal issue, but I

15    think also you have to take into account that all of the

16    business is North American mainland business.

17          THE COURT:  You can't do it that way, because 75

18    percent of their business is Canadian.  So, the only statement

19    you can make is 25 percent of their business is U.S., and we

20    have no idea how they got that business.

21          MR. KIDNEY:  Well, we probably will after we take some

22    discovery.

23          THE COURT:  Well, you may or may not, but you don't

24    allege in this complaint that that's a relevant consideration.

25    That's not part of your allegations.

D8D7SECC

1          MR. KIDNEY:  Well, the SEC has put in the complaint

2     that 25 percent of the visitors to this website were from the

3     United States, and we have put in --

4          THE COURT:  Well, let me make sure I have this right.

5     I thought the allegation was that 25 percent of their customers

6     were U.S. citizens.  It's 25 percent of the people who --

7          MR. KIDNEY:  Website hits.

8          THE COURT:  Wait a minute.  That 25 percent of the

9     website hits are customers?

10          MR. KIDNEY:  No, are U.S. citizens.  Come from the

11     U.S.

12          THE COURT:  Right.  But that's not what you just said.

13     So, you are not talking about customers.

14          MR. KIDNEY:  I'm talking about website hits.

15          THE COURT:  25 percent of the website hits are --

16          MR. KIDNEY:  -- are U.S. people.

17          THE COURT:  But that does not advance your argument

18     one way or the other --

19          MR. KIDNEY:  Yes, it does.

20          THE COURT:  -- with regard to solicitation.

21          MR. KIDNEY:  Sure it does.

22          THE COURT:  How?  Who cares whether or not --

23          MR. KIDNEY:  It's not necessary that any of those 25

24     percent have gone the extra step and invested through

25     Gibraltar.  What it does show is that there is a website, that

D8D7SECC

the language we have cited shows that they are soliciting

people as investors in North America, and in 25 percent of

their hits they were successful in at least showing their ad to

25 percent.

THE COURT:  Yeah, but you see that's the thing.  I

think I understand your argument.  That's a false argument.

That just means that 25 percent of the hits were U.S.

customers.  That means --

MR. KIDNEY:  No, U.S. people.

THE COURT:  U.S. people, not customers.  So let's

say -- that means that, you know, 1,000 people looked at their

website, 1,000 U.S. people looked at their website.  What does

that prove?  What does that prove about solicitation?

MR. KIDNEY:  That they solicited U.S. customers.

THE COURT:  How?

MR. KIDNEY:  By saying we have commissions equal to

the mainland, we do all of this other stuff.  What other kind

of solicitation would your Honor want?

THE COURT:  Because I'm just saying that that's an

irrelevant statistic.  It doesn't matter whether or not a

thousand people came to the website; it doesn't matter if it

was one person that came to the website.  The question is

whether the website is a solicitation.  If I'm looking up

Gibraltar as a place, and this comes up as a hit, that doesn't

prove one way or the other that I have been solicited.  How

D8D7SECC

does it prove that I have been solicited by the percentage of

people who went to the website?  If your argument is it's not

how many people go to the website, it's how many people are

convinced by the website, are being solicited by the words of

the website, if they haven't seen the words ever the website

until they got there, what difference does it make that 25

percent of the people who got there were U.S. people?

          MR. KIDNEY:  Because --

          THE COURT:  Because you don't tell me how they got

there.

          MR. KIDNEY:  Well, they got to the website.

          THE COURT:  Not by being solicited.

          MR. KIDNEY:  And once they got to the website they

were solicited.

          THE COURT:  That's true whether it's 25 percent or 90

percent.

          MR. KIDNEY:  Yeah, we are showing -- it just says that

people in the United States went to the website --

          THE COURT:  Went to the website.

          MR. KIDNEY:  Yeah.

          THE COURT:  That's right.  That doesn't prove --

          MR. KIDNEY:  And the language --

          THE COURT:  That doesn't advance --

          MR. KIDNEY:  They weren't told you can't invest here.

They weren't told you can't do anything like that.

D8D7SECC

1          THE COURT:  I know.  But again I just don't see --

2          MR. KIDNEY:  In fact, it said we offer commissions to

3   you that are equal to that of the mainland, we will hide your

4   trading, we will do all this stuff.  It's an ad.

5          THE COURT:  But the problem I have with that argument

6   is that argument stands on its own regardless of what

7   percentage of the people got there.  How does the percentage of

8   the people who got there advance that argument?  Whether it was

9   5 percent or 95 percent, what difference does it make?

10          MR. KIDNEY:  That's true.  We just put that in the

11   complaint because that's what the number was.

12          THE COURT:  I understand that, but I'm saying to you

13   you are trying to argue that that somehow advances the argument

14   that they are being solicited.  I'm saying I don't understand

15   that part of the argument, because telling me what percentage

16   went to the website that were U.S. citizens doesn't tell me

17   whether or not they are solicited.  If they went to the website

18   and the website is not a solicitation, then they weren't

19   solicited.  If they went to the website and the website is a

20   solicitation, they were solicited.  And that's irrelevant as to

21   what number went to the website.

22          MR. KIDNEY:  Well, I don't think it is irrelevant,

23   because one way you consider an ad is where you place the ad

24   and who your audience is likely to be.

25          THE COURT:  Right.

D8D7SECC

1           MR. KIDNEY:  And if I wanted to do advertise to the

2      people in Brooklyn or in Manhattan, I would put an ad in a New

3      York newspaper.  But it would be very difficult to argue when

4      we're only in the print version, at least, that that was a

5      solicitation of people in San Francisco.

6           THE COURT:  I know.  But you are not arguing in this

7      case that this website is somehow more accessible to people who

8      are on the Internet in the U.S. than the people who are on the

9      Internet net in Afghanistan.  That's not an argument to make.

10          MR. KIDNEY:  I have no idea how accessible it is.

11          THE COURT:  Right.  I could be anywhere in the world

12     and I go on the website and put in Gibraltar, and I'm going to

13     come up with this website.

14          MR. KIDNEY:  But the point is you asked about the

15     website, and you seemed to be skeptical that the use of the

16     term mainland and the comparison to mainland commissions and so

17     forth is sufficient evidence.

18          THE COURT:  Is not the strongest.

19          MR. KIDNEY:  I disagree with that, but other evidence

20     would be --

21          THE COURT:  Do you have a case in which that was the

22     only set of allegations and that it was held to be sufficient

23     either on motion to dismiss or on summary judgment?

24          MR. KIDNEY:  I think this may be the first case --

25          THE COURT:  It will be the first one I heard of too.

D8D7SECC

1   Most of them are stronger than this.

2          MR. KIDNEY:  But the fact the ad drew flies shows that

3   it was intended to be what it said.  So, it's just more

4   evidence in support.  You say it's a weak inference, I don't

5   think it is a weak inference.  It would be a stronger inference

6   if it said U.S. investors come to this website.

7          THE COURT:  That's right.

8          MR. KIDNEY:  Yeah, but --

9          THE COURT:  But let's put it this way.  It is a weaker

10   set of allegations than any other case that I am aware of that

11   gives me a factual scenario in which the SEC says, look, they

12   are solicited; it's obvious they are solicited.

13          I mean, every other case I have seen is a stronger set

14   of allegations than this.

15          MR. KIDNEY:  Well, you probably end up mostly with

16   fraud cases, because those are the ones that tend to litigate.

17          THE COURT:  Probably.

18          MR. DEFEIS:  So, on a fraud case you are really saying

19   you're lying, and you have a directed audience from whom you

20   are trying to steal money.

21          THE COURT:  That may be true.  And, as I say, that's

22   not the determinative factor here whether or not you've got the

23   strongest set of allegations or the weakest set of allegations.

24   But obviously if I have to put this on one spectrum or the

25   other, I put it on the weaker set of allegations that I've been

D8D7SECC

1    aware of in terms of cases that I've seen rather than the

2    stronger set of allegations that I am aware of.

3           MR. KIDNEY:  Well, the way we pled it we don't need to

4    prove scienter.  And we're not suggesting that Gibraltar didn't

5    do exactly what it said it was going to do, which was hide your

6    income from taxes and do all those things.  So, we are not

7    alleging fraud.  The fact is they may defraud the IRS, but they

8    didn't defraud their investors.  So, the website itself was

9    accurate, or at least we're not claiming it wasn't accurate.

10          Now, on the Section 5 claim -- if I can spend a minute

11   on that -- basically the complaint says -- first of all, this

12   business about promissory notes, we don't even allege that

13   Gibraltar got involved in the promissory notes.  We suspect

14   these promissory notes created by the flat nominees were

15   created after the SEC investigation.  Had they in fact seen the

16   promissory notes, the case would be even stronger against

17   Gibraltar because then they'd see -- which they should have

18   known anyway because it was S8 stock, which goes to consultants

19   and so forth, and mostly for start-up companies who don't have

20   the cash, so they give stock to their outside consultants and

21   so forth-- which the consultants then are supposed to be able

22   to sell so that they can be compensated, and Gibraltar knew

23   this was S8 stock supposedly that these nominees sent to it, it

24   changed it, put it in its own name, the broker dealer, and then

25   sent most of the proceeds back to Magnum DOR.

D8D7SECC

1          So, they knew or should have known -- and we are not

2     even alleging scienter here -- that it was actually to raise

3     capital for Magnum DOR rather than to compensate outside

4     vendors.

5          But in any event, as your Honor said -- and as the

6     government said, and there was the case in the sentencing we

7     all heard just this morning -- just as that doctor was

8     important to that scheme because he could sign the scripts and

9     so forth, and they could have got other doctors -- apparently

10    from what I heard they did get another doctor -- the fact that

11    you can get other people to do your work for you doesn't make

12    you not an important party for conducting the Section 5

13    violation that we allege here that they participated in.  And

14    they were totally instrumental in that; they were not a minor

15    party.  So, the Section 5 certainly should withstand any motion

16    to dismiss.

17         The control person liability, I don't think the

18    defendants went to administrative proceedings.  I have not

19    looked to see whether there are control person cases that are

20    not also fraud cases, but I suspect if you went -- I am

21    familiar from just my 25 years at the SEC that that happens.

22    If your Honor want more authority on that, we are glad to give

23    it to you.  But certainly culpable means responsible.  And

24    Mr. Davis is the only person at Gibraltar, as far as we are

25    concerned -- I mean he had people working for him but he was in

D8D7SECC

1     charge.

2              Finally, I know the other side has asked to

3     consolidate this case.  There are no common factual issues with

4     the other case.  Our case has no scienter claims.

5              THE COURT:  Are you representing the SEC in both

6     cases?

7              MR. KIDNEY:  No, I'm not.

8              THE COURT:  All right.  I can tell you what my view is

9     on this, and you can convince me otherwise.  But my view is

10    that I would deny the motion without prejudice to consolidate

11    at this point, but I would probably -- I think I'm going to

12    order that you still coordinate discovery.  I don't see any

13    reason why you shouldn't coordinate discovery.

14             And I know that there is a motion that's just recently

15    been made in the other case, and my intention is to adjourn

16    this case to the date when the other case is on and to have the

17    SEC and the defense coordinate discovery so we don't have a

18    waste of resources.

19             Now, if it turns out to be appropriate for some

20    consolidation at trial, that's an issue and I can revisit.  But

21    at this point I think consolidation is necessary, and I can put

22    that off once we get further into it, depending on where we are

23    in both of these cases, after the motions are decided.

24             But there is no reason why you shouldn't coordinate

25    the document production.  There is no reason why you shouldn't

D8D7SECC

coordinate the depositions, to the extent you propose to

depose.

          MR. KIDNEY:  The only comment I have on that, you

know, I don't have any objection in principle to that.  I think

though then that our earlier -- we submitted a statement to the

court last week saying that we were happy with the court's

proposed litigation schedule.  We would have to revisit that

depending on what the schedule is for the other case, which is

bigger and more complicated and has a lot more facts that it

needs to develop.  So, I would probably have to withdraw that

based on whatever your Honor rules.

          THE COURT:  Why don't we do this.  I think I have the

motion filed, but I don't have a response to the motion in the

other case.  Hopefully it will be fully submitted, and I will

hear them on the motion on that day.  I think they are coming

here in September.

          MR. KIDNEY:  There is a September date I heard.

          MR. PATTERSON:  I think it's September 10, your Honor.

          THE COURT:  I don't even know if that motion is going

to be fully submitted by September 10.

          MR. KIDNEY:  Well, if your Honor would just include us

in whatever notice for both cases for the next scheduling

conference.

          THE COURT:  As a matter of fact, I'm going to leave

the September 10 date on for now, and I'm going to say that you

D8D7SECC

1    guys should be here too, and if we need to deal with some joint

2    issues, we will.  I don't know whether or not in that short

3    period of time I can get a decision out to you on this one

4    before then, this being the end of August, and quite frankly

5    I'm going to be transitioning new law clerks in the next couple

6    of weeks too.  So, we will see if I can do it by then.

7           Otherwise, I'm going to tell the other parties to be

8    heard on that motion, if it's fully submitted, on the 10th.  If

9    not, I will put it off until it's fully submitted, hear you on

10   that, resolve the motions, and then have you coordinate the

11   discovery, and then we can revisit the consolidation for trial,

12   if it's necessary.

13          Mr. DeFeis, did you want to add anything?

14          MR. DEFEIS:  Just one additional housekeeping

15   schedule.  We would just like to request an opportunity to file

16   our initial disclosures by September 3, because our client is

17   presently traveling on vacation.  That's a week before the

18   initial conference in that case.

19          MR. KIDNEY:  Well, I guess it probably wouldn't be

20   worth objecting.  We are going to start our document production

21   in two weeks.

22          MR. DEFEIS:  Thank you, your Honor.

23          THE COURT:  As I say, I don't want to have a lot of

24   unnecessary duplicative work.  Judge Cedarbaum said to me in

25   another case the government is fungible.  So, it's hard enough

D8D7SECC

```
1    to say when I have the SEC, the CFTC, and the U.S. Attorney's

2    office, and they're all arguing from a different government

3    point of view, but when I have the SEC in one case and the SEC

4    in another case, I would assume that there's is one SEC and

5    that you could --

6             MR. KIDNEY:  It's the New York office versus the

7    Washington office.  We aren't all that close.

8             THE COURT:  That distinction I don't think I'll draw.

9             All right.  So, let me get to this as quickly as

10   possible.  But I will see you on the 10th unless their motion

11   is not fully submitted.  And if we need to adjourn that, I will

12   adjourn that until quickly after that, right after it is fully

13   submitted, so we can move forward.  All right?

14            MR. KIDNEY:  Thank you, your Honor.

15            MR. DEFEIS:  Thank you.

16

17

18

19

20

21

22

23

24

25
```