**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

**SECURITIES AND EXCHANGE COMMISSION,**

|                      **Plaintiff,**

    **v.**

**GIBRALTAR GLOBAL SECURITIES, INC.,**
**and WARREN A. DAVIS,**

|                      **Defendants.**

**13 CV 2575 (GBD) (JCF)**

---

**MEMORANDUM IN SUPPORT OF SECURITIES AND EXCHANGE**
**COMMISSION MOTION FOR A SANCTION OF DEFAULT JUDGMENT AND**
**RELATED REMEDIES AGAINST DEFENDANTS GIBRALTAR GLOBAL**
**SECURITIES, INC. AND WARREN DAVIS**

Kevin P. O'Rourke
Attorney for Plaintiff
Securities and Exchange Commission
100 F Street, N.E.
Washington, D.C. 20549-1040
Telephone: (202) 551-4442
Facsimile: (202) 772-9245
ORourkeK@sec.gov

Dated: June 12, 2015

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................1

BACKGROUND ..................................................................................................2

    I.   THE COMPLAINT ALLEGED MULTIPLE VIOLATIONS OF THE SECURITIES
        LAWS ..........................................................................................................2

    II.  PROCEDURAL BACKGROUND.....................................................................3

        A.  Defendants Defied A Court Order to Produce Documents............................................3

        B.  Defendants Defied A Court Order To Attend Their Depositions .................................4

ARGUMENT.......................................................................................................5

    I.   THE COURT SHOULD ENTER A RULE 37 SANCTION OF DEFAULT JUDGMENT
        AGAINST DEFENDANTS............................................................................5

        A.  Defendants' Refusal To Participate In Discovery Warrants A Default Judgment ........5

    II.  THE SCOPE OF DEFENDANTS' LIABILITY PURSUANT TO THE DEFAULT
        JUDGMENT ENCOMPASSES ALL OF THE ALLEGATIONS IN THE
        COMPLAINT ...............................................................................................7

        A.  Defendants Violated Section 15(a)(1) of the Exchange Act by Failing to Register as a
            Broker ......................................................................................................8

        B.  Defendants Violated Section 5 of the Securities Act by Participating in the
            Unregistered Offer and Sale of Securities ..................................................................10

    III.  DEFENDANTS' VIOLATIONS OF THE SECURITIES LAWS WARRANT
        SUBSTANTIAL PENALTIES......................................................................12

        A.  The Court Should Permanently Enjoin the Defendants from Future Violations .........13

        B.  The Court Should Order Defendants to Jointly and Severally Disgorge Ill-Gotten
            Gains and Pay Prejudgment Interest Thereon............................................................15

            1.  Section 15(a)(1) Disgorgement Amount..............................................................16

            2.  Section 5 Disgorgement Amount.......................................................................17

            3.  Total Disgorgement Amount .............................................................................19

C. The Court Should Impose the Maximum Civil Monetary Penalties Permissible Under the Law........................................................................................................................19

CONCLUSION.....................................................................................................................21

## PRELIMINARY STATEMENT

This Memorandum is submitted by the Securities and Exchange Commission ("SEC") in support of its motion for a sanction of default judgment against Defendants Gibraltar Global Securities, Inc. ("Gibraltar") and Warren A. Davis ("Davis") (collectively, "Defendants").  For at least four and a half years, Defendants ran an offshore unregistered broker-dealer that solicited U.S. customers with promises of anonymity and tax avoidance. The SEC filed this action because these practices constituted violations of Section 15(a)(1) of the Exchange Act of 1934 (failure to register with the SEC as a broker-dealer) [15 U.S.C.§ 78o] and Sections 5(a) and (c) of the Securities Act of 1933 (offering or sale of securities not subject to a registration statement and not exempt from registration)[15 U.S.C. §§ 77e(a) and (c)].  Rather than defend their conduct on the merits, Defendants have sought to avoid discovery at every turn.  And when this Court ordered Defendants to provide relevant information, Defendants deliberately refused to comply with those orders. Defendants have announced that they will not participate further in the proceedings of the Court and do not oppose the entry of a default judgment.  Accordingly, default judgment should be imposed against Defendants pursuant to Fed. R. Civ. P. 37(b)(2)(A)(vi) and 37(d)(3).

Moreover, this Court should impose substantial remedies that address the severity of the misconduct alleged in the SEC's Complaint.  Specifically, the SEC seeks $17,245,762 in disgorgement and prejudgment interest, and a $7,246,024 civil monetary penalty against each defendant.  This relief would ensure that Defendants' retain no ill-gotten gains from their violations and to deter future misconduct.  Thus, the SEC respectfully requests that this Court enter the proposed Final Judgment of Default filed simultaneously herewith.[1]

---

[1] In support of this motion, the SEC also submits herewith Exhibits ("Ex.") 1-6 and the Declaration of Gary Peters (with Exhibits A-C).

# BACKGROUND

## I.   THE COMPLAINT ALLEGED MULTIPLE VIOLATIONS OF THE SECURITIES LAWS

The Complaint alleges facts establishing violations of Section 15(a)(1) and Sections 5(a) and 5(c).  Specifically, the Complaint details how Gibraltar ran an offshore unregistered broker-dealer catering to entities and persons seeking to sell shares of low-priced thinly traded securities into the U.S. securities markets.  (Cplt. ¶¶ 1-2.)  For at least four and a half years, Gibraltar accepted deposits of low-priced microcap stocks from its U.S. customers, arranged to have the shares re-titled in its name, and then sold over $100 million of the shares on behalf of the U.S. customers through U.S. broker-dealers.  (*Id*.) Gibraltar's website[2] solicited U.S. customers by enticing them  with promises of anonymity and not having to pay taxes on their profits.  (Cplt. ¶¶ 1-2, 16, 19.)  Davis – Gibraltar's sole owner and president – made good on this promise by knowingly submitting false tax withholding forms to United States broker-dealers.  (*Id*. ¶ 20.)

The Complaint also describes how Gibraltar used this system of anonymity to facilitate violations of Section 5, which generally protects U.S. investors by requiring that stock traded on public markets be properly registered.  To circumvent these requirements, and facilitate a massive scheme, the promoters of Magnum D'Or ("MDOR") stock and their nominees worked with Gibraltar to offer and sell securities in the United States that were not subject to a registration statement filed with the SEC and were not eligible for any exemption from registration.  Over 11 million shares of MDOR stock were deposited into accounts at Gibraltar, which then deposited the shares in its own name with U.S. brokers, sold the stock, and returned $7.175 million directly back to the issuer.

---

[2]        A screenshot of the Gibraltar website, as produced by Defendants, is provided herewith as Ex. 1.

## II.      PROCEDURAL BACKGROUND

### A. Defendants Defied A Court Order to Produce Documents

During the course of this case, Defendants consistently refused to produce relevant documents. Defendants filed a motion for a protective order to prevent production, claiming that they did not control the documents and that they were precluded from producing the documents because of Bahamian secrecy laws.  This Court rejected Defendants' arguments in an April 1, 2015 Memorandum and Order (Docket No. 52), emphasizing that Defendants' failed attempt at voluntary liquidation "does not excuse a party from its discovery obligations."  (*Id*. *1.)  The Court held that the plain language of the relevant Bahamian statute "could not be more clear" concerning the necessity of prior approval from the Securities Commission of The Bahamas ("SCB") for liquidation and the surrender of registration.  (*Id*. *5.)  Since the claimed liquidation and attempted surrender of registration were ineffective, Gibraltar "remain[ed] in control of the documents sought by the SEC." (*Id*. *6.)  Further, the Court found that there were no Bahamian secrecy laws that apply to the documents.  (*Id*. *8.)  Accordingly, the Court required that "*defendants shall produce the requested documents within two weeks.*"  (*Id*. *13, emphasis added.)

The Court's order to produce the requested documents was clear and unambiguous.  Yet Defendants did not produce a single page by the Court-imposed April 15, 2015 deadline. Instead, Defendants repeatedly announced that they will no longer defend themselves.  Thus, Defendants' failure to produce was intentional and they have no plans of curing that failure in order to comply with this Court's orders.[3]

---

[3]        This case was not the first time that Gibraltar has refused to produce documents based on a claim of Bahamian secrecy.  In an enforcement investigation and proceeding of the British Columbia Securities Commission (BCSC), from 2009, when information was requested, through May, 2012, Gibraltar refused to provide the names, account information and account statements for account holders based on a claimed prohibition under Bahamian

### B. **Defendants Defied A Court Order To Attend Their Depositions**

Defendants also have defied the Court's April 2, 2015 Order (Docket No. 53), which held that the Defendants must attend their depositions in New York. The SEC properly noticed a deposition of Davis and a Rule 30(b)(6) deposition of Gibraltar in this action. The original notices of the depositions are provided herewith as Ex. 2. Defendants then sought a protective order regarding the location of the noticed depositions, arguing that the proper place for the depositions was in The Bahamas. (Docket No. 48 at 2.) With respect to the Gibraltar Rule 30(b)(6) deposition, Defendants also argued that because a "liquidator" had been appointed in The Bahamas, Gibraltar would "not be in a position to designate a 30(b)(6) witness in the immediate future." *(Id.*) No objection was made to any of the Rule 30(b)(6) specifications which directly related to the allegations in this case and a coordinated action filed by the SEC's New York office. Instead, in an effort to avoid Gibraltar's Rule 30(b)(6) obligation, defense counsel argued that there was no witness available for Gibraltar to present at the deposition. This bald assertion incorrectly ignored 1) the controlling founder, sole owner, President and Managing Director of the company, Warren Davis, 2) the so-called "liquidator" who is storing Gibraltar's documents; although not a duly appointed liquidator, he is an agent of Gibraltar, with the ability to review the documents in storage in order to provide some or all of the information required by the 30(b)(6) specifications, and 3) Gibraltar's Financial Consultant, identified in Warren Davis' purported "registration surrender" letter. (Rolle Aff. ¶ 8, at 11 of 15; Docket No. 50-1.)

On April 2, 2015, this Court rejected Defendants' application and ordered that the depositions "shall be conducted in New York, with the SEC bearing the reasonable costs of the

---

secrecy laws. *See Gibraltar Global Securities Inc. Decision, Hearing and Findings (liability),* 2012 BCSECCOM 194, *available at* http://www.bcsc.bc.ca/Enforcement/Decisions/PDF/2012_BCSECCOM_194_pdf/, at ¶¶ 4-6, 43-47.

witnesses' travel and accommodation."  (Docket No. 53.)  Defendants' depositions were re-noticed pursuant to the Court's order for May 12, 2015 at the SEC's New York Office.  Copies of the Revised Notices of Deposition are provided herewith as Ex. 3.  In advance of the re-noticed depositions, counsel for Defendants informed the SEC both that Davis would not attend and that there would be no 30(b)(6) witness on behalf of Gibraltar.  There was no effort to reschedule the ordered depositions because Defendants' defiance of the Court's order was intentional.

## ARGUMENT

## I.  THE COURT SHOULD ENTER A RULE 37 SANCTION OF DEFAULT JUDGMENT AGAINST DEFENDANTS

### A.  Defendants' Refusal To Participate In Discovery Warrants A Default Judgment

Rule 16(f) and Rule 37 of the Federal Rules of Civil Procedure vest the Court with the authority to impose just sanctions when parties refuse to participate in discovery.  Specifically, Rule 37(b)(2)(A) provides that if "a party ... fails to obey an order to provide or permit discovery ... the court where the action is pending may issue further just orders," including  "rendering a *default* judgment against the disobedient party."  Fed. R. Civ. P. 37(b)(2)(A)(vi) .  Rule 37(b)(2)(A) and 37(d)(3) recognizes that sanctions are available when a party fails to attend its deposition.  *See generally*, *Sang Lan v. Time Warner, Inc.*, 2015 WL 480378, at *1 (S.D.N.Y.)(JCF); *Agiwal v. Mid Island Mortg. Corp.,* 555 F.3d 298, 302 (2d Cir. 2009); *Daval Steel Products v. M/V Fakredine,* 951 F.2d 1357, 1365 (2d Cir.1991).  Moreover, the Second Circuit has emphasized the import of deterring defendants from "elect[ing] to defy" court discovery orders.  *Sieck v. Russo,* 869 F.2d 131, 134 (2d Cir. 1989); *see also, S.E.C. v. Razmilovic,* 738 F.3d 14, 25 (2d Cir. 2013); *S. New England Telephone Co. v. Global NAPs Inc.,*

624 F. 3d 123, 148-49 (2d Cir. 2010); *Cine Forty–Second St. Theatre Corp. v. Allied Artists Pictures Corp.,* 602 F.2d 1062, 1068 (2d Cir. 1979).

When determining the appropriate sanction to impose under Rule 37, courts in this Circuit weigh several factors, including "(1) the willfulness of acts underlying noncompliance; (2) the efficacy of lesser sanctions; (3) the duration of noncompliance; and (4) whether the noncompliant party was on notice that it faced possible sanctions." *Sang Lan, 2015 WL 480378,* at *2; *Sentry Insurance A Mut. Co. v. Brand Mgmt., Inc.,* 295 F.R.D. 1, 5 (E.D.N.Y. 2013) (citing *Agiwal,* 555 F.3d, at 302–03); *Peterson v. Apple Inc.*, 2013 WL 3963456, at *2 (S.D.N.Y.)(GBD).  All of these factors weigh in favor of entering a default judgment in the present case.

First, both Defendants' failure to produce documents and their decisions not to attend Court-ordered depositions in New York were in willful violation of the Court's orders.[4]  Second, either of Defendants' deliberate violations of this Court's orders would be a sufficient basis for imposing default judgment pursuant to Rule 37 but, together, they highlight the futility of even considering a lesser sanction.  Third, the duration of Defendants' noncompliance is indefinite. Defendants refused to participate in discovery and expressly acknowledged their unwillingness to do so in the future.  Defendants only participated in this action when they believed that they may prevail by thwarting the SEC's attempts at discovery.  When the Court consistently held that Defendants would have to comply with their discovery obligations, Defendants elected to abandon this proceeding rather than comply with the Court's orders.  Further, defense counsel is

---

[4]       Instead of complying with Judge Francis' unambiguous April 1, 2015 order compelling the production of documents, Defendants pronounced through their counsel that Davis believed the document production "is or should be moot."  The Court disabused Defendants of this feigned excuse, pointing out that Davis was "incorrect" and that "he continues to be bound to comply with discovery obligations and court orders."  (Docket No. 64, **6-7.) Further, the Court made it clear that there were no circumstances that excused Davis from appearing for his deposition, which the Court previously ordered to take place in New York.  (*Id*.)  Thereafter, Defendants continued to refuse to comply with the ordered discovery, confirming their willfulness.

seeking to withdraw based on representations they will no longer be paid.[5]  Finally, the

noncompliant parties were on notice of the relevant Court orders.[6]  Indeed, the relevant orders

were the result of contested litigation and Davis has submitted an Affidavit in this litigation,

indicating that he is aware of developments in the case (both in his individual capacity and as the

sole owner and president of Gibraltar).  Davis tactically decided on behalf of himself and

Gibraltar to refuse to comply with any requirements of this proceeding.  Moreover, Defendants'

defiance of separate court orders, as well as their declaration that they will not further participate

in this case, prove that a warning is not necessary and would not be effective.

 In sum, an analysis of the four factors to be considered when determining appropriate

Rule 37 sanctions demonstrates that a sanction of default judgment should be entered against

both Defendants.

## II. THE SCOPE OF DEFENDANTS' LIABILITY PURSUANT TO THE DEFAULT JUDGMENT ENCOMPASSES ALL OF THE ALLEGATIONS IN THE COMPLAINT

 Once a default is entered, the allegations of the complaint are accepted as true for

purposes of determining liability.  A defendant may not raise any defense at the relief stage that

"effectively contests settled issues of liability."  *Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty

Corp.*, 973 F.2d 155, 158-59 (2d Cir. 1992) (evidence of comparative negligence precluded at

damages inquest following default judgment); *accord* C. WRIGHT & A. MILLER, FEDERAL

---

[5] Due to Defendants' actions in this litigation, there has been no accounting for the destination of the millions of dollars Defendants made from the activities alleged in the Complaint.  There was no sworn financial information provided in the Davis Affidavit or in any other submission.  To the contrary, the Davis Affidavit merely stated that "no party is *willing* to fund [Gibraltar's] defense of the SEC actions."  (Davis Aff. ¶ 2; Docket No. 63-1)( emphasis added.)

[6] Regardless, the Second Circuit has made clear that there is no absolute entitlement to a warning, even before the imposition of severe sanctions for violating a specific, previously entered court order.  There is no free defilement of a court's order by a party.  *Daval Steel*, 951 F.2d at1366.  "Although entry of a default judgment is an extreme measure, discovery orders are meant to be followed. A party who flouts such order does so at his peril." *Bambu Sales, Inc. v. Ozak Trading Inc.*, 58 F.3d 849, 853 (2d Cir. 1995) (internal quotations omitted); *S.E.C. v. Euro Sec. Fund*, 1999 WL 182598 (S.D.N.Y.).

PRACTICE AND PROCEDURE § 2688 (3d ed. 1998).  Accordingly, if this Court enters an order of

default, it will legally establish the liability of Defendants for violations of Section 15(a)(1)

(failure to register with the SEC as a broker-dealer) and Sections 5(a) and (c) (offering or sale of

securities not subject to a registration statement and not exempt from registration).

### A. Defendants Violated Section 15(a)(1) of the Exchange Act by Failing to Register as a Broker

Based on the allegations in the Complaint, Defendants violated Section 15(a)(1).  Section

15(a)(1) requires that any broker or dealer using the mails or any means of interstate commerce

to effect or induce purchases or sales of securities must register with the SEC in accordance with

Section 15(b).  The SEC is not required to prove scienter for a violation of Section 15(a)(1).

*SEC v. Martino*, 255 F. Supp. 2d 268, 283 (S.D.N.Y. 2003); *SEC v. Nat'l Exec. Planners, Ltd*.,

503 F. Supp. 1066, 1073 (M.D.N.C. 1980).  Neither of the Defendants registered with the SEC.

(Answer ¶¶ 8, 9, 24.)  Thus, the only relevant issues for Gibraltar's liability are (1) whether

Gibraltar acted as a "broker" within the meaning of Section 3(a)(4) of the Exchange Act and (2)

whether it used the mails or means of interstate commerce.

First, it is abundantly clear that Gibraltar acted as a broker under Section 3(a)(4), and thus

violated Section 15(a) by failing to register with the SEC under Section 15(b).  Section

3(a)(4)(A) defines a "broker" as "any person engaged in the business of effecting transactions in

securities for the account of others."  15 U.S.C. § 78c(a)(4)(A).  The regularity of participation is

the primary indicator of being "engaged in the business."  *Martino*, 255 F. Supp. 2d at 283, citing

*SEC v. Hansen*, 1984 WL 2413, at *10 (S.D.N.Y.) and other authorities; *see also SEC v. Kenton

Capital, Ltd.,* 69 F. Supp.2d 1, 12-13 (D.D.C. 1998); *citing SEC v. Margolin*, 1992 WL 279735

(S.D.N.Y.).  Regularity of participation is demonstrated by, among other things, receiving

transaction based compensation, possession of client funds and securities, *Martino*, 255 F. Supp.

2d, at 283, active solicitation and the dollar amount of securities sold, *Nat'l Exec. Planners, Ltd.*, 503 F. Supp., at 1073 ($4.3 million of securities sold).  Applying these standards, Gibraltar's status as a broker is clear.  Gibraltar's own website described itself as a broker-dealer offering offshore brokerage services with commissions comparable to those on the mainland.  (Cplt. ¶ 15; Ex. 1.)  Gibraltar actively handled the securities and funds of U.S. customers (Cplt. ¶¶ 21-23, 26), sold over $100 million of low-priced microcap securities on behalf of U.S. customers (Cplt. ¶ 2), traded on behalf of U.S. customers (Cplt. ¶¶ 22, 26-27), earned transaction based compensation (Cplt. ¶ 23), and solicited U.S. customers through its website (Cplt. ¶¶ 1-2, 15-19; Ex. 1).  Indeed, Defendants have admitted that Gibraltar is a broker-dealer (Answer ¶ 1, 8, 15, 16), and performed broker transactions executed upon customer orders, including U.S. customers (Answer ¶¶ 2, 3, 14, 21, 22, 23, 25-27, 29).

Second, Gibraltar made use of the mails and the means and instrumentalities of interstate commerce.  (Cplt. ¶¶ 5-6.)  Specifically, Defendants, who were located in The Bahamas: 1) facilitated the re-titling of micro-cap shares into Gibraltar's name (Cplt. ¶¶ 2, 21, 26); 2) deposited those shares in U.S. brokerage accounts (Cplt. ¶¶ 5, 26); 3) sold those shares through U.S. broker accounts maintained by the Defendants (Cplt. ¶¶ 2, 6, 27; Answer ¶ 27); and 4) caused proceeds of such sales to be wired from Gibraltar's U.S. brokerage accounts to its foreign account at the Royal Bank of Canada and then back to the U.S. (Cplt. ¶¶ 23, 29; Answer ¶ 29; Peters Decl. ¶¶ 2, 6-15).  Any one of these actions would satisfy Section 15's interstate commerce requirement.  *See SEC v. Verdiramo*, 890 F. Supp. 2d 257, 268 (S.D.N.Y. 2011) (sale of securities using a brokerage account satisfies the interstate commerce element).

Thus, Gibraltar violated Section 15(a)(1) by acting as an unregistered broker.  Davis is also liable for these violations of the securities laws because he was Gibraltar's "control

person" under Section 20(a) of the Exchange Act.  Control person liability is established by the following:  (1)  Gibraltar committed a primary violation of Section 15(a); (2) Davis controlled Gibraltar; and (3)  Davis was a culpable participant in the acts perpetrated by Gibraltar.  *See SEC v. Buntrock*, 2004  WL 1179423, *9 (N.D. Ill.); *see also SEC v. First Jersey Sec., Inc.*, 101 F.3d  1450, 1472 (2d Cir.1996).  Gibraltar's liability is set forth above.  With respect to the second factor, Defendants admit that Gibraltar is wholly owned by Davis, and that Davis is the founder and president of Gibraltar.  (Answer ¶¶ 1, 9.)  Finally, Davis was a culpable participant in the acts perpetrated by Gibraltar.  Davis established Gibraltar's accounts at the U.S.  broker-dealers.  He deposited shares and entered sell orders of MDOR into the U.S. account.  (Cplt. ¶¶ 25-27.)   He directed trades and authorized other Gibraltar employees to trade  in the United States.   (Cplt. ¶ 9.)   Davis submitted IRS withholding forms to U.S. broker-dealers  falsely certifying that Gibraltar was the beneficial owner of the proceeds of shares sold in the U.S.  (Cplt. ¶ 20.)  Based on this misconduct, Davis is also liable for violating Section 15(a)(1).

### B.  Defendants Violated Section 5 of the Securities Act by Participating in the Unregistered Offer and Sale of Securities

Based on the allegations of the Complaint, Defendants are also liable for violating Section 5(a) and 5(c) of the Securities Act.  To establish a *prima facie* violation of Section 5(a) and (c), the SEC must establish the following three elements by a preponderance of the evidence:

1.    That the defendant directly or indirectly offered or sold securities;

2.    That the defendant did so through the use of any means of interstate transportation or communication or the mails; and

3.    That there was no applicable registration statement in effect or on file for the offer or sale of those securities.

*SEC v. Cavanagh*, 445 F.3d 105, 111 n. 13 (2d Cir. 2006).  "Once a *prima facie* case has been

made, the defendant bears the burden of proving the applicability of an exemption."  *Id.* (citing *SEC v. Ralston Purina Co.*, 346 U.S. 119, 126 (1953)).  Neither scienter nor negligence is required under Section 5.  *See Swenson v. Engelstad*, 626 F.2d 421, 424 (5th Cir. 1980) ("The Securities Act of 1933 imposes strict liability on offerors and sellers of unregistered securities… regardless of … any degree of fault, negligent or intentional, on the seller's part").

From approximately November, 2008 through December, 2009, Defendants received deposits of 11 million MDOR shares from the Flatt nominees of MDOR, facilitated the re-titling of those shares into Gibraltar's name, and deposited those shares into four Gibraltar broker-dealer accounts in the U. S.  (Cplt ¶¶ 10-14, 25-27.)  Pursuant to customer requests, Gibraltar then sold over 10 million MDOR shares in 600 transactions for proceeds of over $11 million.  (Cplt.¶¶ 25-27; Answer ¶¶ 25-27.)  Gibraltar instructed the U.S. brokerage to wire the sale proceeds from its U.S. accounts to Gibraltar's Royal Bank of Canada account.  (Cplt. ¶¶ 23, 29; Answer ¶¶ 23, 29.)  Finally, sale proceeds were distributed pursuant to customer instructions, less Gibraltar's commissions.  (Cplt.¶ 29; Answer ¶¶23, 29.)  Gibraltar caused approximately $7.175 million of the MDOR proceeds to be wired directly back to the issuer (MDOR), (Cplt. ¶¶ 10, 29; Answer ¶ 29; Peters Decl. ¶ 23.), thus demonstrating Defendants' direct knowledge of the prohibited capital-raising function the shares were being used for. [7]

No registration statement was filed with the SEC with respect to any of the MDOR sales effected by Defendants on behalf of Gibraltar's U.S. customers.[8]  (Exs. 4 and 5 -- SEC

---

[7]       The use of S-8 stock for capital-raising functions is explicitly prohibited by the Form S-8 registration statement.  *See General Instruction A.1(a) to Form S-8.*

[8]       Section 5 "prohibits the sale or delivery after sale of any security by means of interstate commerce '[u]nless a registration statement is in effect as to [the] security.'"  *Cavanagh*, 445 F.3d, at 111 n. 2.  Here, there is a distinction between the original issuance of MDOR shares to the Flatt Nominees – which was purportedly made pursuant to S-8 Registration Statements – and subsequent offers and sales by the Flatt Nominees through the Gibraltar accounts.  Shares issued in an S-8 offering require a subsequent registration statement or an exemption

Attestations -- submitted herewith; Cplt. ¶¶ 3, 10-13, 28.)  The receipt, re-titling, deposit, and sale of such shares make Gibraltar a direct participant in the offer and sale of MDOR shares.

Thus, Defendants' sale of unregistered MDOR securities constitute a *prima facia* violation of Sections 5(a) and 5(c) of the Securities Act.[9]  Once a *prima facie* case for a Section 5 violation has been made, the defendant bears the burden of proving the applicability of an exemption.  *Cavanagh*, 445 F.3d, at 111 n. 13.  Defendants have relinquished the opportunity of establishing any defense by refusing to participate in this proceeding.[10]  The Court's default judgment against Defendants should find them liable for violations of Sections 5(a) and (c).

## III.   DEFENDANTS' VIOLATIONS OF THE SECURITIES LAWS WARRANT SUBSTANTIAL PENALTIES

As set forth in the description of Defendants' liability above, their conduct was egregious and warrants substantial relief.  Moreover, Defendants' blatant disregard for the discovery process and this Court's orders further demonstrate the need for significant remedies in this case.

---

when re-sold.  *Id,* at 133; *SEC v. Universal Express, Inc.*, 475 F.Supp.2d 412 (S.D.N.Y. 2007).  No registration statement was filed in connection with the resale by the Flatt Nominees through Gibraltar.

[9]      As the Court is aware, this is not the only instance where Defendants have participated in a Section 5 violation. *See SEC v. Carrillo Huettel*, 13-cv-1735 (S.D.N.Y.)(GBD).

[10]      Not only are Defendants precluded from establishing an exemption, it is also clear that the "brokers exemption" under Section 4(a)(4) is inapplicable to Defendants for two reasons.  First, Gibraltar acted as an underwriter.  A person is liable under Section 5 if he acts as an underwriter with respect to a distribution of securities.  15 U.S.C. § 77d(a)(1).  Section 2(a)(11) defines  "underwriter" as any person who "offers to sell for an issuer in connection with the distribution of any security… or who has a direct or indirect  participation in any such undertaking."  *See SEC v. Culpepper*, 270 F.2d 241, 247 (2d Cir. 1959) (a direct or indirect participation by a  broker-dealer in the distribution brings it within the definition of underwriter).  Second, Defendants failed to conduct a reasonable inquiry as to the origin of the MDOR shares.  A broker may avail itself of the 4(a)(4) exemption only if "[a]fter reasonable inquiry [the broker] is not aware of circumstances indicating that . . . the transaction is a part of a distribution of securities of the issuer."  *Wonsover v. SEC*, 205 F.3d 408, 415 (D.C. Cir., 2000) (quoting 17 C.F.R. § 230.144); *World Trade Financial Corp. v. SEC*, 739 F.3d 1243, 1249 (9th Cir. 2014) ("a broker is not merely an 'order taker,' and must conduct a reasonable inquiry into the circumstances surrounding the transaction before the broker may claim the protection of the Section 4(4) brokers' exemption."); *Quinn & Co. v. SEC*, 452 F.2d 943, 946 ("[t]he dealers' and brokers' exemptions * * * are inapplicable to transactions involving an underwriter").    The Flatt nominees received MDOR shares directly from the issuer for purported consultancy services pursuant to a Form S-8 registration statement.  (Cplt. ¶ 10-13, 25.)  After being re-titled and deposited in Gibraltar's U.S. brokerage accounts, the shares were quickly liquidated, and $7.125 million of the $11 million in MDOR sales proceeds were wired by Gibraltar directly to MDOR, the issuer, thus demonstrating Defendants' direct knowledge of the prohibited capital-raising function for which the S-8 shares were used.  (Cplt. ¶ 25-29; Answer ¶ 29; Peters Decl. ¶23.)

Thus, the SEC respectfully requests that the Court enter a Final Default Judgment enjoining Defendants from future violations of the securities laws, imposing $17,245,762 in disgorgement and prejudgment interest, and imposing identical $7,246,024 civil monetary penalties on Gibraltar and Davis.  The evidentiary and legal support for each requested remedy is set forth below.

### A.   The Court Should Permanently Enjoin the Defendants from Future Violations

Section 20(b) of the Securities Act, 15 U.S.C. § 77t(b), and Section 21(d) of the Exchange Act, 15 U.S.C. 78§u(d), both authorize the SEC to seek injunctive relief upon a showing that (1) violations of the securities laws have occurred, and (2) a reasonable likelihood exists that violations will occur in the future.  *See, e.g., SEC v. Commonwealth Chem. Sec., Inc.,* 574 F.2d 90, 99-100 (2nd Cir. 1978).  Permanent injunctions against future violations of the securities laws may be issued as part of a judgment by default upon a finding that a factual basis for such relief exists.  *See, e.g., SEC v. Management Dynamics*, 515 F. 2d 801, 814 (2nd Cir. 1975).

To determine whether there is a reasonable likelihood that a defendant will commit future violations, courts generally consider: (i) the egregiousness of the conduct; (ii) the isolated or recurrent nature of the infraction; (iii) the degree of scienter involved; (iv) the sincerity of the defendant's assurances against future violations; and, (v) the defendant's recognition of the wrongful nature of his conduct.  *Cavanaugh*, 155 F. 3d, at 135*; SEC v. Universal Major Indus. Corp*., 546 F.2d 1044, 1048 (2d Cir. 1976).

All of these factors weigh in favor of a finding that Defendants will likely engage in future violations absent appropriate injunctions.  The illegal conduct went on for at least four and a half years, involved an ongoing failure to register with the SEC as a broker-dealer and an

offering or sale of securities not subject to a registration statement, and involved sales in excess of $100 million of securities on behalf of U.S. customers.  (Cplt. ¶¶1, 2, 8.)  The egregiousness of the conduct at issue is demonstrated by Gibraltar's website, which solicited U.S. customers by blatantly offering a means of trading without paying taxes on the profits made.  (Cplt. ¶16; Ex. 1.)  Defendants have not provided any assurances against future violations.  To the contrary, they have refused to disclose the extent and nature of their conduct.

Further, Defendants have demonstrated their continuing disregard for U.S. legal obligations through their flagrant violations of the Court's discovery orders.  Since there is no Bahamian duty of confidentiality that precludes the disclosure of the requested information and the documents are in Defendant's control (Docket No. 52, p. 3-8), Defendants' false claims of such restrictions, subsequent refusal to comply with the Court's discovery orders and the refusal to participate further in the litigation were calculated to prevent disclosure of the egregiousness of their past illegal activity.  Moreover, Defendants' improper attempt to dissolve Gibraltar immediately upon learning that an SEC enforcement action was imminent was conduct "from which it may be inferred that the defendants have not acted in good faith."  (Docket No. 52 at *12.)  There is thus strong and ample support for a finding that Defendants will likely engage in future violations absent an appropriate injunction.

Defendants should therefore be enjoined from violating, directly or indirectly, Section 15(a)(1) of the Exchange Act of 1934 (failure to register with the SEC as a broker-dealer)[15 U.S.C.§ 78o] and Sections 5(a) and (c) of the Securities Act of 1933 (offering or sale of securities not subject to a registration statement and not exempt from registration)[15 U.S.C. §§ 77e(a) and (c)].

**B.  The Court Should Order Defendants to Jointly and Severally Disgorge Ill-Gotten Gains and Pay Prejudgment Interest Thereon**

The Court may order a defendant to disgorge the amount by which he was unjustly enriched through his violations.  *First Jersey*, 101 F.3d, at 1474-75.  The purpose of disgorgement "is to deprive violators of their ill-gotten gains, thereby effectuating the deterrence objectives of those laws."  *Id.* at 1474 (citations omitted); *see also Cavanagh*, 445 F.3d, at 117 (disgorgement forces a defendant to give up all illegal gains "reaped through his securities law violations … , even if it exceeds actual damages to victims") (internal quotation marks omitted).  Second Circuit case law firmly establishes the propriety of joint and several liability for disgorgement.  *First Jersey,* 101 F.3d at 1456, 1475; *SEC v. Pentagon Capital Mgt. PLC*, 725 F.3d 279, 288 n.8 (2d Cir. 2013); *SEC v. Contorinis*, 743 F.3d 296, 302 (2d Cir. 2014).  In calculating disgorgement, defendants are not allowed to deduct the costs associated with committing their illegal acts.  *SEC. v. Amerindo Inv. Advisors Inc.*, 2014 WL 2112032, at *5, 9 (S.D.N.Y.); *FTC v. Bronson Partners, LLC,* 654 F.3d 359, 375 (2d Cir.2011).  The amount of disgorgement "'need only be a reasonable approximation of profits [or illegal gains] causally connected to the violation,'" and "'any risk of uncertainty [in calculating disgorgement] should fall on the wrongdoer whose illegal conduct created that uncertainty.'"  *Razmilovic*, 738 F.3d at 31 (quoting *First Jersey*, 101 F.3d at 1475, and *SEC v. Warde*, 151 F.3d 42, 50 (2d Cir. 1998)).  Further, the Second Circuit has long recognized that a defendant "cannot be permitted to block the discovery of precise, clear and direct evidence and then be heard to complain that the evidence should have been more convincing."  *Trans World Airlines, Inc. v. Hughes*, 449 F.2d 51, 73 (2d Cir. 1973).  Once the SEC meets its initial burden of showing a "reasonable approximation of the profits causally related to the fraud, the burden shifts to the defendant to show that his gains 'were unaffected by his offenses.'"  *Id.* (quoting *SEC v. Lorin*, 76 F.3d 458,

462 (2d Cir. 1996)).  As part of disgorgement, courts also may order defendants to pay

prejudgment interest to "prevent[ ][the] defendant from obtaining the benefit of what amounts to

an interest free loan."  *SEC v. Moran,* 944 F. Supp. 286, 295 (S.D.N.Y. 1996);  *see also SEC v.*

*Koenig,* 557 F.3d 736, 745 (7th Cir. 2009) (noting that prejudgment interest is designed to take

account of "inflation and the power of money to earn an economic return").  Courts have

approved the use of the IRS underpayment rate to measure prejudgment interest.  *See, e.g., First*

*Jersey*, 101 F.3d at 1476.

### 1.  Section 15(a)(1) Disgorgement Amount

To approximate Defendants' ill-gotten gain from their Section 15(a)(1) violations, the

SEC relied on Defendants' admission that they received 2-3% commissions for their transactions

for U.S. customers.  (Cplt. ¶ 2; Answer ¶ 23; Ex. 6, p. 2 --Defendants' Wells submission in the

New York investigation -- enclosed herewith.)  Defendants have blocked discovery of detailed

information on their transactions.  It is thus appropriate to use the highest admitted commission

rate of 3% as the "reasonable approximation" of the ill-gotten gains for purposes of Section

15(a)(1).

The SEC alleged in the Complaint that Gibraltar sold more than $100 million of

securities on behalf of U.S. customers.  (Cplt.¶ 2.)  So, at least $3 million would be a reasonable

approximation of ill-gotten gains.  The Declaration of Mr. Gary Peters submitted herewith

provides a verified analytical basis for the SEC's calculation of ill-gotten gains.

As reflected in his Declaration, Peters undertook a detailed analysis of a voluminous

business record spreadsheet produced by JPMorgan Chase ("JPMC spreadsheet") to the SEC.

(Peters Decl. ¶¶ 4-5.)  Gibraltar created accounts at U.S. brokers, performed brokers'

transactions for U.S. customers at such accounts, and then transferred proceeds of the

transactions to its account at Royal Bank of Canada ("RBC").  (Answer ¶¶ 20, 23, 27, 29.)  The JPMC spreadsheet reflects all wire transfers that were originated or received on behalf of Gibraltar through its account at Royal Bank of Canada.  (Peters Decl.¶ 3.)  RBC had a relationship with JPMorgan Chase as its correspondent bank for such international wire transfers.  (*Id.*)

To reasonably approximate the total value of the securities transactions undertaken by Gibraltar for U.S. recipients as an unregistered broker-dealer, Peters undertook an analysis consisting of multiple filtering steps that allowed him to summarize the voluminous data and calculate the payment amounts wired from Gibraltar's RBC account to Gibraltar's customers with addresses in the United States.  (*Id.*¶¶ 5-14.)  Peters then calculated the wire transfers to the U.S. recipients included in the time periods alleged in the Complaint.  (*Id.* ¶¶ 15, 17.)  The amount of wire transfers to U.S. customers was then multiplied by the commission rate, resulting in total ill-gotten gains of $3,486,867 for the time period in the Complaint.  (*Id.* ¶¶19-20.)  Peters also calculated the amount of prejudgment interest, using the IRS rate.  The total amount of prejudgment interest calculated is $614,995.  (*Id.* ¶ 20.)  When the prejudgment interest amount is added to the commissions amount, the total amount that Defendants should jointly and severally disgorged as a result of the Section 15(a)(1) violation is $4,101, 862.  (*Id.* ¶ 20.)  The analysis performed provides a reasonable approximation of Defendants' ill-gotten gains.  The burden thus shifts to Defendants to establish that these gains were unaffected by their offenses, which they cannot do given Defendants' refusal to provide their own financial documents.

## 2.  Section 5 Disgorgement Amount

With respect to Defendants' violation of Section 5, the SEC seeks disgorgement in the amount of proceeds from the improper sales.  The use of proceeds as the appropriate

measurement of Section 5 disgorgement is supported by case law.  "For purposes of disgorgement there is no meaningful distinction between receiving funds outright and having funds paid into an account one controls."  *In re Pierce*, Securities Act Rel. No. 9555, 2014 WL 896757, at *24-25 (March 7, 2014) (imposing disgorgement on joint and several basis for Section 5 violations). *Accord Pinter v. Dahl*, 486 U.S. 622, 646 (1988) ("when a broker acting as agent of one of the principals to the transaction successfully solicits a purchase, he is a person from whom the buyer purchases within the meaning of § 12 and is therefore liable as a statutory seller" for full disgorgement); *SEC v. Platforms Wireless International Corp.*, 617 F.3d 1072, 1098 (9th Cir. 2010) ("[w]e have never held that a personal financial benefit is a prerequisite for joint and several liability" in a Section 5 case); *SEC v. Whittemore*, 659 F.3d 1, 9 (D.C. Cir. 2011) ("a person who controls the distribution of illegally obtained funds is liable for the funds he or she dissipated as well as the funds he or she retained"); *SEC v. Verdiramo*, 890 F. Supp. 2d 257, 376 (S.D.N.Y. 2011) ("a defendant may be jointly and severally liable for disgorgement even if he did not personally profit from the Section 5 violation").  Gibraltar had the unregistered shares titled in its name, sold the shares into the open market from its account, and then held the proceeds from those transactions in its account.  Defendants have refused to participate in discovery regarding their relationship with MDOR and, thus, should not be able to reduce their disgorgement amount by any proceeds that were shared with MDOR.

Defendants have admitted to total sales proceeds of $11,384,589.  (Cplt ¶ 27; Answer ¶ 27.)  Peters eliminated possible double counting, resulting in adjusted proceeds of $11,043,051.  (*Id*. ¶ 24.)  He then calculated prejudgment interest of $2,100,849.  (*Id*. ¶¶ 24-25.)  This resulted in a total disgorgement amount for the Section 5 violation of $13,143,900.  (*Id*. ¶ 25.)  The SEC seeks disgorgement of the full amount of these proceeds for Defendants' Section 5 violations.

### 3. Total Disgorgement Amount

In total, the SEC seeks an order holding Davis and Gibraltar jointly and severally liable for disgorgement and prejudgment interest in the amount of $17,245,762 for purposes of Defendants' violations of both Section 15(a)(1) of the Exchange Act and Section 5 of the Securities Act.

### C. The Court Should Impose the Maximum Civil Monetary Penalties Permissible Under the Law

A monetary penalty is designed to serve as a deterrent against securities law violations. *SEC v. Lybrand*, 281 F. Supp 726,  729 (S.D.N.Y. 2003).  Both the Securities Act and the Exchange Act authorize three tiers of monetary penalties, in increasing severity, for statutory violations.  *See* 15 U.S.C. § 77t(d); 15 U.S.C. § 78u(d)(3).  Both statutes provide for three tiers of civil penalties in civil enforcement actions brought by the SEC, depending on the facts and circumstances of a given case.  Each tier provides that, for each violation, the amount of the penalty "shall not exceed the greater of a specified monetary amount or the defendant's gross pecuniary gain." 15 U.S.C. § 77t(d); 15 U.S.C. § 78u(d)(3).  Under each statute, a first-tier penalty may be imposed for any violation; a second-tier penalty may be imposed if the violation "involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement"; a third-tier penalty may be imposed when, in addition to meeting the requirements of the second tier, the "violation directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons," *Razmilovic,* 738 F.3d at 38 (quoting 15 U.S.C. § 77t(d)(2)(A)-(C) and 15 U.S.C. § 78u(d)(3)(B)(i)-(iii)).  All three tiers allow for the imposition of a penalty not to exceed the "gross amount of pecuniary gains."

Second tier penalties are appropriate in this case because Defendants demonstrated "deliberate or reckless disregard of a regulatory violation" by repeatedly violating Section

15(a)(1) for at least four and a half years.  The amount of the penalty is left up to the discretion of the district court.  In exercising their discretion, courts consider factors similar to those discussed above with respect to injunctions, *Lybrand*, 281 F. Supp.2d at 730 (collecting S.D.N.Y. cases).  As discussed above, an analysis of these  factors reveal the egregious nature of Defendants' misconduct: they essentially advertised a business that would allow customers to circumvent regulatory requirements while reaping millions in profits.

The SEC therefore requests that the Court impose a second tier penalty of $7,246,024 on Gibraltar and an identical penalty on Davis.  The SEC measured Defendants' collective pecuniary gain as $14,492,049, which is the amount of disgorgement for both the Section 15(a)(1) and Section 5 violations for the time period within the statute of limitations.  (Peters Decl. ¶ 27.)  The Second Circuit has stated that civil penalties may not be imposed jointly and severally because "[t]he statutory language allowing a court to impose a civil penalty plainly requires that such awards be based on the 'gross amount of pecuniary gain to such defendant.'" *Pentagon Capital Mgmt. PLC*, 725 F.3d at 288 (quoting 15 U.S.C. § 77t(d)(2)).  Defendants have refused to participate in discovery and thus prevented the SEC or the Court from learning any information about how their ill-gotten gains were shared among them.  As with disgorgement, "'any risk of uncertainty [in apportioning a penalty based on gross pecuniary gain between defendants] should fall on the wrongdoer whose illegal conduct created that uncertainty.'" *Razmilovic*, 738 F.3d at 31 (quoting *First Jersey*, 101 F.3d at 1475, and *SEC v. Warde*, 151 F.3d 42, 50 (2d Cir. 1998)).  Every transaction was done by Gibraltar while Davis was its sole owner and president.  They shared in this misconduct – and presumably its rewards – equally.  Thus, the SEC recommends that the Court split the pecuniary gain of Defendants' scheme equally between them and impose a $7,246,024 penalty on each defendant.

## <u>CONCLUSION</u>

For the foregoing reasons, the SEC respectfully requests that the Court enter a sanction of default judgment against the Defendants and enter a Final Judgment enjoining Defendants from future violations of the securities laws, imposing $17,245,762 in disgorgement and prejudgment interest, and imposing  a $7,246,024 civil monetary penalty on each defendant.


Dated: June 12, 2015

<div style="margin-left: 40%;">

Respectfully submitted,

<u>/s/Kevin P. O'Rourke</u>

By:    KEVIN P. O'ROURKE
Attorney for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
100 F Street, N.E.
Washington, D.C. 20549-1040
Telephone: (202) 551-4442
Facsimile: (202) 772-9245
ORourkeK@sec.gov

</div>