UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

SECURITIES AND EXCHANGE COMMISSION,

          Plaintiff,

v.

GIBRALTAR GLOBAL SECURITIES, INC.,
and WARREN A. DAVIS,
          Defendants.

13 CV 2575 (GBD) (JCF)

---

### DECLARATION OF GARY L. PETERS IN SUPPORT OF THE SECURITIES AND EXCHANGE COMMISSION'S MOTION FOR A SANCTION OF DEFAULT JUDGMENT AGAINST DEFENDANTS GIBRALTAR GLOBAL SECURITIES, INC. AND WARREN DAVIS

I, Gary L. Peters, pursuant to 28 U.S.C. § 1746, declare as follows:

1. I am employed as an Assistant Chief Accountant in the Enforcement Division in the Home Office of the Plaintiff Securities and Exchange Commission ("SEC"). I am a licensed Certified Public Accountant in the state of Virginia.

2. I have reviewed Defendants' Answer to the Complaint, filed on April 24, 2014 (Docket No. 35). In their Answer, Defendants admitted that Gibraltar Global Securities, Inc., hereafter referred to as "Gibraltar", "created accounts at U.S. brokers" (Answer ¶ 20) and "performed brokers' transactions executed upon customers' orders, including U.S. customers, and transferred proceeds to its account at Royal Bank of Canada." (Answer ¶ 23).

3.     Attached as Exhibit A hereto is a copy of the cover letter received from JPMorgan Chase, in response to a SEC subpoena, which describes its production, including a "spreadsheet consisting of all wires originated/received on behalf of Gibraltar Global Securities via its account with Royal Bank of Canada Nassau, branch of correspondent banking customer Royal Bank of Canada Nassau for the period between 1/1/2008 to present". The cover letter's attached inventory listing includes, among other things: "Date Range Searched: 1/1/2008 – 10/2/2012". The spreadsheet produced by JPMorgan Chase will hereafter be referred to as the "JPMC spreadsheet".

4.     Attached as Exhibit B hereto is a copy of the Affidavit that accompanied the production of the JPMC spreadsheet to the SEC. The Affidavit states that the records are "a true and correct copy of the original documents kept by JPMorgan Chase Bank in the ordinary course of business"; that the "records were made at or near the time of occurrence of the matters set forth in the records by, or from information transmitted by, a person with knowledge of those matters"; and that it is the "regular practice of JPMorgan Chase Bank to make such a record of transactions in the ordinary course of business." (¶¶ 4-6).

5.     I was asked to analyze the JPMC spreadsheet for the purpose of quantifying the proceeds of securities sales that ultimately flowed to Gibraltar's United States customers from its bank account at Royal Bank of Canada Nassau,

hereafter referred to as "RBC". I summarize herein my analysis of the voluminous data contained in the JPMC spreadsheet.

6. JPMC's spreadsheet appears to include money transfers both into and out of Gibraltar's bank account at RBC including proceeds received from U.S. brokers and sent to, or on behalf of, Gibraltar's customers. However, the JPMC spreadsheet does not specifically identify whether the recipients of funds from Gibraltar's RBC account were, in fact, U.S. customers. Accordingly, I relied on the address information contained in the beneficiary columns of the JPMC spreadsheet as a reasonable basis for identifying U.S. based customers of Gibraltar.

7. I analyzed the money outflows, hereafter referred to as "outgoing wires", from Gibraltar's RBC account as reflected in the JPMC spreadsheet to identify the amounts sent to recipients with addresses in the United States. Such recipients will hereafter be referred to as "U.S. recipients".

8. The JPMC spreadsheet includes outgoing wires throughout the period January 4, 2008 through October 2, 2012.

9. The JPMC spreadsheet contains 8,641 rows and 42 columns of data. The following fields were relevant to my analysis:

    a. Column C "Amount" – represents amount debited and or received;

    b. Column N "DR_ID" – represents either debit account of JPM customer or ID of sending bank;

    c. Column S "CR_ID" – represents either credit account of JPM customer or ID of receiving bank;

    d. Columns Y through AC "ACCT_PTY1-5" – up to five lines representing data identifying the beneficiary bank (name and address). If no beneficiary bank is involved, the field can be used for beneficiary information (account, name and address); and

    e. Columns AD through AH "ULT_BENE1-5" – up to five lines representing beneficiary account, name and address.

10. I began my analysis by identifying the outgoing wires as reflected in the JPMC spreadsheet from Gibraltar's RBC account by filtering the data in the sending and receiving account fields (columns N and S, respectively) and analyzing the results.

11. I then began to identify outgoing wires being sent to U.S. recipients by filtering the data in the relevant beneficiary columns (Columns AD through AH and Y through AC).

12. I then identified outgoing wires being sent to non-U.S. recipients by filtering the data in the relevant beneficiary columns (Columns AD through AH and Y through AC).

13. The results of this preliminary analysis resulted in the identification of approximately $99 million of outgoing wires sent to U.S. recipients and

approximately $167 million of outgoing wires sent to non-U.S. recipients. After identifying both U.S. and non-U.S. wire recipients, I noted that there were still approximately 3,000 lines of data totaling approximately $93 million which did not include addresses for the recipients.

14. I further refined my analysis by filtering the results noted in the preceding paragraph and created two alphabetical lists of names, one for U.S. recipients and one for non-U.S. recipients and then performed a manual name search in the remaining outgoing wires with no addresses listed for the recipients. Where there was a named recipient without an address listed whose name matched a U.S. recipient for which another entry on the spreadsheet contained an address, I included that wire as going to a U.S. recipient, resulting in an additional $18 million being added to the total wires sent to U.S. recipients. Where there was a named recipient without an address listed whose name matched a non-U.S. recipient, I included that wire as going to a non-U.S. recipient, resulting in an additional $28 million being added to the total wires sent to non-U.S. recipients.

15. My analysis of Gibraltar's outgoing wires sent from its bank account at RBC resulted in the identification of a grand total of approximately $117 million of outgoing wires sent to U.S. recipients and approximately $195 million of outgoing wires sent to non-U.S. recipients. After identifying both U.S. and non-U.S. wire recipients, I noted that there were still approximately 1,500 lines of data

totaling over $46 million of outgoing wires sent to recipients for which no address was provided or determinable in the JPMorgan Chase spreadsheet. This remaining population of wires could represent wires to U.S. recipients, non-U.S. recipients, or a combination of both.

16. I was asked by trial counsel to calculate disgorgement, including ill-gotten gains and pre-judgement interest, and penalties associated with Gibraltar's violations of Section 15 of the Securities and Exchange Act of 1934 based on a 3% commission rate.

17. The Complaint describes the relevant period as running from "as early as March 2008 and continuing through August 2012" (Cplt. ¶ 1). Accordingly, for purposes of calculating disgorgement, I sorted the data representing the $117 million of wires going to U.S. recipients (see ¶ 13 above) by date which resulted in a total of approximately $116 million of wires going to U.S. recipients during the relevant period.

18. I have been informed by trial counsel that there is a five year statute of limitations concerning penalties that may be applicable to the violations of the federal securities laws alleged in the Complaint. Accordingly, for purposes of calculating penalties, I sorted the data representing the $116 million of wires going to U.S. recipients during the relevant period (see ¶ 17 above) which resulted in

approximately $115 million of wires going to U.S. recipients during the period May 2008 through August 2012.

19.   I estimated Gibraltar's commissions charged to its U.S. customers by multiplying the monthly totals of outgoing wires to U.S. recipients by 3%. This calculation is based on outgoing wires which are net of commissions and wire fees and therefore represents a conservative estimate.

20.   I calculated Gibraltar's ill-gotten gains of $3,486,867, based only on estimated commissions during the relevant period, March 2008 through August 2012. I calculated pre-judgement interest by utilizing an automated calculator based on the aforementioned estimated monthly ill-gotten gains. The prejudgment interest calculation utilizes the same rates used by the Internal Revenue Service to calculate interest on underpayments which is defined as the Federal short term rate plus three percentage points. 26 U.S.C. §6621(a)(2), however the interest is compounded and re-set quarterly rather than daily.  This calculation resulted in pre-judgment interest of $614,995 for a total disgorgement amount of $4,101,862.

21.   I then calculated penalties of $3,448,998, by utilizing the aforementioned estimated monthly ill-gotten gains, exclusive of any amounts prior to May 2008, so that the resulting penalty would exclude ill-gotten gains that are beyond the statute of limitations period. Transactions occurring at the end of April

2008, while within the statute of limitations period, have been excluded for purposes of this calculation resulting, again, in a conservative estimate.

22. The table of Disgorgement and Penalty calculations discussed in ¶¶ 16-21 is attached hereto at Exhibit C.

23. In their Answer, Defendants admitted to "transferring proceeds from its account at the Royal Bank of Canada to Magnum d'Or." (Answer ¶ 30). I was also asked to analyze the JPMC spreadsheet for the purpose of quantifying the proceeds of securities sales that ultimately flowed to Magnum d'Or. I performed this analysis by applying filters to the beneficiary and additional reference data in the JPMC spreadsheet to identify such outgoing wires. I identified $6,515,384 of wires sent to Magnum d'Or and another $660,373 sent to its subsidiary, Magnum Recyclage Canada, for a total of $7,175,757.

24. I was also asked by trial counsel to calculate disgorgement, including ill-gotten gains and pre-judgement interest, and penalties associated with Gibraltar's violations of Section 5 of the Securities Act of 1933 based on the $11,384,589 of proceeds from Gibraltar's sales of Magnum d'Or common stock as reflected in the SEC's Complaint (Cplt. ¶ 27) which was admitted by Gibraltar in their Answer (Answer ¶ 27).

25. The disgorgement computation discussed in paragraph 18 above could result in double counting a portion of Gibraltar's ill-gotten gains associated with its

sales of Magnum d'Or stock. To avoid any potential double counting, I reduced the Magnum d'Or sales proceeds by the 3% commission rate, or $341,538. As a result, the adjusted proceeds, or ill-gotten gains, amounts to $11,043,051. I then calculated pre-judgement interest based on the adjusted proceeds by utilizing the same automated calculator described in paragraph 20 above, however the calculation in this instance is based on the assumption that all sales proceeds from the Magnum d'Or stock were received on the last transaction date of December 15, 2009 (Cplt.¶ 27). This resulted in pre-judgement interest of $2,100,849 for total disgorgement amounting to $13,143,900.

26. The sales proceeds from the Magnum d'Or stock occurred during the period November 28, 2008 and December 15, 2009, (Cplt. ¶ 27) all of which was within the relevant period running from "as early as March 2008 and continuing through August 2012." (Cplt. ¶ 1). Additionally, all of the sales proceeds were received within the statute of limitations period May 2008 through August 2012 discussed in ¶ 18 above. Accordingly, I calculated the penalty at $11,043,051 based on the adjusted proceeds as discussed in ¶ 25 above so that there would be no double counting of Gibraltar's ill-gotten gains.

27. The following table represents the results of my calculations of disgorgement and penalties associated with Gibraltar's alleged violations of

Section 15 of the Exchange Act of 1934 and Section 5 of the Securities Act of 1933:

| Area | Ill-Gotten Gains | Pre-Judgement Interest | Total Disgorgement | Penalty | Total |
|---|---|---|---|---|---|
| SEA §15 | $ 3,486,867 | $ 614,995 | $ 4,101,862 | $ 3,448,998 | $ 7,550,860 |
| SA §5 | 11,043,051 | 2,100,849 | 13,143,900 | 11,043,051 | 24,186,951 |
| Total | $14,529,918 | $2,715,844 | $17,245,762 | $14,492,049 | $31,737,811 |

I declare under penalty of perjury that the foregoing is true and correct.

Executed on June 11, 2015.

Gary L. Peters