UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

SECURITIES AND EXCHANGE COMMISSION,

                Plaintiff,

    v.

GIBRALTAR GLOBAL SECURITIES, INC.,
and WARREN A. DAVIS,
                Defendants.

13 CV 2575 (GBD) (JCF)

---

**PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
SUBMITTED BY PLAINTIFF SECURITIES AND EXCHANGE COMMISSION**

**I.     INTRODUCTION**

On July 2, 2015, the Court granted the Securities and Exchange Commission's ("SEC") motion for a sanction of default judgment pursuant to Federal Rules of Civil Procedure 37(b)(2)(A)(vi) and Rule 37(d)(3) against Defendants Gibraltar Global Securities, Inc. ("Gibraltar") and Warren A. Davis ("Davis") (collectively, "Defendants").  (ECF No. 73.)  As part of the order, the Court permanently enjoined Defendants from violating Section 15(a) of the Securities Exchange Act, 15 U.S.C. § 780, and Section 5 of the Securities Act, 15 U.S.C. § 77e.  *Id*.  The Court referred the remedy issues of disgorgement, prejudgment interest, and civil monetary penalties to Magistrate Judge Francis.  *Id* at 3.

The liability of Gibraltar and Davis for violations of Section 15(a)(1) of the Securities Exchange Act (failure to register with the SEC as a broker-dealer) and Section 5(a) and 5(c) of the Securities Act (offering or sale of securities not subject to a registration statement and not

exempt from registration) having been established by the Court's order of default judgment,[1] the SEC hereby submits the following Proposed Findings of Fact and Conclusions of Law in further support of the remedies of disgorgement, prejudgment interest, and penalties.

## II.     FINDINGS OF FACT AND CONCLUSIONS OF LAW

### A. Disgorgement of Ill-Gotten Gains and Prejudgment Interest

1. Disgorgement is equitable and remedial rather than compensatory or punitive. The Court may order a defendant to disgorge the amount by which he was unjustly enriched through his violations. *SEC v. First Jersey*, 101 F.3d 1450, 1474-75 (2d Cir. 1996).

2. The purpose of disgorgement "is to deprive violators of their ill-gotten gains, thereby effectuating the deterrence objectives of those laws." *Id.* at 1474 (citations omitted); *see also SEC v. Cavanagh*, 445 F.3d 105, 117 (2d Cir. 2006) (disgorgement forces a defendant to give up all illegal gains "reaped through his securities law violations … , even if it exceeds actual damages to victims") (internal quotation marks omitted).

3. "The emphasis on public protection, as opposed to simple compensatory relief, illustrates the equitable nature of the remedy [of disgorgement]." *Id.* "Upon awarding disgorgement, a district court may exercise its discretion to direct the money toward victim compensation or to the United States Treasury." *Id.*

4. In calculating disgorgement, defendants are not allowed to deduct the costs associated with committing their illegal acts. *SEC. v. Amerindo Inv. Advisors Inc.*, 2014 WL 2112032, at *5, 9 (S.D.N.Y.); *FTC v. Bronson Partners, LLC,* 654 F.3d 359, 375 (2d Cir.2011); *see also*, *SEC v. Hughes Cap. Corp.,* 917 F. Supp. 1080, 1086-1087 (D.N.J. 1996) (refusing to

---

[1] A defendant may not raise any defense at the relief stage that "effectively contests settled issues of liability." *Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp.*, 973 F.2d 155, 158-59 (2d Cir. 1992); *accord* 10A C. WRIGHT & A. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2688 (3d ed. 2010). Since the Court has entered an order of default judgment, the liability of Defendants for violations of Section 15(a)(1) and Sections 5(a) and (c) has been legally established.

offset disgorgement by certain "legitimate" business expenses and noting that the overwhelming weight of authority holds that securities law violators may not offset their disgorgement liability with business expenses), *aff'd*, 124 F.3d 449 (3d Cir. 1997).

5.   As an exercise of the court's equitable authority, the amount of disgorgement "'need only be a reasonable approximation of profits [or illegal gains] causally connected to the violation,'" and "'any risk of uncertainty [in calculating disgorgement] should fall on the wrongdoer whose illegal conduct created that uncertainty.'"  *SEC v Razmilovic*, 738 F.3d 14, 31 (2d Cir. 2013) (quoting *First Jersey*, 101 F.3d at 1475, and *SEC v. Warde*, 151 F.3d 42, 50 (2d Cir. 1998)).

6.   For purposes of violations of Section 15(a)(1), which focuses on the act of being a broker, commissions provide a "reasonable approximation" of the profits causally connected to the trades executed for U.S. customers by an unregistered broker-dealer.

7.   For purposes of violations of Section 5(a) and (c), which focus on illegal sales of securities by anyone, the appropriate measurement of disgorgement are the total proceeds from the improper sales of the unregistered security. "For purposes of disgorgement there is no meaningful distinction between receiving funds outright and having funds paid into an account one controls."  *In re Pierce*, Securities Act Rel. No. 9555, 2014 WL 896757, at *24-25 (March 7, 2014) (imposing disgorgement on joint and several basis for Section 5 violations); *cf. Pinter v. Dahl*, 486 U.S. 622, 646 (1988) ("when a broker acting as agent of one of the principals to the transaction successfully solicits a purchase, he is a person from whom the buyer purchases within the meaning of § 12 and is therefore liable as a statutory seller"); *SEC v. Platforms Wireless International Corp.*, 617 F.3d 1072, 1098 (9th Cir. 2010) ("[w]e have never held that a personal financial benefit is a prerequisite for joint and several liability" in a Section 5 case);

*SEC v. Whittemore*, 659 F.3d 1, 9 (D.C. Cir. 2011) ("a person who controls the distribution of illegally obtained funds is liable for the funds he or she dissipated as well as the funds he or she retained"); *SEC v. Verdiramo*, 890 F. Supp. 2d 257, 376 (S.D.N.Y. 2011) ("a defendant may be jointly and severally liable for disgorgement even if he did not personally profit from the Section 5 violation").

8. Once the SEC meets its initial burden of showing a "reasonable approximation of the profits causally related", the burden "shifts to the defendant to show that his gains 'were unaffected by his offenses.'" *SEC v. Lorin*, 76 F.3d 458, 462 (2d Cir. 1996).

9. The Second Circuit has long recognized that a defendant "cannot be permitted to block the discovery of precise, clear and direct evidence and then be heard to complain that the evidence should have been more convincing." *Trans World Airlines, Inc. v. Hughes*, 449 F.2d 51, 73 (2d Cir. 1973).

10. As part of disgorgement, courts also may order defendants to pay prejudgment interest to "prevent[ ][the] defendant from obtaining the benefit of what amounts to an interest free loan." *SEC v. Moran,* 944 F. Supp. 286, 295 (S.D.N.Y. 1996); *see also SEC v. Koenig,* 557 F.3d 736, 745 (7th Cir. 2009) (noting that prejudgment interest is designed to take account of "inflation and the power of money to earn an economic return"). Courts have approved the use of the IRS underpayment rate to measure prejudgment interest. *See, e.g., First Jersey*, 101 F.3d at 1476.

11. Second Circuit case law firmly establishes the propriety of joint and several liability for disgorgement. *First Jersey,* 101 F.3d at 1456, 1475; *SEC v. Pentagon Capital Mgt. PLC*, 725 F.3d 279, 288 n.8 (2d Cir. 2013); *SEC v. Contorinis*, 743 F.3d 296, 302 (2d Cir. 2014).

12. The five year statute of limitations does not apply to claims for disgorgement. *See Johnson v. SEC*, 87 F.3d 484, 491 (C.A.D.C. 1996); *see also Lorin*, 869 F. Supp. at 1122-23.

### B. Section 15(a)(1) Disgorgement Amount

13. Defendants admitted that Gibraltar received 2-3% commissions on the trades that it executed for U.S. customers. (ECF No. 69-7; Answer ¶ 23.) Defendants, however, blocked discovery of information about their transactions and did not respond to the SEC's remedies brief, which approximated their ill-gotten gain for Section 15(a)(1) violations at 3 percent. It is thus appropriate to use the highest admitted commission rate of 3% to calculate the "reasonable approximation" of the Defendants' ill-gotten gains for purposes of the Section 15(a)(1) violations.

14. The SEC undertook a detailed analysis of a voluminous business record spreadsheet produced to the SEC by JPMorgan Chase ("JPMC spreadsheet"). (Peters Decl. ¶¶ 4-5, ECF No. 70.) Gibraltar created accounts at U.S. brokers, performed brokers' transactions for U.S. customers at such accounts, and then transferred proceeds of the transactions to its account at Royal Bank of Canada ("RBC"). (Answer ¶¶ 20, 23, 27, 29.) The JPMC spreadsheet reflects all wire transfers that were originated or received on behalf of Gibraltar through its account at RBC Nassau. (Peters Decl.¶ 3.) RBC had a relationship with JPMorgan Chase as its correspondent bank for such international wire transfers. (*Id*.)

15. To approximate the total value of the securities transactions undertaken as an unregistered broker-dealer for U.S. customers, an analysis was conducted by the SEC consisting of multiple filtering steps and the use of reasonable assumptions that allowed for a summary of the voluminous data and the calculation of the payment amounts wired from Gibraltar's RBC account to Gibraltar's customers with addresses in the United States. (*Id*.¶¶ 5-14.) The wire

5

transfers to the U.S. recipients included in the time periods alleged in the Complaint were then calculated.  (*Id*. ¶¶ 15, 17, 22.)

16.  The outgoing wires sent from the Gibraltar bank account at RBC included a total of at least $117 million sent to U.S. recipients.  (*Id*. ¶15.)  Of this amount, approximately $116 million was sent to U.S. recipients during the time period covered by the Complaint.  (*Id*. ¶¶ 17, 22.)  These totals may underestimate the funds sent by Gibraltar to its U.S. customers since there were $46 million of additional outgoing wires sent to recipients for which no address was provided or determinable.  (*Id*. ¶15.)

17.  For purposes of disgorgement, the approximately $116 million amount constitutes a reasonable approximation of the total trades that Gibraltar executed for U.S. customers as an unregistered broker-dealer during the relevant period.

18.  Multiplying the actual monthly totals of the outgoing wires to the U.S. recipients for the time period covered in the Complaint by the 3% commission rate results in ill-gotten gains of $3,486,867.  (*Id.* ¶¶19-20, 22.)

19.  The SEC accurately calculated the amount of prejudgment interest based on the IRS underpayment rate.  (Id. at ¶ 20.)  The total amount of prejudgment interest calculated is $614,995.  (*Id*. ¶¶ 20, 22.)

20.  When the prejudgment interest is added to the commissions, the total is $4,101,862.  (*Id*. ¶ 20, 22.)  This is a reasonable approximation of ill-gotten gains, including appropriate prejudgment interest, based on the violation of Section 15(a)(1).

21.  Accordingly, Gibraltar and Davis, for himself and as the controlling person of Gibraltar, should jointly and severally disgorge $4,101,862 as a result of their violation of Section 15(a)(1).

### C.  Section 5 Disgorgement Amount

22.     With respect to Defendants' violation of Section 5, proceeds from the improper sales are the appropriate measurement of disgorgement.

23.     Defendants were direct participants in the illegal distribution of the unregistered MDOR shares.  Gibraltar sold over 10 million MDOR shares in 600 transactions for proceeds of over $11million. (Cplt.¶¶ 25-27; Answer ¶¶ 25-27.)  Illustrating the essential role that Defendants played in the distribution of the unregistered shares -- and demonstrating the reasonableness of total proceeds as the measurement of disgorgement -- is the fact that Gibraltar directed approximately $7.175 million of the MDOR proceeds to be wired from its own account directly back to the issuer, establishing Defendants' direct knowledge of the improper capital-raising function the shares were being used for.  (Cplt. ¶¶ 10, 29; Answer ¶ 29; Peters Decl. ¶ 23.)  Moreover, Defendants' offered their customers international business corporations or "IBCs" to help conceal the identity of the individual or entity who placed a trade, essentially facilitating the anonymity of any customers who traded in violation of U.S. laws.  (Cplt. ¶ 1.)

24.     Defendants took this practice one step further by refusing to comply with discovery requests that would have revealed other participants in the violative transactions.  They cannot now contest proceeds as a reasonable approximation of their ill-gotten gains on the theory that they were acting merely as brokers.  Disgorgement is designed to make violations unprofitable.  To limit Section 5 disgorgement to commissions under the circumstances presented here would risk making disgorgement a cost of doing business, instead of providing the level of deterrence necessary to discourage entities like Gibraltar from engaging in illegal distributions of worthless penny stocks.  Gibraltar was willing to participate in an illegal distribution, traded in its own accounts, and its participation was necessary and substantial for

7

the success of the scheme. Accordingly, having lent themselves to the illegal scheme, requiring them to disgorge proceeds from their illegal transactions is appropriate and equitable.

25. Accordingly, Gibraltar and Davis must disgorge total sales proceeds of $11,043,051 from the Magnum d'Or sales. (Cplt ¶ 27; Answer ¶ 27; Peters Decl. ¶ 25.) The SEC is also entitled to prejudgment interest on the proceeds, amounting to $2,100,849, calculated using the IRS underpayment rate. (Peters Decl. ¶¶ 24-25.)

26. When the prejudgment interest is added to the amount of ill-gotten gains, the total amount of disgorgement for the Section 5 violation is $13,143,900. (*Id*. ¶25.) This is a reasonable approximation of ill-gotten gains and appropriate prejudgment interest, based on the violation of Section 5. Accordingly, Gibraltar and Davis, for himself and as the controlling person of Gibraltar, should jointly and severally disgorge $13,143,900 as a result of their violation of Sections 5(a) and (c).

### D. Total Disgorgement Amount

27. The SEC has made a reasonable showing of the ill-gotten gains made by Gibraltar and Davis based on the violations of Section 15(a)(1) of the Exchange Act and Section 5 of the Securities Act. The burden thus shifts to the Defendants' to rebut this reasonable approximation and show that any gains were unaffected by their misconduct. *Lorin*, 76 F.3d at 462. Defendants cannot meet this burden. They refused to participate in court-ordered discovery and they did not respond to the SEC's Motion for a Sanction of Default Judgment and Related Remedies. (ECF No. 68.) They made no showing that the disgorgement amount requested by the SEC was inaccurate in any way or that the demonstrated gains were unaffected by their offenses.

28. In securities cases, the wrongdoer bears the risk of any uncertainty created by his misconduct. *Razmilovic*, 738 F.3d at 31. This principle is particularly appropriate in the present case where Defendants have shielded many of the relevant facts from discovery.

29. Gibraltar and Davis received total ill-gotten gains of $14,529,918, which together with prejudgment interest of $2,715,844, amount to disgorgement of $17,245,762 for purposes of the violations of both Section 15(a)(1) of the Exchange Act and Section 5 of the Securities Act.

30. As Gibraltar's sole owner and president, and controlling participant in the misconduct, Davis is jointly and severally liable with Gibraltar for the ill-gotten gains and prejudgment interest.

31. Gibraltar and Davis are liable, jointly and severally, for disgorgement of $14,529,918, the total ill-gotten gains that resulted from their conduct as alleged in the Complaint, together with prejudgment interest thereon in the amount of $2,715,844, for a total of $17,245,762.

### E. Civil Monetary Penalties

32. "A monetary penalty is designed to serve as a deterrent against securities law violations." *SEC v. Lybrand*, 281 F. Supp.2d 726, 729 (S.D.N.Y. 2003).

33. Both the Securities Act and the Exchange Act authorize three tiers of monetary penalties, in increasing severity, for statutory violations. *See* 15 U.S.C. § 77t(d); 15 U.S.C. § 78u(d)(3). Both statutes provide for three tiers of civil penalties in civil enforcement actions brought by the SEC, depending on the facts and circumstances of a given case. Each tier provides that, for each violation, the amount of the penalty "shall not exceed the greater of a specified monetary amount or the defendant's gross pecuniary gain." 15 U.S.C. § 77t(d); 15 U.S.C. § 78u(d)(3). Under each statute, a first-tier penalty may be imposed for any violation; a

second-tier penalty may be imposed if the violation "involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement"; a third-tier penalty may be imposed when, in addition to meeting the requirements of the second tier, the "violation directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons," *Razmilovic,* 738 F.3d at 38 (quoting 15 U.S.C. § 77t(d)(2)(A)-(C) and 15 U.S.C. § 78u(d)(3)(B)(i)-(iii)).  All three tiers allow for the imposition of a penalty not to exceed the "gross amount of pecuniary gains."  Prejudgment interest is not considered in the determination of the amount of penalty.

34.     Second tier penalties are appropriate in this case because Defendants demonstrated "deliberate or reckless disregard of a regulatory violation" by repeatedly violating Section 15(a)(1) for over four years.

35.     The amount of the penalty is left to the discretion of the district court.  In exercising their discretion, courts consider factors similar to those considered with respect to injunctions.  *Lybrand*, 281 F. Supp.2d at 730 (collecting S.D.N.Y. cases).  An analysis of these factors reveal the egregious nature of Defendants' misconduct: they essentially advertised a business that would allow customers to circumvent regulatory requirements while reaping millions in profits.

36.     Due to the five year statute of limitation applicable to penalties (*Gabelli v. SEC,* 133 S.Ct. 126, (2013), the transactions subject to penalties are limited to those conducted during the time period May 2008 through August 2012, two months less than the time period for disgorgement.

37.     The collective pecuniary gain for purposes of penalties is $14,492,049, the amount of disgorgement, not including prejudgment interest, for both the Section 15(a)(1) and

Section 5 violations for the time period within the statute of limitations applicable to penalties. (Peters Decl. ¶¶18, 21, 26-27.)

38. The Second Circuit has stated that civil penalties may not be imposed jointly and severally because "[t]he statutory language allowing a court to impose a civil penalty plainly requires that such awards be based on the 'gross amount of pecuniary gain to such defendant.'" *SEC v. Pentagon Capital Mgmt. PLC*, 725 F.3d 279, 288 (2d Cir. 2013 (quoting 15 U.S.C. § 77t(d)(2)).

39. Gibraltar and Davis have refused to participate in discovery and thus prevented the SEC or the Court from learning any information about how their ill-gotten gains were shared among them. As with disgorgement, "'any risk of uncertainty [in apportioning a penalty based on gross pecuniary gain between defendants] should fall on the wrongdoer whose illegal conduct created that uncertainty.'" *Razmilovic*, 738 F.3d at 31 (quoting *First Jersey*, 101 F.3d at 1475, and *SEC v. Warde*, 151 F.3d 42, 50 (2d Cir. 1998)).

40. Every transaction was conducted by Gibraltar while Davis was its sole owner and president. They shared in the misconduct – and presumably its rewards – equally. Thus, the Court splits the pecuniary gain of Defendants' scheme equally between them and imposes a $7,246,024 penalty on each defendant.

41. Accordingly, Gibraltar Global Securities, Inc. and Warren Davis are each separately liable for a civil penalty in the amount of $7,246,024, pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78U(d)(3)].

In addition to the above Proposed Findings of Fact and Conclusions of Law, it is respectfully requested that that Court include in its Order the various provisions, including the ordering of payment, included in the SEC's previously proposed Final Judgment. (ENF. No. 69-1, at 7-9.)

### III. CONCLUSION

For the foregoing reasons, the SEC respectfully requests that the Court enter a Final Judgment, imposing $17,245,762 in disgorgement and prejudgment interest, and imposing a $7,246,024 civil monetary penalty on each defendant.

Dated: August 14, 2015

Respectfully submitted,

By: /s/Kevin P. O'Rourke
KEVIN P. O'ROURKE
Attorney for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
100 F Street, N.E.
Washington, D.C. 20549-1040
Telephone: (202) 551-4442
Facsimile: (202) 772-9245
ORourkeK@sec.gov

## **CERTIFICATE OF SERVICE**

  I hereby certify that on August 14, 2015, I caused a copy of the foregoing PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW SUBMITTED BY PLAINTIFF SECURITIES AND EXCHANGE COMMISSION to be served upon Defendants Gibraltar Global Securities, Inc. and Warren Davis by emailing the aforementioned document to: warrenanthonydavis@gmail.com.

                /s/ Kevin P. O'Rourke
                Kevin P O'Rourke