UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - -:
SECURITIES AND EXCHANGE COMMISSION,: 13 Civ. 2575 (GBD) (JCF)
                                    :
            Plaintiff,              :       REPORT AND
                                    :       RECOMMENDATION
    - against -                     :
                                    :
GIBRALTAR GLOBAL SECURITIES, INC.   :
and WARREN A. DAVIS,                :
                                    :
            Defendants.             :
- - - - - - - - - - - - - - - - - - -:
TO THE HONORABLE GEORGE B. DANIELS, U.S.D.J.:

       This is an action brought by the Securities and Exchange
Commission (the "SEC") alleging various violations of the federal
securities laws.   The SEC asserts that between March 2008 and
August 2012, Gibraltar Global Securities, Inc. ("Gibraltar"), a
Bahamian company under the direction of its president and sole
shareholder, Warren A. Davis, operated as an offshore, unregistered
broker-dealer in violation of 15 U.S.C. §§ 78o(a)(1) and 78t(a)
(the "Section 15 claims").   The SEC further alleges that the
defendants engaged in the sale of millions of shares of
unregistered stock in a company called Magnum d'Or in violation of
15 U.S.C. §§ 77e(a) and 77e(c) (the "Section 5 claims").

       On July 2, 2015, the Honorable George B. Daniels, U.S.D.J.,
granted judgment by default for the SEC and referred the case to me
for a calculation of damages. (Order dated July 2, 2015).   I held
an inquest on September 18, 2015; the defendants did not appear.
Accordingly, the following findings are based on evidence the SEC
presented at the hearing and information it submitted beforehand.
For the reasons set forth below, I recommend that the defendants be

held liable, jointly and severally, for disgorgement in the amount of $14,449,176 and for prejudgment interest in the amount of $2,700,443. I further recommend that a tier two civil penalty be entered against each defendant in the amount of $3,667,146.

<u>Background</u>

From approximately March 2008 through August 2012, the defendants operated as unregistered broker-dealers, offering their customers -- many of whom resided in the United States -- a means to engage in securities transactions anonymously and without paying taxes on their profits. (Complaint, ¶ 1). During the relevant period, Gibraltar maintained a website that encouraged customers to establish brokerage accounts with the defendants by offering a variety of brokerage services, as well as confidentiality, protection against asset seizure, and tax avoidance. (Complaint, ¶¶ 15-16). For example, Gibraltar advertised the ability to form international business corporations ("IBCs") with nominee officers and directors, thereby allowing customers to trade through their IBCs without disclosing their identities. (Complaint, ¶¶ 1, 19). To enable customers to avoid U.S. taxes, Mr. Davis submitted withholding forms to brokers in the U.S. that falsely certified that Gibraltar -- a non-U.S. entity exempt from withholding -- was the beneficial owner of the income generated from its transactions. (Complaint, ¶ 20).

The defendants' illegal operation functioned as follows. First, Gibraltar received from its customers "shares of low-priced, thinly-traded stock." (Complaint, ¶ 21). Next, Gibraltar retitled

the shares in its name and deposited them in accounts it maintained with brokers in the U.S. (Complaint, ¶ 21-22). Gibraltar customers could then convey sell orders to the defendants, who conveyed those orders to their U.S. brokers, who sold the corresponding stock on the open market. (Complaint, ¶ 22). Once the U.S. brokers sold the shares, Gibralter instructed them to wire the proceeds to an account it maintained with the Royal Bank of Canada in the Bahamas. (Complaint, ¶ 23). Finally, after deducting its commission of 2-3%, Gibraltar wired the remaining sale proceeds back to its customers in the U.S. (Complaint, ¶ 23). Throughout the relevant time period, neither Gibraltar nor Mr. Davis were registered as brokers with the SEC as required by 15 U.S.C. § 78o(a)(1). (Complaint, ¶ 8).

The defendants' legal transgressions did not end there. Starting in November 2008 and continuing through September 2009, Dwight Flatt, David Della Sciucca, and Shannon Allen (referred to collectively in the complaint as "the Flatt nominees") deposited over 11 million shares of stock in a company called Magnum d'Or ("Magnum") in accounts they held with Gibraltar. (Complaint, ¶¶ 10-14, 25). Gibraltar retitled the Magnum shares -- which the Flatt nominees had acquired directly from the issuer -- in its own name and deposited them in four accounts it maintained with U.S. brokers. (Complaint, ¶¶ 25-26). Between November 2008 and December 2009, the defendants sold over 10 million shares of Magnum stock through their U.S. brokers, generating total proceeds of $11,384,589. (Complaint, ¶ 27). The defendants never filed a

registration statement with the SEC in connection with any sale of Magnum stock. (Complaint, ¶ 28). As described above, the U.S. brokers then wired the proceeds from these sales to Gibraltar's account in the Bahamas. (Complaint, ¶ 29). Gibraltar eventually wired approximately $7.175 million directly back to Magnum. (Complaint, ¶ 29).

In light of these violations, the SEC seeks disgorgement of the defendants' profits, including prejudgment interest, and a civil monetary penalty to be imposed against each defendant. (Memorandum in Support of Securities and Exchange Commission Motion for a Sanction of Default Judgment and Related Remedies Against Defendants Gibraltar Global Securities, Inc. and Warren Davis ("Pl. Memo.") at 1).

Discussion

A. Liability

Where a defendant has defaulted, all of the facts alleged in the complaint, except those relating to the amount of damages, must be accepted as true. See Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp., 973 F.2d 155, 158 (2d Cir. 1992); see also City of New York v. Mickalis Pawn Shop, LLC, 645 F.3d 114, 137 (2d Cir. 2011) ("It is an 'ancient common law axiom' that a defendant who defaults thereby admits all 'well-pleaded' factual allegations contained in the complaint." (quoting Vermont Teddy Bear Co. v. 1-800 Beargram Co., 373 F.3d 241, 246 (2d Cir. 2004))). Nonetheless, a court "must still satisfy itself that the plaintiff has established a sound legal basis upon which liability may be

4

imposed." <u>Jemine v. Dennis</u>, 901 F. Supp. 2d 365, 373 (E.D.N.Y. 2012).   The SEC asserts two causes of action against the defendants.   The facts alleged establish the defendants' liability on both counts.

    1.   <u>Mr. Davis' Liability</u>

The SEC alleges that Mr. Davis "is the founder, president and sole owner of Gibraltar" and that during the relevant period he, "directly or indirectly, controlled Gibraltar's activities." (Complaint, ¶ 9).   Because the SEC's theory for holding Mr. Davis liable under § 78o(a)(1) differs from its theory of his liability under § 77e, it is useful to address each theory at the outset.

Pursuant to 15 U.S.C. § 78t(a), anyone who "directly or indirectly, controls any person liable" under the Securities Exchange Act of 1934 (the "1934 Act") or its regulations is liable to the same extent as the controlled person, "unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation."[1]   To establish "control person" liability, a plaintiff must show, at the very least, "(1) a primary violation by the controlled person and (2) control of the primary violator by the defendant."   <u>Special Situations Fund III QP, L.P. v. Deloitte Touche Tohmatsu CPA, Ltd.</u>, 33 F. Supp. 3d 401, 437 (S.D.N.Y. 2014).

With respect to the first element, I address below Gibraltar's liability under the 1934 Act as the controlled person.   Regarding

---

[1] As used in the statute, "person" includes a company.   15 U.S.C. § 78c(a)(9).

the second element, as the founder, president, and sole owner of Gibraltar, Mr. Davis undoubtedly had control over that entity.  See Dietrich v. Bauer, 126 F. Supp. 2d 759, 765 (S.D.N.Y. 2001) ("[O]wnership strongly suggests that the defendant has the potential power to influence and direct the activities of the wrongdoer.").  Indeed, the complaint indicates that Mr. Davis was responsible for authorizing Gibraltar employees to place trades in the U.S. (Complaint, ¶ 9).

The Second Circuit has repeatedly stated that liability under § 78t(a) further requires "culpable participation" by the controlling person in the illegal conduct.  See Special Situations Fund, 33 F. Supp. 3d at 438 (collecting cases).[2]  To the extent

---

[2] Not only is the precise import of the phrase "culpable participation" unclear, see In re Philip Services Corp. Securities Litigation, 383 F. Supp. 2d 463, 486 (S.D.N.Y. 2004) ("[D]istrict courts in the Circuit are split as to what exactly the phrase means."), but its applicability to the present action is complicated by the fact that the concept developed in the context of holding a control person liable for another's fraud, see 69A Am. Jur. 2d Securities Regulation-Federal § 1211 ("Some courts require that, in order to hold liable a person who is deemed to control a person who commits fraud, it must be established that the controlling person was a culpable participant in the fraud." (emphasis added)); see also Carpenters Pension Trust Fund of St. Louis v. Barclays PLC, 750 F.3d 227, 236 (2d Cir. 2014) (discussing culpable participation in the context of control person liability for fraud); ATSI Communications, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 108 (2d Cir. 2007) (same); Boguslavsky v. Kaplan, 159 F.3d 715, 720 (2d Cir. 1998)(same); SEC v. First Jersey Securities, Inc., 101 F.3d 1450, 1472 (2d Cir. 1998) (same); Lanza v. Drexel & Co., 479 F.2d 1277, 1299 (2d Cir. 1973) (arguing that the control person provision in the statute was intended to "impose liability only on those [control persons] . . . who are in some meaningful sense culpable participants in the fraud perpetrated by controlled persons" (emphasis added)).  Indeed, much of the confusion surrounding the meaning of "culpable participation" has to do with how the phrase relates to the heightened pleading standards required in actions alleging fraud.  See, e.g., Mishkin v. Ageloff, No. 97 Civ. 2690, 1998 WL 651065, at *22-25 (S.D.N.Y. Sept. 23,

that the SEC is required to establish Mr. Davis' culpable participation in Gibraltar's § 78o(a)(1) violation, it is sufficient that he both established Gibraltar's brokerage accounts in the U.S. and authorized Gibraltar (through its employees) to place trades. (Complaint, ¶ 9).

To establish Mr. Davis' liability for the Section 5 claims, the SEC does not rely on a theory of control person liability. Instead, the SEC would hold Mr. Davis directly liable under the statute, which requires only that the defendant be "a necessary and substantial participant in the unregistered sale[]" of securities. SEC v. Verdiramo, 890 F. Supp. 2d 257, 271 (S.D.N.Y. 2011).  The SEC's allegations (described in detail below) concerning Mr. Davis' involvement in the unregistered sale of Magnum stock satisfy that standard.

2.  Section 15 Claims

Section 15(a)(1) of the 1934 Act, 15 U.S.C. § 78o(a)(1), makes it unlawful for (1) an unregistered (2) broker or dealer (3) to make use of the mails or any means or instrumentality of interstate commerce (4) to effect any transactions in, or to induce or attempt to induce the purchase or sale of, any security.  No showing of scienter is required to establish a violation under Section 15(a)(1).  SEC v. Aronson, No. 11 Civ. 7033, 2013 WL 4082900, at *7 (S.D.N.Y. Aug. 6, 2013).

---

1998) (exploring relationship between culpable participation requirement and pleading standards for actions alleging fraud). Because the SEC has sufficiently pled facts that show Mr. Davis' culpable participation in Gibraltar's violation, I need not resolve this lack of clarity in the case law.

At the time the SEC filed its complaint, neither defendant had ever registered as a broker-dealer. (Complaint, ¶¶ 8-9, 24). Between 2008 and 2012, Gibraltar received stock shares from its customers, retitled the shares in its name, deposited the shares with U.S. brokers, sold the shares through the U.S. brokers pursuant to its customers' instructions, had the sale proceeds wired to an account maintained at the Royal Bank of Canada, and then forwarded the proceeds to its customers after deducting a 2-3% commission. (Complaint, ¶¶ 21-23). Accordingly, the SEC has adequately demonstrated that the defendants are unregistered and that Gibraltar effected transactions in, or induced the purchase and sale of securities. Therefore, the first and fourth requirements of the statute are met.

A "'broker' [is] any person engaged in the business of effecting transactions in securities for the account of others." 15 U.S.C. § 78c(a)(4)(A). Courts look at "regularity of participation in securities transactions 'at key points in the chain of distribution'" in determining whether a defendant acted as a broker. SEC v. StratoComm Corp., 2 F. Supp. 3d 240, 262 (N.D.N.Y. 2014) (quoting Massachusetts Financial Services, Inc. v. Securities Investor Protection Corp., 411 F. Supp. 411, 415 (D. Mass.), aff'd, 545 F.2d 754 (1st Cir. 1976); accord SEC v. Hansen, No. 83 Civ. 3692, 1984 WL 2413, at *10 (S.D.N.Y. April 6, 1984). Evidence of brokerage activity may include "receiving transaction-based compensation . . . and possessing client funds and securities." SEC v. Margolin, No. 92 Civ. 6307, 1992 WL 279735, at

\*5 (S.D.N.Y. Sept. 30, 1992); <u>see also</u> 15 David A. Lipton, <u>Broker-Dealer Regulation</u> § 1:6 (describing various "badges" of broker status including "effecting transactions for others," "earning of a commission," "[s]olicitation of business," and "transmission of funds or securities in conjunction with transactions in such securities"). Gibraltar's activities, as described in the complaint, demonstrate that it acted as a broker as that term is defined in the statute.

Interstate commerce is defined in the statute to include "trade, commerce, transportation, or communication . . . between any foreign country and any State." 15 U.S.C. § 78c(a)(17). Operating from the Bahamas, Gibraltar accepted stock deposits from U.S. customers, deposited those stocks in U.S. brokerage accounts, received sell orders from its customers telephonically or through email, placed those orders with its U.S. brokers, instructed those brokers to wire sale proceeds to Gibraltar's account in the Bahamas, and wired the proceeds back to its U.S. customers after deducting their commission. These actions, alone and in combination, satisfy the interstate commerce element of Section 15(a). <u>Cf.</u> <u>SEC v. Spinosa</u>, 31 F. Supp. 3d 1371, 1376 (S.D. Fla. 2014) (holding that use of telephone and internet sufficient to satisfy interstate commerce requirement and collecting authority). Accordingly, the SEC has established the required elements of the Section 15(a)(1) claim for both Gibraltar and for its control person, Mr. Davis.

3.   Section 5 Claims

"Section 5 [of the Securities Act of 1933, 15 U.S.C. § 77e,] requires that securities be registered with the SEC before any person may sell or offer to sell such securities." SEC v. Cavanagh, 445 F.3d 105, 111 (2d Cir. 2006).  The elements of a Section 5 violation are as follows: "(1) That the defendant directly or indirectly sold or offered to sell securities; (2) that no registration statement was in effect for the subject securities; and (3) that interstate means were used in connection with the offer or sale." SEC v. Universal Express, Inc., 475 F. Supp. 2d 412, 422 (S.D.N.Y. 2007).  Scienter is not a required element under Section 5, and the defendant bears the burden of proving the applicability of any registration exemption. SEC v. Czarnik, No. 10 Civ. 745, 2010 WL 4860678, at *11 (S.D.N.Y. Nov. 29, 2010).

Between November 2008 and September 2009, the Flatt nominees deposited more than 11 million shares of Magnum stock into accounts they held with the defendants.  (Complaint, ¶ 25).  More than 10 million of those shares were subsequently retitled in Gibraltar's name, deposited (by Mr. Davis) in Gibraltar's U.S. brokerage accounts via mail, and then sold (by both Gibraltar and Mr. Davis) through U.S. brokers between November 2008 and December 2009. (Complaint, ¶ 26-27).  Gibraltar then instructed the U.S. brokers to wire the proceeds from those sales ($11,384,589) to its account with the Royal Bank of Canada in the Bahamas, at which point Gibraltar wired $7.175 million back to Magnum.  (Complaint, ¶ 29). No registration statement was filed with the SEC with respect to

any of the sales of Magnum d'Or stock effected by the defendants. (Complaint, ¶ 28; Attestations of Larry Mills dated March 24, 2015, attached as Exhs. 4 & 5 to Pl. Memo.).

The facts related above are sufficient to establish that the defendants violated Section 5.  By retitling the shares in Gibraltar's name, transferring the shares to U.S. brokers and instructing those brokers to sell the shares, the defendants sold securities within the meaning of Section 5.  Cf. SEC v. Greenstone Holdings, Inc., No. 10 Civ. 1302, 2012 WL 1038570, at *11 (S.D.N.Y. March 26, 2012) ("A person not directly engaged in the transfer of the title of a security can be held liable if he has 'engaged in steps necessary to the distribution of [unregistered] security issues.'" (alteration in original) (quoting SEC v. Chinese Consolidated Benevolent Association, Inc., 120 F.2d 736, 741 (2d Cir. 1941))).  The securities were unregistered and were transferred to the U.S. brokers by mail.  Having refused to further participate in this matter (Order dated July 2, 2015, at 1), the defendants cannot satisfy their burden of proving the applicability of any registration exemption.

   B. Damages

Once it demonstrates liability, a plaintiff must present evidence that establishes the amount of damages with reasonable certainty.  See United States v. DiPaolo, 466 F. Supp. 2d 476, 483 (S.D.N.Y. 2006).  Courts, in calculating damages, may make "all reasonable inferences from the evidence" the plaintiff has offered to support its demand for a default judgment.  Labarbera v. ASTC

11

Laboratories Inc., 752 F. Supp. 2d 263, 270 (E.D.N.Y. 2010). Based on the pleadings, the documentary evidence, and the testimony presented at the inquest, the plaintiff is entitled to a judgment as follows.

      1. <u>Disgorgement</u>

    "Disgorgement of ill-gotten gains is a congressionally and judicially recognized remedy for a violation of the securities law." <u>SEC v. Shehyn</u>, No. 04 Civ. 2003, 2010 WL 3290977, at *7 (S.D.N.Y. Aug. 9, 2010) (footnote omitted) (awarding disgorgement for, <u>inter</u> <u>alia</u>, violation of Section 15); <u>see also</u> <u>SEC v. Tavella</u>, 77 F. Supp. 3d 353, 359-60 (S.D.N.Y. 2015) (awarding disgorgement for violation of Section 5). Disgorgement aims to deprive lawbreakers of all unjust enrichment and, thereby, deter others from committing similar violations. <u>SEC v. Universal Express, Inc.</u>, 646 F. Supp. 2d 552, 563 (S.D.N.Y. 2009); <u>see also</u> <u>SEC v. StratoComm Corp.</u>, 89 F. Supp. 3d 357, 367 (N.D.N.Y. 2015). While courts have broad discretion in determining both whether to order disgorgement and the amount to be disgorged, <u>SEC v. First Jersey Securities, Inc.</u>, 101 F.3d 1450, 1474 (2d Cir. 1996), in setting the disgorgement amount, "a court must focus on the extent to which a defendant has profited from his [illegal conduct]," <u>Universal Express</u>, 646 F. Supp. 2d at 563; <u>see also</u> <u>SEC v. Patel</u>, 61 F.3d 137, 139 (2d Cir. 1995) ("[D]isgorgement need only be a reasonable approximation of profits causally connected to the violation." (alteration in original) (quoting <u>SEC v. First City Financial Corp.</u>, 890 F.2d 1215, 1231 (D.C. Cir. 1989))). Any uncertainty in

calculating the defendants' illicit gains should be resolved in favor of the plaintiff. Patel, 61 F.3d at 140.  The plaintiff here seeks two distinct disgorgement amounts: one amount based on the Section 15 claims and one amount based on the Section 5 claims.  I address each in turn.

Regarding the Section 15(a) violation, the plaintiff argues for disgorgement of $3,486,867. (Pl. Memo. at 17).  To arrive at this figure, the SEC has identified wire transfers from the defendants to their U.S.-based customers during the relevant period totaling approximately $116 million.  (Declaration of Gary L. Peters dated June 11, 2015 ("Peters 6/11/15 Decl."), ¶ 17).[3]  The SEC plausibly argues that these transactions represent the defendants' return of stock sale proceeds to their customers. (Pl. Memo. at 17).  Based on admissions the defendants made, the SEC assumes that the defendants earned a 3% commission on these sales. (Pl. Memo. at 16); see also Wells Submission on Behalf of Warren Davis and Gibraltar Global Securities, Inc., attached as Exh. 6 to Pl. Memo., at 2).  Taking 3% of the total outgoing transfers, the SEC arrives at its disgorgement amount.  Considering that this amount (1) disregards more than $46 million worth of wire transfers to customers whose residency could not be determined (Peters 6/11/15 Decl., ¶ 15), and (2) almost certainly undervalues the

_____

[3] The precise figure, based on a spreadsheet provided by the SEC, appears to be $116,228,909.52.  (See Penalty and Disgorgement Table, attached as Exh. C to Peters 6/11/15 Decl.).

defendants' profits,[4] the SEC's Section 15 disgorgement calculation is a reasonable approximation of the defendants' illicit profits. Accordingly, the SEC should be awarded the amount of disgorgement it requested in connection with the defendants' Section 15 violation, i.e., $3,486,867.

The basis for the disgorgement amount the SEC requests in connection with the Section 5 claims is more attenuated but ultimately also represents a fair approximation of the defendants' ill-gotten gains. The amount -- $10,962,309 (Revised Proposed Findings of Fact and Conclusions of Law Submitted by Plaintiff Securities and Exchange Commission ("Revised Proposed Findings"), ¶ 25) -- represents the total revenue generated by the defendants' sale of Magnum stock, less some minor deductions.[5] What the SEC's figure does not account for is the $7,175,757 that the defendants wired back to Magnum and its subsidiary. (Peters 6/11/15 Decl., ¶ 23). The SEC would have the Court overlook this transfer and treat all of the revenue from the illegal sales as the defendants' profit. According to the SEC, "[t]he use of proceeds as the

_____

[4] By the time the defendants wired proceeds back to their customers they would presumably have already deducted their commission. As such, the SEC calculated the defendants' commission based on a post-commission amount. Had the SEC based the defendants' commission on the pre-commission amount, they would have come up with profits of $3,594,708 (i.e., 116,228,909.52/.97 x 3%).

[5] To avoid having the defendants disgorge commissions already accounted for in the Section 15 calculation, the SEC reduced the total proceeds by 3%. (Peters 6/11/15 Decl., ¶ 25). The SEC further reduced the requested disgorgement amount by $80,742 to account for a disgorgement payment it received from one of the Flatt nominees. (Declaration of Gary L. Peters dated Sept. 9, 2015 ("Peters 9/9/15 Decl."), ¶¶ 1-3).

14

appropriate measurement of Section 5 disgorgement is supported by case law." (Pl. Memo. at 17-18). While that may be true, the SEC's position conflates two distinct issues: (1) Whether the Court can treat the total revenue generated from the sale of Magnum stock as being subject to disgorgement and (2) whether the Court can order the defendants in this case to disgorge that amount.

It is well-settled that a disgorgement award should reflect the amount by which the defendant has enriched himself through illegal conduct. See SEC v. Inorganic Recycling Corp., No. 99 Civ. 10159, 2002 WL 1968341, at *2 (S.D.N.Y. Aug. 23, 2002) ("The principal issue, therefore, in determining the amount of disgorgement to be ordered is the amount of gain received . . . ." (emphasis added)). However, where a defendant fails to come forward with evidence that distinguishes between his total proceeds and his net gain, it is within a court's discretion to use the amount of proceeds as the appropriate measure of disgorgement. See SEC v. Platforms Wireless International, Corp., 617 F.3d 1072, 1096-97 (9th Cir. 2010) ("[G]iven this failure of proof from defendants, it was not an abuse of discretion for the district court to conclude that the entire proceeds from the sale were a 'reasonable approximation' of the profits from the transactions."); cf. First City Financial Corp., 890 F.2d at 1232 (shifting to defendants burden of demonstrating that SEC's disgorgement calculation was not reasonable approximation of profit); SEC v. Johnson, No. 03 Civ. 177, 2006 WL 2053379, at *8 (S.D.N.Y. July 24, 2006) (same).

15

It does not necessarily follow, however, that these defendants should be ordered to disgorge all proceeds generated by their sale of the unregistered Magnum stock.  On the one hand, courts have the discretion to reduce the disgorgement amount by any necessary transaction costs associated with the illegal conduct.  See SEC v. McCaskey, No. 98 Civ. 6153, 2002 WL 850001, at *4 (S.D.N.Y. March 26, 2002) ("Courts in this Circuit consistently hold that a court may, in its discretion, deduct from the disgorgement amount any direct transaction costs . . . that plainly reduce the wrongdoer's actual profit.").  The SEC's own submissions make it clear that the majority of the revenue generated by the sale of Magnum stock "ultimately flowed to Magnum d'Or," (Peters 6/11/15 Decl., ¶ 23), presumably reducing the defendants' actual profits.  On the other hand, a court's discretion to award disgorgement is not limited to a defendant's personal pecuniary gain.  See SEC v. Contorinis, 743 F.3d 296, 306 (2d Cir. 2014) ("The amount a court may order a wrongdoer to disgorge may not exceed the total amount of gain from the illegal action, but that does not entail that the gain must personally accrue to the wrongdoer."), petition for cert. filed, No. 14-471 (U.S. Oct. 23, 2014); United States Securities and Exchange Commission v. Universal Express, Inc., 438 F. App'x 23, 26 (2d Cir. 2011) (upholding disgorgement award that included $2.6 million defendant paid to separate entity); SEC v. Tourre, 4 F. Supp. 3d 579, 590 (S.D.N.Y. 2014) ("The Second Circuit has upheld the disgorgement of all profits received, even though a portion of those profits were later transferred to another party . . . .").

16

Alternatively, courts have discretion to impose joint and several liability for "combined profits" where, as is the case here, there are "collaborating or closely related parties," i.e., the defendants, Magnum, and the Flatt nominees. See SEC v. AbsoluteFuture.com, 393 F.3d 94, 97 (2d Cir. 2004); see also SEC v. Verdiramo, 907 F. Supp. 2d 367, 373 & n.12 (S.D.N.Y. 2012) (stating that courts have discretion to impost joint and several liability for combined profits and collecting cases).

The indispensable role the defendants played in selling the unregistered Magnum stock, combined with their refusal to participate in discovery (and thereby shed light their relationship with Magnum and the Flatt nominees), makes it appropriate to hold them jointly and severally liable for the total proceeds generated by their illegal conduct.[6]  Accordingly, based on the evidence the SEC has offered, I recommend that the defendants be held jointly and severally liable for a disgorgement judgment of $10,962,309 in connection with their Section 5 violation.

### 2. Prejudgment Interest

A court's discretion in fashioning a remedy for violations of the securities laws includes the discretion to both order the payment of prejudgment interest and set the rate at which such interest is calculated. Tourre, 4 F. Supp. 3d at 591.  This remedy

---

[6] Of course, in the event that the defendants actually disgorge these proceeds, they could seek contribution from other individuals or entities involved in the scheme.  See Steed Finance LDC v. Laser Advisers, Inc., 258 F. Supp. 2d 272, 277 (S.D.N.Y. 2003) (setting out requirements for stating claim for contribution under federal securities laws).

"ensure[s] that the defendant does not profit [by] obtaining the time-value of any unlawful profits." SEC v. World Information Technology, Inc., 590 F. Supp. 2d 574, 578 (S.D.N.Y. 2008). In general, the rate used to calculate prejudgment interest is the IRS underpayment rate, see 26 U.S.C. § 6621(a)(2), which "reflects what it would have cost to borrow money from the government and therefore reasonably approximates one of the benefits the defendant derived" from his illegal conduct. First Jersey Securities, 101 F.3d at 1476.

The SEC has calculated prejudgment interest separately (and differently) for each of the disgorgement amounts. To calculate interest for the Section 15 violation, the SEC isolated the defendants' commissions on a month-by-month basis and then applied the interest rate at the end of each month, compounding the interest on a quarterly basis. (Peters 6/11/15 Decl., ¶ 20; Transcript dated Sept. 18, 2015, at 5-6). This resulted in a total of $614,995 in prejudgment interest for the Section 15 violation. For the section 5 violation, the SEC simply took the total disgorgement amount and calculated interest starting on the date of the last relevant transaction. (Peters 9/9/15 Decl., ¶ 3). This resulted in a total of $2,085,488 in prejudgment interest for the Section 5 violation. The SEC's calculations accurately reflect the value of the "interest free loan" the defendants received by virtue of their violations. SEC v. Moran, 944 F. Supp. 286, 295 (S.D.N.Y. 1996). Accordingly, I recommend that the defendants be held jointly and severally liable for $2,700,443 in prejudgment

interest.

### 3. Civil Penalties

The federal securities laws empower courts to impose civil penalties for violations based on a three-tiered system. See 15 U.S.C. §§ 77t(d)(2) & 78u(d)(3)(B). Under any tier, a court has the authority to impose a penalty equal to the amount of "pecuniary gain" the defendant received as a result of the violation.[7] Id. Below that amount, the size of the penalty is left to the court's discretion. SEC v. Kern, 425 F.3d 143, 153 (2d Cir. 2005). The factors a court may consider in setting the size of the penalty to impose include:

---

[7] As a practical matter, the tier designation for the defendants' violations in this case is mostly beside the point, as their pecuniary gain far exceeds the alternative cap for even the highest tier (three) violation. See 15 U.S.C. §§ 77t(d)(2) & 78u(d)(3)(B) (setting alternative cap for tier three violations at $100,000 for a natural person and $500,000 for any other person). Moreover, it is not necessarily true that a lower tier penalty corresponds to a lower penalty amount. Compare SEC v. Jean-Pierre, No. 12 Civ. 8886, 2015 WL 1054905, at *11-12 (S.D.N.Y. March 9, 2015) (assessing tier two penalty of $1,425,000), and SEC v. Elliott, No. 09 Civ. 7594, 2012 WL 2161647, at *11 (S.D.N.Y. June 12, 2012) (awarding tier one penalties of $6,500 per transaction in case involving at least 328 transactions), with StratoComm Corp., 89 F. Supp. 3d at 373 (awarding tier three penalties of $100,000, $50,000 and $25,000 against three separate defendants). One way in which the tier could be relevant here is if the Court were to treat each of the defendants' transactions as a distinct violation, see SEC v. Pentagon Capital Management PLC, 725 F.3d 279, 288 n.7 (2d Cir. 2013) ("[W]e find no error in the district court's methodology for calculating the maximum penalty by counting each [transaction] as a separate violation."), which, depending on the tier, could quickly lead to an exorbitantly high maximum penalty. However, in this case the defendants' illicit profits seem an appropriate benchmark for establishing their civil penalty. Regardless of the tier assigned to a violation, the appropriate amount of the penalty imposed is determined by the "particular facts and circumstances" in each case. SEC v. Opulentic, LLC, 479 F. Supp. 2d 319, 331 (S.D.N.Y. 2007) (quoting Moran, 944 F. Supp. at 297).

> (1) the egregiousness of the violations at issue, (2) defendants' scienter, (3) the repeated nature of the violations, (4) defendants' failure to admit their wrongdoing; (5) whether defendants' conduct created substantial losses or the risk of substantial losses to other persons; (6) defendants' lack of cooperation and honesty with authorities, if any; and (7) whether the penalty that would otherwise be appropriate should be reduced due to defendants' demonstrated current and future financial condition.

SEC v. Lybrand, 281 F. Supp. 2d 726, 730 (S.D.N.Y. 2003). Unlike with disgorgement, a court may not impose a civil penalty on a joint and several basis. SEC v. Pentagon Capital Management PLC, 725 F.3d 279, 288 (2d Cir. 2013). Furthermore, the amount of "pecuniary gain" is limited to gains received within a five-year statute of limitations.[8] SEC v. Cole, No. 12 Civ. 8167, 2014 WL 4723306, at *5 (S.D.N.Y. Sept. 22, 2014).

Of the relevant considerations listed above, factors 1, 3, 4, and 6 suggest that a substantial civil penalty is appropriate in this case. The defendants' repeated Section 15 violations generated hundreds of millions of dollars in revenue while both encouraging and helping customers avoid taxes. The Section 5 violations resulted in millions of unregistered Magnum shares being sold in the open market. Mr. Davis unequivocally declared his intention to cease cooperating in this litigation but never admitted to any wrongdoing on the part of either defendant. (Declaration of Warren A. Davis dated April 23, 2015, attached as Exh. 1 to Letter of Philip C. Patterson dated April 24, 2015, ¶ 5).

---

[8] The SEC's proposed penalty amounts account for the statute of limitations by excluding gains earned prior to May 2008. (Peters 6/11/15 Decl., ¶ 18).

As to the defendants' scienter, the SEC has argued persuasively that the defendants committed the Section 5 violations knowing of Magnum's illegal capital-raising scheme, but otherwise ignored the issue.  (Pl. Memo. at 11).   The SEC has not attempted to demonstrate that the defendants' conduct created substantial loss or a risk thereof, although the SEC emphasizes the sheer volume of illegal transactions.

In light of these considerations, the SEC argues that the amount of each defendant's penalty should correspond to half of the total disgorgement amount, including prejudgment interest but less any gains generated outside the statutory period.  (Pl. Memo. at 20).   In the absence of any information as to how profits were shared as between Gibraltar and Mr. Davis, I agree that it is reasonable to apportion half of their combined profits to each defendant for purposes of establishing their respective penalties.[9]  (Pl. Memo. at 20).   I further agree that the complaint establishes at the very least that the defendants acted with "deliberate or

_____

[9]   Courts in this circuit have developed divergent interpretations of the statutory phrase "gross amount of pecuniary gain to such defendant" in light of the Second Circuit's prohibition on joint and several liability for civil penalties.  On the one hand, one could read the statute as prohibiting the imposition of separate civil penalties that, when combined, exceed the total gain shared by multiple defendants.  See SEC v. Syndicated Food Service International, Inc., No. 04 CV 1303, 2014 WL 1311442, at *26 n.22 (E.D.N.Y. March 28, 2014).  On the other hand, the statute could be construed to permit the imposition of a civil penalty against every defendant equal to the total amount of shared profit, so long as liability is not joint and several.  See SEC v. Amerindo Investment Advisors Inc., No. 05 Civ. 5231, 2014 WL 2112032, at *11 & n.11 (S.D.N.Y. May 6, 2014), appeal filed, No. 14-2425 (2d Cir. July 6, 2014).  Whether or not a $14 million penalty could be imposed against each of these defendants, I do not consider such a penalty necessary.

reckless disregard of a regulatory requirement," see 15 U.S.C. §§ 77t(d)(2)(B) & 78u(d)(3)(B)(ii), making tier two penalties appropriate.

However, I disagree with the SEC as to the appropriate size of the penalty in this case.  The SEC has not cited any case law to suggest that a $7,246,024 civil penalty for each defendant is reasonable in this case.  In light of the substantial disgorgement and prejudgment interest award I have recommended, the "punitive and deterrent purposes of the civil penalty statutes" can be achieved by penalties below the maximum.  SEC v. Razmilovic, 822 F. Supp. 2d 234, 282 (E.D.N.Y. 2011)  (assessing civil penalty equal to half of maximum possible penalty in light of other relief granted), vacated in part on other grounds, 738 F.3d 14 (2d Cir. 2013).  I recommend that each defendant be assessed a tier two civil penalty of $3,667,146.  This figure represents (1) the commissions received in connection with the Section 15 violations during the statute of limitations period ($3,448,998) (Peters 6/11/15 Decl., ¶ 21), plus (2) the total proceeds generated by the Section 5 violations after accounting for the SEC's double-counting deduction ($11,043,051) (Peters 6/11/15 Decl., ¶ 25), less (3) the $7,157,757 that the defendants wired back to Magnum (Peters 6/11/15 Decl., ¶ 23), (4) divided equally between the defendants.  This substantial amount maintains a relationship between the penalty and the defendants' ill-gotten gains, see SEC v. One Wall Street, Inc., No. 06 CV 4217, 2008 WL 5082294, at *9 (E.D.N.Y. Nov. 26, 2008) (noting that penalties should bear some relationship to amount of

22

ill-gotten gains and collecting cases), while adequately punishing the defendants for their violations.

Conclusion

For the reasons stated above, I recommend a judgment be entered against the defendants as follows:

1. Disgorgement of $14,449,176, representing the defendants' illicit profits, joint and several;

2. Disgorgement of $2,700,443, representing prejudgment interest on the defendants' illicit profits, joint and several; and

3. A tier two civil penalty against each defendant in the amount of $3,667,146.

Pursuant to 28 U.S.C. § 636(b)(1) and Rules 72, 6(a), and 6(d) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from this date to file written objections to this Report and Recommendation. Such objections shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable George B. Daniels, Room 1310, 500 Pearl Street, New York, New York 10007, and to the chambers of the undersigned, Room 1960, 500 Pearl Street, New York, New York 10007. Failure to file timely objections will preclude appellate review.

Respectfully submitted,

James C. Francis IV

JAMES C. FRANCIS IV
UNITED STATES MAGISTRATE JUDGE

Dated: New York, New York
October 16, 2015

23

Copies transmitted this date to:

Kevin Patrick O'Rourke
Robert A. Giallombardo
U.S. Securities and Exchange Commission
100 F Street, N.E.
Washington, DC 20549

Douglas C. McAllister
Gerald W. Hodgkins
U.S. Securities and Exchange Commission
450 Fifth Street, N.W.
Washington, DC 20549

Gibraltar Global Securities, Inc.
Warren A. Davis
warrenanthonydavis@gmail.com