F3PQSECC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

SECURITIES AND EXCHANGE
COMMISSION

                Plaintiff

        v.                          13 CV 2575 (GBD) (JCF)
                                    Argument
GIBRALTAR GLOBAL SECURITIES,
INC., WARREN DAVIS

                Defendants

------------------------------x
                                    New York, N.Y.
                                    March 25, 2015
                                    10:00 a.m.

Before:

                HON. JAMES C. FRANCIS IV

                                    Magistrate Judge

                        APPEARANCES

U. S. SECURITIES AND EXCHANGE COMMISSION
     Attorneys for Plaintiffs
KEVIN P. O'ROURKE
TODD BRODY
CHRISTOPHER INNIS


DeFEIS, O'CONNELL & ROSE PC
     Attorneys for Defendants Gibraltar & Davis
PHILIP CANNING PATTERSON


PECKAR & ABROMSON PC
     Attorney for Defendant Carrillo
BRADLEY SUSSMAN

F3PQSECC

1          (Case called)

2          THE DEPUTY CLERK:  Counsel, state your name for the

3     record.

4          MR. O'ROURKE:  Kevin O'Rourke on behalf of plaintiff

5     Securities and Exchange Commission.

6          THE COURT:  Good morning.

7          MR. INNIS:  Christopher Innis.

8          MR. BRODY:  Todd Brody on behalf of the Securities and

9     Exchange Commission in the combined discovery case.

10         MR. PATTERSON:  Philip Patterson, DeFeis, O'Connell &

11    Rose for Davis and Gibraltar.  Good morning, your Honor.

12         MR. SUSSMAN:  For Louis Carrillo, Bradley Sussman from

13    the law firm of Peckar & Abromson.

14         THE COURT:  Good morning.

15         We have two things on the agenda in Gibraltar.  We

16    have the pending motion with respect to the documents, and we

17    have the issue of the sites of the depositions.  We don't

18    technically have anything on the agenda in Carrillo, but what I

19    would like to do at the end is take stock of where we are and

20    see what is pending and what the briefing situation is there.

21         I am happy to hear first from the movant in Gibraltar.

22         MR. SUSSMAN:  Thank you, your Honor.  Here or at the

23    lectern?

24         THE COURT:  Your choice.

25         MR. SUSSMAN:  OK.  I'll stay here.

3

F3PQSECC

1        I think it would be worthwhile just to take a moment

2    and explain how we got to this point.  It's in our filings, but

3    I think it is relevant to the legal arguments, and, frankly, it

4    may benefit our audience here.

5        Gibraltar, of course, is a Bahamian broker-dealer

6    owned by Warren Davis.  Back in 2010, the SEC's Washington D.C.

7    office and the SEC's New York office were both conducting

8    investigations.  In 2010, in the course of those

9    investigations, they requested documents from Gibraltar via its

10   regulator in the Bahamas, which is the Securities Commission of

11   the Bahamas, the SCB.

12       For the D.C. office, apparently they were primarily

13   focused on a stock called Magnum d'Or, MDOR, an alleged

14   pump-and-dump involving Magnum d'Or.  For the New York office,

15   I understand they're primarily interested in two stocks named

16   Trade Show and Pacific Blue.

17       Fast forward to 2011.  The SEC's Florida office

18   commences an action in federal court in Miami, an enforcement

19   action against the alleged perpetrators of the Magnum d'Or

20   pump-and-dump.  In fact, in that complaint, Gibraltar is in

21   fact mentioned as the transactions allegedly at one point went

22   through Gibraltar.  Gibraltar was not named.  Davis was not

23   named in that action in Florida in 2011, and that action was

24   concluded, I understand, by 2012.

25       Fast forward to the summer of 2012.  Gibraltar

1    appoints a liquidator under Bahamian law.  Its board votes to

2    appoint a liquidator.  I think the simplest analogy is it's

3    akin to a bankrupt trustee in the U.S.  Of course, what you are

4    going to hear from the SEC is that part of that process is

5    Gibraltar's regulator, the SCB, has to accept the surrender of

6    Gibraltar's registration to complete the liquidation process.

7    But from the moment, the point being Gibraltar appoints a

8    liquidator, it closes down its business, and its 20 employees

9    are out of work.

10            Now fast forward to the spring of 2013, and the two

11   SEC offices determining to commence their actions against

12   Gibraltar and Davis in the D.C. case and against Gibraltar and

13   Davis and others in the Carrillo Heuttel New York case, but

14   they essentially waited until Gibraltar was closed down and

15   attempting to go into liquidation before bringing the action.

16            We went through motions to dismiss.  We went through

17   initial disclosures.  As part of the initial disclosure process

18   beginning about a year and a half ago, we raised the issues

19   that are before us today, at least with respect to the

20   documents, to the SEC.  We told them that there is this issue

21   of control or lack thereof over the documents by Gibraltar.  We

22   told them about the liquidator.  We told them about the

23   confidentiality issue which I can go into in a moment, about

24   the confidentiality of Gibraltar's clients.  We repeatedly

25   proposed resolutions to this in the form of exchange of

F3PQSECC

1    Bahamian legal opinions.  To date, I have not seen an opinion

2    from the SEC by someone who is knowledgable in Bahamian law on

3    the subjects.  We also during that year and a half long process

4    suggested to the SEC some workarounds, first and foremost being

5    a request for international channels.  Gibraltar and Davis

6    throughout this were advised by Bahamian counsel.  I understand

7    from Bahamian counsel that the SEC in the past has made

8    international requests to the Bahamas.  They work.  It's a

9    process of months rather than years.  We suggested the SEC that

10   if they pursued that, it might have resolved the issues that

11   we're talking about.  And the issue that we're talking about is

12   Gibraltar is essentially stuck in a Catch 22.  According to

13   Bahamian counsel, you have the declaration from Raynard Rigby,

14   who is a well-credentialed, well-respected member of the bar in

15   the Bahamas, he says that when Gibraltar appointed a

16   liquidator, when the board appointed a liquidator, the board

17   ceased to function, and at that point they did, according to

18   Bahamian counsel, everything that Gibraltar was supposed to do

19   to get the SCB to accept the surrender of their registration.

20           THE COURT:  Let's stop there for a second.  Mr. Rigby,

21   I take it, is Bahamian counsel to Gibraltar.

22           MR. SUSSMAN:  He is.

23           THE COURT:  So we don't have an outside expert's

24   affidavit with respect to Bahamian law.

25           MR. SUSSMAN:  Not an objective expert, if that's what

1      your Honor is referring to.

2                  THE COURT:  I am.

3                  The second question is, you said that they've done

4      everything they have to do.  Is it not true that one per

5      requisite for their going to liquidation is the approval of the

6      SCB?

7                  MR. SUSSMAN:  This is why -- and, again, I'm operating

8      on the advice of Bahamian counsel -- it's a Catch 22.  There is

9      actually another attorney, although he didn't provide a formal

10     affidavit.  Mr. Sean Moree provided a letter, and he says the

11     same thing, which is, when the board voted to appoint the

12     liquidator, control over Gibraltar vests in the liquidator the

13     board ceases to function.

14                 As a practical matter, another problem here is the

15     SEC, despite beginning these investigations in 2010 -- and I

16     forgot to mention that in 2010 -- maybe I did mention it -- the

17     SEC did get documents from Gibraltar via Gibraltar's regulator.

18     They made a request of the Securities Commission of the Bahamas

19     which passed it on to Gibraltar.  Gibraltar to my knowledge

20     produced everything the SEC wanted.  They could have asked for

21     these documents back then when Gibraltar was alive, frankly.

22                 In 2011 they had an action in Florida against the

23     alleged MDOR pump-and-dumpers.  Gibraltar is mentioned I think

24     in paragraph 20 of the complaint.  They could have subpoenaed

25     documents at that point.  They didn't.  They waited.  We're now

F3PQSECC

1     in year five.  They waited about three years until Gibraltar

2     was out of business.  As a practical matter, that also

3     complicates the issue of control.  As a legal matter, Bahamian

4     counsel advises that when the board appointed a liquidator,

5     that's it, the board no longer has authority.  As I say, it's

6     really a Catch 22.  The Securities Commission of the Bahamas

7     did not provide any reason why they are refusing to accept the

8     surrender of Gibraltar's registration.  Gibraltar has an action

9     down there.  They're trying to get clarity on this.  They seem

10    to be the only entity that is trying to get clarity on it.

11              THE COURT:  An action which apparently they are not

12    pushing forward, according to the recent submission.

13              MR. SUSSMAN:  I was handed that about ten minutes ago.

14    The first thing I'd note is, like the declaration that the SEC

15    relies on, it's essentially hearsay.  It's by someone who is

16    describing what counsel for the SCB is telling them, but all I

17    can say is that Bahamian counsel has told me that the reason

18    for the delay here is that's the way Bahamian courts move.

19              I asked him again yesterday when might this go to

20    trial.  He said it might go to trial by the end of 2015.

21    According to him, that's the way the world moves down there.

22    That's all I can say.

23              I haven't had a chance to review this.  I haven't had

24    a chance to run this by Bahamian counsel.  I really can't speak

25    to it except to point out again that apparently it's hearsay.

F3PQSECC

1          Anyway, the punch line of all this is we raised these

2     issues a year and a half ago.  Gibraltar is simply not in a

3     position to produce these documents.  I think when we had the

4     premotion conference on this motion, my colleague attended.  I

5     think Mr. O'Rourke attended.  I believe at that conference your

6     Honor may have asked has anybody tried to talk to the

7     liquidator on all of this.

8          So, once your Honor set the briefing schedule, I

9     picked up the phone and I called the liquidator.  I'll be

10    completely honest, I didn't want to do it repeatedly, and I

11    didn't want to do it at length because I didn't want the SEC to

12    subsequently say that I was trying to steer the liquidator one

13    way or the other; but I can tell you this:  It was a very brief

14    conversation.  The word the liquidator used without prompting

15    was purgatory.  He said Gibraltar is in purgatory, and he's not

16    comfortable doing anything until they get some clarity on the

17    legal situation.

18          The irony here is if the Securities Commission of the

19    Bahamas simply accepted the surrender of Gibraltar's

20    registration -- and I understand their refusal was

21    unprecedented, or virtually unprecedented -- there's no issue.

22    We have clarity, the liquidator is in control, and the SEC can

23    just go to the liquidator.

24          This is not a stalling tactic by Gibraltar and Davis.

25    It's a result of the fact that SEC waited until the company was

F3PQSECC

1    dead before seeking these documents, and it's a result of the

2    fact that the Securities Commission of the Bahamas has done

3    something with no explanation that apparently is unprecedented.

4    And Gibraltar is trying to vindicate itself on these issues and

5    get clarity.  If they succeed -- I guess because it's the

6    Bahamas, it's going to take time, but if they succeed, then

7    apparently the SEC can just seek the documents from the

8    liquidator.

9              It's not a stalling tactic.  It's not strategery, as

10   the SEC has accused me of many times in the past.  We propose

11   workarounds in good faith.  We sent them Bahamian legal

12   opinions.

13             Actually, the SEC New York office is here, and I think

14   at this very moment, they're making a Hague Convention request

15   in the companion Carrillo Heuttel case for documents in the

16   Caribbean.  I think in that instance it's Barbados.  Bahamian

17   counsel informs me that the SCB does this all the time in the

18   Bahamas and that it would resolve some, if not all, of the

19   issues.

20             THE COURT:  The difference in Carrillo is those are

21   third-party documents.  Isn't that correct?

22             MR. SUSSMAN:  Fair enough.  As I say, Bahamian counsel

23   advised me that this mechanism works in the Bahamas.

24             Do you want me to get into the deposition issue or

25   should we stick with documents?

F3PQSECC

1          THE COURT:  Let's stick with documents.

2          MR. SUSSMAN:  Nothing further.

3          THE COURT:  Thank you.

4          MR. O'ROURKE:  Thank you, your Honor.

5          Just a few points, a couple of things from their reply

6     brief, if I could.  As you know, we did submit a full brief in

7     opposition.  I think we've covered all the issues.  I would

8     emphasize that a party relying on a foreign law to avoid

9     production of documents bears the burden of proving that such a

10    law exits and that it prohibits production of documents.  We

11    haven't seen one regulation or one statute in the Bahamas that

12    prohibits production of documents here.  They've totally failed

13    to meet their burden and they should be ordered to produce the

14    documents.

15          Secondly --

16          THE COURT:  Let's stop there.  When we say prohibits

17    them, if Mr. Patterson is reading is correct and Mr. Davis and

18    Gibraltar are without the authority to produce the documents --

19    they may not be prohibited, but isn't the effect the same?

20          MR. O'ROURKE:  Don't have the authority?  Well, your

21    Honor, if your Honor orders them there's nothing to preclude

22    them from producing the documents.  They're a party here.  The

23    court has jurisdiction over them.  If they choose to not follow

24    the laws of this court, that's their choice.

25          THE COURT:  But if they lack the possession, custody

F3PQSECC

1    and control, how could they follow the orders of this court?

2              MR. O'ROURKE:  But their basis for arguing they don't

3    have possession, custody or control is that the so-called

4    liquidator has the documents, but that liquidator is null and

5    void.  The liquidation is null and void.  As your Honor knows,

6    we pointed that out in detail, and that actually gets to my

7    second point in their reply brief.  Not just once but twice

8    accused me of relying on the plain language of the statute.

9    Now, that is -- not just once but twice.  In my 27 years of

10   practice at the SEC and a few years before that, no one ever

11   accused me of relying on the plain language of the statute.

12   I'm usually accused of not having a statutory basis or trying

13   to expand the statute, but here I'm accused of relying on the

14   plain language of the statute. what more do you need, your

15   Honor?  The plain language of the statute says that they have

16   to get approval of the Securities Commission of the Bahamas

17   before they could go into liquidation, and they didn't do that,

18   your Honor.

19             Now, Mr. Patterson laid out some of the background of

20   this case, but he left out a very important element.  First of

21   all, in Mr. Rigby's declaration, he points out in paragraph

22   seven, he says, "It must also be noted that on the 29th of

23   August 2012, GGSI passed a resolution dissolving the company by

24   appointing a liquidator."

25             Now, we know that they -- it never got approval from

1     that liquidator, and the new declaration that we did submit

2     this morning from the executive director of the Bahamian

3     Securities Commission, Christina Rolle points out that they did

4     need to obtain authorization of SCB, and they didn't get that

5     authorization.  And, in fact, the SCB wasn't told until months

6     later, if not significantly longer than that, that they even

7     purportedly went into liquidation.  They didn't get the

8     authorization.  They didn't even inform the SCB.

9            But let's go before that.  August 29, 2012 when

10    Mr. Patterson laid out his summary.  What he didn't point out

11    was the day before, August 28, there's an established procedure

12    well-known securities in law called a Wells notice that the SEC

13    staff gives to people, when the SEC staff is recommending an

14    enforcement action to the commission.  They can submit a Wells

15    statement make their arguments.

16           The day before they went into supposed litigation,

17    they received a Wells notice from the SEC staff that an action

18    was going to be recommended.  In fact, the Wells Commission was

19    then submitted on December 17, 2012 by DeFeis O'Connell & Rose.

20    And at the very start of that -- just so there is no ambiguity,

21    the very beginning says, "We make this submission on behalf

22    Warren Davis and Gibraltar Global Securities, Inc. in response

23    to the August 28, 2012 and November 20, 2012 Wells notices sent

24    by the staff of the division of enforcement.  So, the very day

25    before they were told that an enforcement action is going to be

F3PQSECC

recommended against both Mr. Davis and Gibraltar.  And what did

they do the next day?  They went in and passed a resolution

dissolving the company and appointing a liquidator, the

functional equivalent to a bank robber running down the street,

your Honor.  They knew they were going to likely be sued, and

they go into liquidation or they claim they went into

liquidation but they didn't, because they didn't get authority

to do it and they didn't as a new declaration filed in the case

in the security -- that Gibraltar brought in the Bahamas

indicates the securities commission didn't even know that they

purported to be in liquidation.  Mr. Patterson conveniently

left that piece of history out.

        Another point, your Honor, in their reply brief not

having a basis that they can point to in the statute of

regulation claim that there's a commonlaw prohibition; not a

criminal prohibition, but a civil prohibition.  We cited the

*Renert* case from Connecticut.  They held no commonlaw

prohibition in the Bahamas.  I even refer to the *Tournier* case.

I am probably not pronouncing it correctly.  And said that

applies -- as we pointed out, that applies to banking

institutions.

        Now, defendants haven't cited a single Bahamian case

that both *Tournier* applies to broker-dealers in the Bahamas.

Not a single.  They even haven't cited a case that it applies

to broker-dealers in jolly old England, but they did under a

F3PQSECC

Westlaw said they found dicta in two Australian cases that had

nothing do with broker-dealers.  They only dealt with the

subject of a solicitor's confidentiality obligations.

For instance, one of the two authorities was a

solicitor who represented a husband and wife.  It was a family

court case.  It was held that the solicitor could not

thereafter represent the wife against the husband or vice

versa.  That was the content.  It had nothing to do with a

broker-dealer, and any of the reference to *Tournier* was

strictly dicta.

They knew that that wasn't enough.  So what they did

do?  They went and also found an Australian Law Review article.

Again, nothing from England or other parts of the commonwealth,

certainly nothing from the Bahamas.  But they found a part of a

paragraph from an Australian Law Review article.  The quote was

"The rationale in *Tournier's* case for applying the contractual

duty of confidentiality in a commercial bank/customer

relationship is applicable to a wider group of financial

institutions."

Let's go on because that which they left out is

telling.  "There is a strong argument that bank confidentiality

is not limited to commercial banks but also applicable to other

financial institutions seeking deposits from customers.  It has

been held that there is an implied include duty of

confidentiality between credit unions and customers, and that,

F3PQSECC

arguably, a similar duty is applicable to building societies

and merchant banks."  That was the rest of the paragraph.  So

you're still -- this law review article was talking about

extending *Tournier* to depository type institutions, not

broker-dealers, and they cited nothing to support application

of the *Tournier* case to broker-dealers, your Honor.  So that

provides them with no support.

        Now, they also told you, as your Honor referred to,

that the Bahamian case filed down there that they want you to

wait for is just waiting for a case management conference.  In

fact, the indications are they have not been prosecuting at

all.  It did come on -- the government down there I'm told

brought a motion for failure to prosecute that came on a few

weeks ago, but then the judge recused himself from knowing a

party.  So that is still pending, I'm told, and a new judge

hasn't yet been appointed.  Who knows how long that is going to

go on for.

        This case certainly should not wait for that.  Because

the ruling in the Bahamas case -- the application of law in the

Bahamas is that they don't have the authority of the securities

commission to liquidate.  So that is the law in the Bahamas.

They're trying to obtain a different interpretation of the law,

but, your Honor, we are to follow -- you are to follow what the

law is as established and as reflected in the plain language of

the Statute Section 73 and Section 71 of the Securities

F3PQSECC

1    Industry Act.

2              THE COURT:  But if the court down there decided

3    contrary to what we think the plain language might be that in

4    fact the SCB was required to accept the liquidation, where

5    would that put us?

6              MR. O'ROURKE:  Well, hypothetically, if that was

7    decided say, two years from now?

8              THE COURT:  Yes, or tomorrow.

9              MR. O'ROURKE:  We can't wait two years from now.  We

10   have procedures here.  That is the law down there now.  Laws

11   can always change, but the application of the law or the plain

12   language of the law -- I don't think we need to look any

13   further since we have the plain language of the statute.  But

14   it's -- if you want to look two years, three years down the

15   road, it can be a different statute.  We don't wait for that.

16   The law is what it is.  And assuming that the law down there

17   said you don't have to produce.  Just assuming arguendo that

18   was the plain language.  Your Honor could still order the

19   production and then the defendants have to make their choice.

20   Are they going to follow the law in a foreign country or are

21   they going to follow the law here?  It's their choice to make.

22             THE COURT:  Ordinarily I would go through the comity

23   analysis.  It's your suggestion I don't have to go through that

24   analysis because there is no conflict.

25             MR. O'ROURKE:  There is no conflict -- there is a

1  conflict.  It's between the defendants and their own country.

2  That's the conflict.  Not between United States and United

3  States regulators and the Bahamian regulators, no conflict

4  whatsoever, your Honor.  They've been cooperative.  As you can

5  tell from the affidavit that was filed, they're not happy with

6  the conduct of the defendants in this case as well.  So you

7  don't even get to the comity.

8          If you do, as we indicated in our brief, we've gone

9  through the elements and we've established those, I think.  But

10  ultimately they have to make their choice or if your Honor

11  orders production are they going to follow your Honor's order

12  or not?  And if they don't, there's consequences.  And even if

13  the foreign law prohibited them, you still would go through the

14  comity analysis, and we believe that we would meet that, but it

15  would still be up to them to make their choice.  If they don't

16  want to comply with the laws here, that's their choice, but

17  then there are very definite consequences if they don't produce

18  the documents if your Honor orders them to produce, and they

19  have no basis for refusing to produce those documents.

20          They say they are in limbo.  They're in a Catch-22.

21  They're not in limbo.  They're not in a Catch 22.  They can't

22  even get to first base with their argument.  They're not in

23  limbo.  They're a registered broker-dealer in the Bahamas.

24  That's not limbo, your Honor.

25          Then they said we've received documents requesting

1    some from the Securities Commission of the Bahamas.  We pointed

2    that out.  It's in our brief.  We did obtain certain limited

3    documents, but they make clear that there's a lot more that

4    they're not producing, and they identify those in their initial

5    disclosures, their original initial disclosures and the amended

6    initial disclosures.

7          Obviously, if your Honor has any other questions, but

8    we do respectfully submit that we have shown that they should

9    be ordered to produce the documents.  They haven't met the

10   burden, and we request your Honor order them to produce all the

11   documents related to U.S. customers by no later than April 24.

12         Judge Daniels said that it needed to be within 30 days

13   from this conference.  I would think they could do it.  We've

14   identified them all.  They've isolated them at the warehouse.

15   They could do it within 15 days, but Judge Daniels said they

16   have to do it within 30 days or whatever your Honor orders.

17         So we would request that they be ordered to produce

18   all such documents.  I would also ask for an order if there is

19   any loss or destruction of documents that they explain that at

20   the same time.

21         Your Honor, otherwise we rely on the brief.

22         THE COURT:  Thank you, Mr. Patterson.

23         MR. SUSSMAN:  Can I briefly respond, your Honor?

24   Mr. O'Rourke just said we can't wait two years for a resolution

25   down in the Bahamas.  The fact is Gibraltar and Davis are in

F3PQSECC

year five of dual SEC investigations.  They previously produced

documents requested by the SEC in 2010.  The SEC could have

asked for these documents then.  We're three years removed from

the Magnum d'Or action.  The Magnum d'Or action in Florida was

an alleged pump-and-dump, the exact same alleged perpetrators,

the exact same trading is what is at issue in their claim in

this case.  They could have subpoenaed documents from Gibraltar

as part of that action.  They could have named Gibraltar and

Davis as part of that action.  So three years before filing

these actions to now complain about the delay, frankly, your

Honor the delay is not the fault of Gibraltar.

Mr. O'Rourke also made much of this affidavit he

handed me a half hour ago from this lady in the Bahamas.  I

would point out, as your Honor pointed out with respect to

Mr. Rigby, she has a stake in this.  She is objective.  She is

with the defendants in the action down in the Bahamas.

Mr. O'Rourke also referred to *Renert*.  *Renert* I think

is very, very distinguishable, first and foremost, because in

that case there was actually an opinion from the Bahamas

Supreme Court on the status of the receivership.  That is not

the case here.  That is what actually Gibraltar is fighting for

down in the Bahamas.

THE COURT:  But in order to establish foreign law, you

don't need a decision in the same case with respect to the

application of law, do you?

1          MR. SUSSMAN:  No, you don't, your Honor, but the point

2     is that it is not analogous, in particular because of the

3     confidentiality argument that the defendant advancing.  He was

4     arguing confidentiality under the Bahamian Constitution, a

5     Bahamian Mutual Fund Act, and the Bahamian Trust Act.  We

6     haven't argued confidentiality under any of those laws down in

7     the Bahamas.

8          What we're arguing is more fundamental, which is

9     simply lack of possession, custody and control.  We're also

10    arguing confidentiality.  We were advised by Bahamian counsel

11    that if Davis or Gibraltar turn over their confidential client

12    documents, they subject themselves to liability in the Bahamas.

13         We raised this to the SEC a year and a half ago and

14    said an international request would most likely, we understand

15    from Bahamian counsel, solve this problem.  Mr. O'Rourke makes

16    light of *Tournier*.  Admittedly, it is an old case but it is a

17    good case.  I actually just wanted to read you one sentence

18    from *Parry-Jones* case, which Mr. O'Rourke also did not find

19    persuasive.  He dismissed it as involving a solicitor.  In

20    fact, there were two privileges at issue in that case.  There

21    was essentially an attorney-client privilege.  I quote, and

22    this is from *Parry-Jones* case, ECF filing document 47.  The

23    second privilege arises out of confidence subsisting between

24    solicitor and client similar to the confidence which applies

25    between doctor and patient, banker and customer, accountant and

client and the like.  The law implies a term into the contract
whereby a professional man is to keep his client's affairs
secret and not to disclose them to anyone without just cause.
See *Tournier v. National Provincial and Union Bank .*"

We are advised by Bahamian counsel that these are
relevant authorities.  They are not as controlling as the
highest court in England, but they are relevant authority, and
we cite them because, frankly, if you Google *Tournier*, your
Honor, you'll find lots of articles written by large New York
law firms about how *Tournier* is still good law.  These cases
show that it doesn't just specifically apply to bankers.  It is
a professional duty of confidentiality that professionals owe
to their client.  And that's a consideration and a serious
consideration for Davis and Gibraltar.

THE COURT:  Aren't Davis and Gibraltar fully protected
if their disclosure is pursuant to court order?

MR. SUSSMAN:  I believe this is actually in
Mr. Rigby's affidavit, but I know he has told me multiple times
they are only protected if it is an order from a Bahamian
court.  With all due respect, I have the ultimate most respect
for your Honor in the Southern District, but apparently you
need a Bahamian court to get protection against violating
client confidentiality down in the Bahamas, and, again, the
international request process would have produced that result.
And had they pursued it a year and a half ago, I think we would

F3PQSECC

1    be at that point right now.

2           Just quickly, on the last point, your Honor, is on the

3    comity issue if your Honor does indeed find a conflict of laws.

4    I was just re-reading the comity analysis last night, and it

5    struck me that the first factor mentioned is the importance of

6    the documents.  It's one of the factors.  I believe it is the

7    first mentioned.

8           Back in August of 2013, Mr. O'Rourke's predecessor at

9    the D.C. office wrote a letter to Judge Daniels opposing our

10   request to consolidate these two SEC actions.  We quoted I

11   believe in our reply brief, he wrote that the SEC, the D.C.

12   office is prepared to move for summary judgment.  This was back

13   in August of 2013.  The only reason they're not moving for

14   summary judgment is because Warren Davis should be offered an

15   opportunity to testify on his own behalf.  That was a year and

16   a half ago, they said they were ready to move for summary

17   judgment.

18          Even more recently, the SEC's D.C. office recently

19   served deposition notices on Davis and Gibraltar.  The dates

20   they noticed, I believe, were February 25 and February 26 of

21   last month.  So, clearly, they were prepared to depose Davis

22   and Gibraltar before they even had a resolution on this

23   document issue, much less have the documents.  So, on that

24   first comity factor, the SEC seems to have made it abundantly

25   clear that these documents are not particularly important to

F3PQSECC

1    proving their case.

2              I have nothing further, your Honor.

3              THE COURT:  One last question before I hear from Mr.

4    O'Rourke.  What about the coincidence of the filing for the

5    resolution bringing the company into liquidation the day after

6    the day after the receipt of the Wells letter?

7              MR. SUSSMAN:  I can't speak to that, your Honor,

8    except I would assume that that Wells notice did not come out

9    of the blue, but particularly given that Gibraltar was

10   investigated and produced documents starting in 2010, I have to

11   believe that they had -- that they were well aware that this

12   potential was on the horizon.

13             THE COURT:  I'm sure they were aware of the potential,

14   but it brings focus when you actually get a Wells notice.

15             MR. SUSSMAN:  I believe we told the SEC during the

16   Wells process that Gibraltar was in the process of shutting

17   down.  There was also an issue regarding their website, and

18   whether that was a solicitation and they had taken down their

19   website, we've made those points in the Wells submission.  As

20   far as I know, it is purely coincidence.  I have no

21   information, again, that this was a game of strategery to try

22   and get ahead of this issue.

23             THE COURT:  Thank you.

24             MR. O'ROURKE:  The Wells submission was a couple of

25   months later.  They included it in their reference to close it

F3PQSECC

1    down.  It was August 28, and the Wells letter, I mentioned

2    earlier, that was December that came in.

3           A few points in response, your Honor.  I'm not even

4    sure you need it, but the argument that we optimistically said

5    we expect to get summary judgment, we remain eternally

6    optimistic that we will get summary judgment.  Nevertheless, in

7    spite of our eternal optimism, sometimes judges disagree with

8    us and we need to get discovery that we need and that we're

9    entitled to, first to buttress our summary judgment arguments,

10   and hopefully we won't get to this, in case we have to go to

11   trial, we need those documents regardless of our stated

12   optimism about summary judgment, and we're entitled to them,

13   and they haven't met their burden.

14          I also would note that in their motion to dismiss

15   before Judge Daniels, the two defendants or counsel made the

16   point over and over that the SEC can't point to a single

17   customer that used the website -- that was solicited by their

18   website, a key issue in the case.  We can't point to a single

19   customer.  Well, who has the records of their customers that

20   they won't produce?  Who has the communication with all their

21   customers?  The emails with those customers.  There was a

22   customer writing in that said, "I saw -- I liked your website,"

23   whatever it might have been said, just as examples of points

24   that are relevant and then they point to us to not being able

25   to point to a single customer because they're hiding all that

F3PQSECC

1    information.  They're trying to have their cake and eat it too,

2    your Honor, and that's inappropriate.  They should be producing

3    all the documents that concern their U.S. customers; not the

4    non-U.S. customers, but the U.S. customers.  They've identified

5    all those documents.  They're in the warehouse, they say.  They

6    identify them in their initial disclosures, and that portion of

7    them that relates to the U.S. customers, we need access to.  At

8    a minimum, if they ordered to produce them and they don't, at a

9    minimum, there should be a preclusion argument that that we

10   can't point to a single customer if they keep all the

11   information hidden.

12        He referenced the sworn affidavit that we only got

13   yesterday afternoon before I got on the train.  I read it on

14   the train coming up last night.  I would note that it is a

15   sworn affidavit.  Rigby's affidavit or declaration, as it may

16   be, is not sworn.  The affidavit we're submitting is sworn, and

17   the affidavit from the executive director of the Securities

18   Commission in the Bahamas says that they had to have

19   authorization of the SCB in order to go into liquidation; and

20   to put it mildly, it is inappropriate -- or it's wrong, I

21   should use a different word, for them not to have obtained such

22   authorization.

23        Finally, *Renert*, he referred to all the mutual fund

24   provisions at issue in *Renert* that aren't at issue here, he's

25   correct, but ultimately he left out the argument about

F3PQSECC

1   commonlaw, confidentiality was at issue in *Renert* and was

2   rejected.

3           I have nothing further, unless your Honor has any

4   questions.

5           THE COURT:  Thank you.

6           MR. O'ROURKE:  Nothing further on that, as we still

7   have to decide this issue.

8           THE COURT:  Why don't we start with that.

9           MR. BRODY:  Your Honor, if I may, for purposes of the

10  motion that is at issue, our second discovery request in the

11  Carrillo Heuttel to Gibraltar and to Davis, the objections that

12  they made with respect to our request are the same issues that

13  are at issue in the Gibraltar case which we have been

14  discussing here.  So to the extent your Honor rules on those,

15  we would request that the order comprise both with respect to

16  the documents sought in Gibraltar case and Carrillo Heuttel.

17          THE COURT:  Well, in the absence of any application

18  other than what you've just made, I doubt that it will

19  encompass it.

20          MR. BRODY:  I may be incorrect, but I thought that the

21  first papers that were submitted said to your Honor that it

22  also included -- that the issues were also the same.

23          THE COURT:  I'm not sure it's going to make any

24  difference because it's going to bind everybody in any event.

25          MR. BRODY:  Right, footnote three in our memorandum

F3PQSECC

1    law firm raised that issue.

2            THE COURT:  Mr. Patterson, do you want to talk to the

3    site of the deposition?

4            MR. PATTERSON:  I do, your Honor.  Gibraltar is, was,

5    a Bahamian corporation office in Nassau, Bahamas.  It's never

6    had an office in the U.S.  Davis is a Bahamian resident, a

7    Bahamian citizen.  He's never lived in the U.S.  He's never had

8    a business interest or office in the U.S. or anything like

9    that.

10           As we all know, the general rule is that parties are

11   supposed to be deposed where they are located.  In this case,

12   Davis and Gibraltar are located in the Bahamas, which is a

13   two-hour plane flight away.  It's the same time zone.  The SEC

14   is supposed to put forth, I think the phrase is, peculiar

15   circumstances why Davis should be dragged up to New York for a

16   deposition.

17           First of all, I would like to be perfectly candid

18   here, your Honor.  This investigation has been going on for

19   five years as to Gibraltar and Davis, and, frankly, your Honor,

20   resources to litigate and defend are becoming an issue.  Also,

21   given the status of Gibraltar, which as we say is uncertain at

22   best, we advised the SEC last week that Gibraltar is simply not

23   in a position to put forth a 30(b)(6) witness regardless of

24   where the deposition takes place.  On the advice of Bahamian

25   counsel, there's no mechanism for it, there are no employees,

F3PQSECC

1   there's a lack of resources.  Gibraltar would be able to unable

2   to build a 30(b)(6) witness, which is what they would have to

3   do.  So, we told the SEC by letter last week that we are

4   withdrawing our proposed motion for protective order as to the

5   location of the deposition of Gibraltar, but we remain

6   completely convinced that the appropriate location for the

7   deposition of Davis individually is the Bahamas.  Of course,

8   your Honor has seen the briefs.  Really, I think what it boils

9   down to is the SEC is looking for the convenience of the SEC

10  itself.  I took a poll informally of defense counsel for the

11  other parties.  They have all advised they have no objection to

12  Davis being deposed in the Bahamas.  We don't object.  Of

13  course, that's our preference, and we believe that's

14  appropriate under the law.  I know actually that the SEC New

15  York office sent out an email yesterday proposing dates to

16  depose defendants who are Canadian in Canada.  I understand

17  they are also going to depose another defendant in California.

18  And I understand they're going to depose witnesses in Hong

19  Kong.

20          It seems to me if they are prepared to travel for

21  these depositions, and if there is no opposition from us, there

22  is no opposition from other defendants, the only party that

23  seems to want this deposition in New York is the SEC's D.C.

24  office, which under the general standards is not appropriate

25  ray.  Davis is Bahamian resident and citizen.  There is no

F3PQSECC

```
 1   reason to bring him up here.  To be perfectly candid, and, in

 2   fact, blunt, the other thing we did last week after much

 3   consultation with our client, Mr. Davis, Mr. Davis directed us

 4   to inform the SEC that when he is deposed, he will assert his

 5   Fifth Amendment privilege in response to all questions having

 6   to do with this action.  So we said to the SEC, under the

 7   circumstances, how about we give you a declaration or a

 8   representation or a statement, whatever will satisfy you, to

 9   that effect.  That will be by far the most efficient,

10   convenient, economical resolution to this for everyone.

11          The response from the SEC New York office -- and,

12   frankly, I know that they have accepted similar arrangements

13   for other defendants in the Carrillo Heuttel case -- the

14   response from the SEC New York offices, they'll think about it

15   once the document issue is resolved.  The response from D.C.

16   office was, no, Davis has to come here.

17          So really what they're arguing for right now is to

18   drag Davis up to New York away from his home, away from his

19   family, away from his attempts to earn some money now that his

20   business has been shut down, all so he can sit down for an hour

21   and a half and say "On the advice of counsel, I assert my Fifth

22   Amendment privilege."  It is the least efficient, least

23   convenient, the least economic way of handling this.  We

24   respectfully request the deposition of Davis should be ordered

25   to take place in the Bahamas where he lives.
```

F3PQSECC

1          THE COURT:  If resources an issue, isn't it more cost

2     effective for your client to come here than to pay for you to

3     go there?

4          MR. PATTERSON:  One thing we proposed to the SEC is a

5     video deposition.  I know in one of the opinions cited, I guess

6     it was *Mill Run*, the issue there was the defendant was

7     proposing a deposition by telephone.  I think back then they

8     didn't have video conferencing.  Today we have video

9     conferencing.  Apparently, we have video conferencing

10     capabilities even in the Bahamas.  If there is any dispute

11     during the course of the deposition and calls need to be made

12     to your Honor, to chambers, I speak with Mr. Davis frequently

13     by telephone.  It is not an impediment.  It is far more

14     economical.

15          Frankly, your Honor, I think with all due respect the

16     starting point is it's where the person's located.  It's not

17     for the SEC to say, why shouldn't he come up here?

18     Particularly if he is going to assert his Fifth Amendment

19     privilege, it makes no sense to drag him here away from his

20     family, away from his home, and away from his attempts to earn

21     a living for the convenience of one of the SEC offices.

22          THE COURT:  Suppose it were on the SEC's dime?

23          MR. PATTERSON:  They've already proposed that, your

24     Honor.  Frankly, I don't think it is fair and I don't think it

25     is right under the law.  To be perfectly blunt, your Honor, I

F3PQSECC

wonder whether the SEC has ulterior motives.  I wonder whether

they are hoping that your Honor will order the deposition to

take place in New York, and then they are going to keep their

fingers crossed and hope that Warren Davis doesn't show up and

then they can move for default as a sanction for failing to

attend the deposition.

You have to bear in mind that Warren Davis --

Mr. O'Rourke referred to him as a bank robber, I believe a few

moments ago.  In the New York action, some of the claims were

10b-5 against Gibraltar and Davis.  We moved to dismiss.  Judge

Daniels agreed with our arguments, and they amended.  The only

fraud claim pending against the defendants now is a 17A

negligence standard claim, but the fact remains that they have

been investigated and charged by the SEC with securities law

violations.

I just can't help but wonder, and I know your Honor

mentioned this in the *Mill Run* opinion, I believe it was, that

it would be inappropriate to order someone into the U.S. for a

deposition as a means of apprehending him.  I don't know if

that is what's going on here, but the fact that by far the most

convenient way of doing this would be by affidavit or even by

video from the Bahamas because he is just going to assert his

Fifth Amendment privilege.  The cynic in me can't help but

wonder whether the SEC has an ulterior motive or they hope he

doesn't show and they can move for a default.

F3PQSECC

1           MR. O'ROURKE:  I can answer that, your Honor.

2           THE COURT:  Are you done?

3           MR. PATTERSON:  Yes, I am.

4           THE COURT:  Go ahead.

5           MR. O'ROURKE:  I thought he had been finished.  I'm

6      sorry.  But we have no intent to apprehend him.

7           We do have intent to take his deposition.  It would be

8      videotaped.  He and Gibraltar are the only defendants in our

9      case when we go to trial.  I need his deposition.  I need him

10     answering on the record.  We're entitled.  It's standard

11     procedure.  The New York case, Carrillo has many defendants.  I

12     can't speak to that case.  I'm speaking to our need.  And their

13     application for a protective order never said anything about

14     the Fifth Amendment, by the way.  If they had, they told us

15     either Wednesday of Thursday in cryptic language he's going to

16     take the Fifth Amendment.  They implied he wouldn't even be

17     coming.  They implied it.  I didn't say it.  He is now

18     saying -- I guess he's saying that he will come.  So it's a

19     two-hour flight.  We have not just offered to pay it.  We are

20     going to reimburse him.  I can't promise first class tickets,

21     but we will reimburse him at the government rates and per diem

22     and hotel.  It's two hours away.

23          He talks about Mr. Davis trying to earn a living.

24     Your Honor, they never submitted a declaration from Mr. Davis

25     that he's now in X business and he's doing this and he can't

F3PQSECC

1    get away.  That is the first time I even heard that he's trying

2    to earn a living.  No proof of that, no proof at all, no

3    declaration that he can't get away.  So we don't need to give

4    that any attention.  And the advice of Bahamian counsel --

5    30(b)(6) is a rule applicable in this court.  It's not the a

6    rule for Bahamian counsel to interpret, but they say they're

7    not going to show up.  I don't think it is right to withdraw a

8    motion when the motion is ready to be presented to be argued.

9           So I think the appropriate thing is to get an order

10   requiring Gibraltar to attend the deposition in New York under

11   30(b)(6).  It's not like there's no basis.  Mr. Davis is the

12   president, the sole owner.  He was, as indicated in the

13   recently filed affidavit, he was the one that attempted after

14   getting the Wells notice to put it into liquidation without

15   going through the appropriate route.  He's the one who controls

16   it, so he could be a 30(b)(6) witness.

17          Indeed, he is not going to take the Fifth.  That's why

18   we need him up here.  He can't take the Fifth as to everything.

19   There were certain admissions in their answers to the

20   complaint.  He is not going to be able to take the Fifth on

21   that.  If he does, we need your Honor nearby for rulings on

22   that because the same analysis applies.  At any rate, Gibraltar

23   should be ordered to attend.  I don't think the motion can be

24   withdrawn at the last minute.  To be sure, sanctions are

25   applicable if Gibraltar doesn't the attend under 37(d).  I

1     think an order at this stage since the protective order was

2     filed would still be appropriate as to Gibraltar.

3              With respect to the requirements concerning the

4     location of the deposition, I don't need to tell your Honor,

5     you wrote the seminal opinion in *Mill Run* in this whole area.

6     Every case cites your Honor's opinion in *Mill Run*.  As pointed

7     out there, the normal presumption that they refer to doesn't

8     apply reply here, because we couldn't sue him in the Bahamas.

9     If we could, we would be required to go where he lives, but

10    we're the United States Securities Commission.  We can only

11    file suit in the United States.  So the Bahamas -- the normal

12    presumption simply doesn't apply here.  This is where the case

13    is pending.  It's a two-hour flight away.  The convenience of

14    counsel still favors New York.

15             Assuming he took an accurate poll, although I think

16    there is more to that statement about the poll.  We have still

17    have SEC New York counsel that wants to ask questions.  We have

18    the Washington counsel who is train ride away.  We have

19    Mr. Patterson and Mr. DeFeis.  So the convenience of counsel

20    still favors it.  All he's got to do is get on a plane, he will

21    be reimbursed, get up here and give us his deposition.  Again,

22    no affidavit has been submitted or any kind of hardship on

23    Davis's business.

24             Your Honor has seen certain acrimony between counsel

25    in this case as a result of all the serial excuses that

F3PQSECC

1    continues today when I focused on August 29 as a result of this

2    affidavit, and as a matter of fact the Wells notice was given

3    the day before.  Their initial disclosures, the original one

4    and the amended never referred to August 29th.  It was only the

5    Rigby declaration that finally referred to it, and it was that

6    declaration from the executive director in the Bahamas that

7    caused them to be concerned because they hadn't been provided

8    with any information.

9         Again, even if he is going to assert the Fifth, he can

10   do it, but we are entitled to contest that, to ask appropriate

11   pointed questions for use at trial, and we may very well need

12   the Court's availability.  We didn't have time to submit a

13   brief because they didn't submit a brief using that as an

14   argument, but I did yesterday quickly look -- and I know there

15   was a case before Judge Duffy years ago.  He ordered the

16   witness to show up for a question-by-question assertion of the

17   Fifth.  They took him up to the Second Circuit and it was

18   quickly reversed, and they had to do it again.  I found *U.S. v.*

19   *Malni*k, 489 F. 2d, 682, 685 (5th Cir. 1974).  Witness is

20   required to appear and assert privilege on a

21   question-by-question basis.  That is what's appropriate here.

22   That is what's required here.  It may be more convenient for

23   him just to stay down in the Bahamas, but I think we're

24   entitled to it.  We made a proper showing as to the appropriate

25   site of the deposition in our submission.  And we will ask

F3PQSECC

1    pointed questions about the admissions in both Mr. Davis's and

2    Gibraltar's answer to the complaint.

3              So, as a remedy, we would ask if your Honor agrees

4    with our opinion, for an order for defendants to attend their

5    depositions in New York at the time.  It was either 9:00 or

6    9:30, whatever was in our previous notice, and at our New York

7    location, our New York office, on a set date.  And we would

8    recommend, if your Honor orders documents, and when that is,

9    but if it is approaching 30 days, May 11 for Warren Davis and

10   May 12 for Rule 30(b)(6) witness, and if additional time is

11   required, to continue on the 13th.  I note Judge Daniels has a

12   conference in the case on May 14.  That is why the Monday,

13   Tuesday and if necessary Wednesday, why I am proposing those

14   dates and that that be included.  And if not those dates, if

15   your Honor wants to put in any dates, we could all be there on

16   those dates.  If he has a problem, I would ask him to propose

17   alternative dates before we leave so we don't have any further

18   disagreement.  Thank you, your Honor.

19             MR. SUSSMAN:  I can't propose any dates without

20   speaking to my client.

21             I just wanted out to point Mr. O'Rourke referred to

22   *Mill Run* and the convenience of the attorneys.  I think it's

23   worth noting in your Honor's opinion in *Mill Run*, you note that

24   what is most important is the convenience of the parties.  The

25   convenience of the attorneys comes after that.  It is

F3PQSECC

subordinate.

          Mr. O'Rourke said they should be entitled to ask
pointed point-by-point questions of Warren Davis.  Fine.  They
can do that in the Bahamas where he lives and where he has his
citizenship.

          To be perfectly blunt, your Honor it seems to me to be
manifestly unfair that Davis is defending two separate actions
in their fifth year by two separate offices.  Discovery is
supposed to be coordinated or consolidated.  The New York
office apparently is prepared to go to Canada to depose
defendants, which would implicate all the concerns over foreign
law that Mr. O'Rourke is mentioning in theory.  That's what
those are.  Those are hypothetical theoretical problems.

          So if one office is prepared to go to Canada, they are
prepared to go to California, which is actually a longer flight
than the Bahamas, they're prepared to go to Hong Kong for
witness.  It seems to be completely unfair that Gibraltar, I
think, frankly, for the convenience of the SEC attorneys -- or
Davis for the convenience of the SEC attorneys should be hauled
up to New York.  I don't understand why they get different
treatment of individual party defendants in different cases.

          It seems to me that if the SEC is doing Hague
Convention requests and is doing depositions in Canada on the
other case, there's no reason why they can't do them here.  I'm
drifting back into the documents, but particularly when we

1    first raised these issues a year and a half ago, as far as the

2    acrimony in this litigation, it is not coming from us.  For a

3    year and a half we have been proposing solutions and

4    workarounds.  It's our position that the default under the law

5    is he should be deposed where he is.  I don't think, frankly,

6    the convenience of the lawyers or the SEC lawyer should be

7    determinative and should be what tips it in favor of dragging

8    Warren Davis away from his home, away from his country up to

9    New York.  It's our position that it should be in the Bahamas.

10           Mr. O'Rourke mentioned he didn't brief this, although

11   I think we did brief it orally today, but if it would be

12   helpful for your Honor to seek further submissions, we'd be

13   happy to do that, although as I mentioned, the defendants are

14   really having to pick and choose their battles at this point

15   because their resources are being drained by this litigation.

16   I would respectfully request that it be done in letter form

17   rather than in the form of a formal motion.

18           Nothing further, your Honor.

19           MR. O'ROURKE:  If I may, just briefly, your Honor,

20   Judge Daniels ordered that any briefing was to be done before

21   today's appearance.  So if they are going to brief it on the

22   Fifth Amendment, that should have been submitted in a brief

23   before.  Mr. Patterson was there when Judge Daniels ordered

24   that and had a chance to speak to it and he didn't.  That was

25   the order.  He's had his opportunity.

F3PQSECC

1          He raised a point I would just like to respond about

2    this year and a half begging us to go and use alternative

3    maintenance.  The fact of the matter is we begged them to show

4    us the basis for them withholding the documents.  When they

5    referred to the Bank and Trust Act.  We showed them that the

6    Bank and Trust Act didn't apply to broker-dealers.  We showed

7    them when they mentioned the liquidation that SCB approval for

8    liquidation was required, and that they didn't have it.  We

9    told them that.  They're the ones that raised points and we had

10   to educate them each time.  We showed them that registration

11   surrender was subject to SCB rejection when they raised that.

12   We showed them the plain language of the Securities & Exchange

13   Commission Act -- Securities Industries Act and we didn't need

14   more.  They raised a point, and we answered and educated them,

15   but they still largely stuck by their points, your Honor.

16          And all along during the year and a half in

17   innumerable letters that we've asked them for the production of

18   all their document concerning their United States customers,

19   when are they coming?  When are they coming?  And they never

20   produced them.  We said you need to file for a protective

21   other.  And they never did.  They never did.  Finally, after

22   waiting, as your Honor knows, I filed a premotion on the issue

23   and your Honor ordered them to -- or set the schedule and then

24   they filed a motion for protective order.  We weren't sitting

25   on anything for a year and a half.  We were trying to get them

F3PQSECC

1    to do their duty by pointing out the law to them, but they

2    continued to stand by it even though the plain language

3    indicated they had not basis.

4              Thank you, your Honor, for your time.

5              THE COURT:  I'll reserve on those applications.

6              Let's turn briefly to Carrillo.

7              My understanding is we have three issues outstanding.

8    We have SEC's motion to compel that it is going to be fully

9    submitted the day after tomorrow.  We have the Hague Convention

10   letters request application.  And we have what I think

11   originally what started as the government's application with

12   respect to the location and the matter of taking the

13   depositions.  And we have Mr. Kirk's application for protective

14   order that was made yesterday.

15             Am I correct about where we are on those things?

16             MR. BRODY:  Yes, your Honor.  I don't think that the

17   first two issues really need any discussion because we are

18   going to brief the issue or the issue with respect to the

19   briefing on the motion to compel, that will be completed by

20   Friday, although I will note that none of the officers or

21   directors of either Pacific Blue Trademark -- Pacific Blue

22   Trade Show or Skymark have opposed our motion.  I guess there

23   are two oppositions, but none of them are by the people who we

24   think are privilege holders.  But we will finish our briefing

25   on Friday.  I don't know if anyone is going to propose the

F3PQSECC

1   Hague Convention request.  We request that those be granted.

2              I guess the bigger issue, an issue I am hoping we can

3   receive some clarity on today is the third issue.  We have

4   depositions that are presently scheduled to take place tomorrow

5   and on Friday in Alberta and Vancouver respectively, and then

6   on Tuesday in Hong Kong.  So, the SEC has set up the

7   depositions in a manner where the SEC and whichever lawyers

8   want to be present at the SEC offices in New York can do

9   deposition by video, and any defendant who wants to personally

10  attend those depositions can travel and attend those

11  depositions in the locus of Albert, Vancouver or Hong Kong.

12             THE COURT:  I guess I am not inviting argument on that

13  because we don't have Mr. Kirk's counsel here.

14             MR. BRODY:  The problem is though that Mr. Kirk's

15  counsel filed a motion for protective order yesterday, and the

16  deposition was supposed to start tomorrow.

17             THE COURT:  Frankly, I am just assuming that your

18  initial letter is your response to their application.  So I

19  don't know that there is anything else I need on this.

20             MR. BRODY:  Well, Mr. Kirk's counsel does raise the

21  issue with respect to us paying for the cost of the deposition

22  under S.D.N.Y. Local Rule 30.1.  We want to have the

23  opportunity to brief that issue, which is kind of separate from

24  the other issue.  What I propose to your Honor is that there is

25  what I believe to be a Solomonic way of resolving this dispute

F3PQSECC

1    where all of the parties' interests can be addressed.  I would

2    just like to briefly state that to your Honor.  In fact, I

3    raised this issue with Mr. Kirk's counsel, but he doesn't

4    address it in his motion for protective order.

5         THE COURT:  I guess I don't want to hear it unless

6    Mr. Kirk's counsel is here.  If you want to put it in writing

7    and copy him, that's fine.  If you and he come to an agreement

8    with respect to this solution, that's fine as well.  I just

9    don't want to be in a position where I'm taking a one-sided

10   argument.

11        MR. BRODY:  I understand, your Honor.  To some

12   respect, if you are going to file a motion for protective order

13   with respect to a deposition that is going to take place in two

14   days, and you know that there is a conference the next day, you

15   should be sending someone to that conference.  That is my view

16   of it.

17        THE COURT:  I understand.  Put it in writing, copy

18   him, and we'll have it taken care of.

19        MR. BRODY:  Thank you.  I'm hoping that that

20   resolution which we will send to you in our letter would

21   hopefully resolve the issues.

22        THE COURT:  That would be great.

23        MR. BRODY:  Thank you.  I send that to your Honor

24   within the next hour and a half, I hope.

25        THE COURT:  Very good.  Thank you all.  (Adjourned)